JOHN L. McDERMOTT #1710
Attorney-at-Law
Suite 711, Century Square
1188 Bishop Street
Honolulu, Hawaii  96813
Telephone No.: (808) 524-1890

MATTHEW H. SIMMONS, *Pro Hac Vice*
Simmons & Associates, Chartered
7347 Wisconsin Ave.
Suite 200
Bethesda, Maryland 20814
Telephone No.: (301) 986-8444

Attorneys for Plaintiffs

### IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GUY ST. CLAIR COMBS; MARION WILCOX COMBS; THE SCOTT MICHAEL ST. CLAIR COMBS IRREVOCABLE TRUST; THE GUY ST. CLAIR COMBS III IRREVOCABLE TRUST; CATHERINE ANNE MOORE-AIRTH; CHARLES SLOGGETT; CARLA  JORDAN; KRISTEN J. LA DOW; ROBERT B. JORDAN; MICHAEL P. JORDAN; JONATHAN WATERS FISHER; ANTHONY H. FISHER; GALEN M. FISHER; TIMOTHY WILCOX FISHER; RICHARD SLOGGETT, JR.; GERALD W. FISHER; THE CATHERINE ANNE MOORE-AIRTH REVOCABLE TRUST; THOMAS JOHNSTON; ANNE SLOGGETT HAMILTON; ARTHUR W. SLOGGETT; BARBARA PERRY FISHER; SCOTT G. FISHER; SUSAN CHAMBERLAIN; ERIK PETERSON; PATRICK FISHER; and, MICHAEL FISHER, <br><br>          Plaintiffs, <br><br>     **vs.** <br><br> STEPHEN M. CASE; ALPS INVESTMENT LLC; ALPS ACQUISITION SUB, INC.; THE STEPHEN M. CASE REVOCABLE TRUST; and, KA PO'E HANA LLC, | ) CIVIL NO.  05-00741 REJ/KSC <br> ) (Insider Trading – <br> ) 15 U.S.C.§ 78j(b)) <br> ) **AMENDED COMPLAINT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

```
         Defendants.              )
_____ )
```

## AMENDED COMPLAINT

Pursuant to this Court's directions during and order following the hearing held on of Plaintiffs, by and through their undersigned attorneys hereby sue the above named defendants.  In support of their suit, Plaintiffs state as follows:

## INTRODUCTION

1.  In September of 2000, Stephen M. Case proposed to make a tender offer to purchase one hundred percent (100%) of the stock of Grove Farm in September.  In October, he signed a definitive agreement with the Company to tender for all shares at $152 per share.

2.  As alleged herein, Stephen Case knew that Grove Farm's Shareholders lacked material non-public information he had obtained from his father, his father's law partners and corporate insiders. Attorneys from Stephen Case's father's law firm were counsel to both buyer and sellers.

3.  In early November of 2000, a prospectus written by Stephen Case's father, Daniel Case, and his father's law partner, James Cribley, was sent to Grove Farm's shareholders in connection with this offer.  This Prospectus, previously filed in the record in this case as an Exhibit to Defendants' Motion for Judgement on the Pleadings pursuant to FRCP 12(c), identified Stephen Case as a party to the transaction.  The Prospectus did not contain material

non-public information about Grove Farm known to Stephen Case but not known to the Shareholders from whom he and his acquisition companies were proposing to buy stock.

4.   Ignorant of material information known to Stephen Case, ALPS Acquisition and ALPS Investment, Plaintiffs sold their stock to these defendants for $152 per share in December of 2000 and January of 2001.   Since these sales, Plaintiffs have discovered that the fair market value of the Company's 21,600 acres, net of its debts, was vastly in excess of $26 million – the total paid by Stephen Case for all Grove Farm stock at $152 per share – and that Defendants had known of but concealed the true value of the Company in connection with the purchases.

## FACTS COMMON TO ALL COUNTS

**THE PARTIES AND CERTAIN RELATED NON-PARTIES.**

**PLAINTIFFS.**

5.   Plaintiff Guy St. Clair Combs is an individual residing in Sunny Glen in Brewster County, State of Texas.   His mailing address is Box 45, Marathon, Texas 79842.

6.   Plaintiff  Marion Wilcox Combs is an individual residing in Nevada.   Her mailing address is P.O. Box 4430, Pahrump, Nevada 89041.

7.   Plaintiff the Scott Michael St. Clair Combs Irrevocable Trust is a trust chartered under the laws of Nevada.

8.   Plaintiff the Guy St. Clair Combs, III Irrevocable Trust

3

is a trust chartered under the laws of Nevada.

9.   Plaintiff Jonathan W. Fisher an individual residing at 3015 Spear Street, Charlotte, Vermont 05445.

10.   Plaintiff Galen M. Fisher, IV is a citizen of California, residing at 445 Summit Road, Watsonville, California  95076.

11.   Plaintiff Timothy W. Fisher is a citizen of Vermont, residing at 727 Fisher Road, Cornwall, Vermont 05753.

12.   Plaintiff Anthony H. Fisher is a citizen of Pennsylvania, residing at 8021 Winston Road, Philadelphia, Pennsylvania 19118.

13.   Plaintiff Catherine Anne Moore-Airth is a citizen of the state of California, residing at 1754 Tourney Way, Sacramento, California 95833.

14.   Plaintiff Charles Sloggett is a citizen of the state of Hawaii. His mailing address is P.O. Box 531, Pakaa, Hawaii 96746.

15.   Plaintiff Carla Jordan is a citizen of the state of Pennsylvania, residing at 320 Maple Drive, Kennett Square, Pennsylvania 19348.

16.   Plaintiff Kristen J. La Dow is a citizen of the state of Pennsylvania. Her mailing address is P.O. Box 516, Unionville, Pennsylvania 19375.

17.   Plaintiff Robert B. Jordan is a citizen of the state of New Jersey and residing at 36 5th Street, Frenchtown, New Jersey, 06825.

18.   Plaintiff Michael P. Jordan is a United States citizen

who currently resides in the Philippines.

19.   Plaintiff Anne Sloggett Hamilton is a citizen of the state of Florida and residing at 125 Worth Court North, West Palm Beach, Florida 33405.

20.   Plaintiff Thomas M. Johnston is a citizen of the country of Australia and residing at 2/614 News South Head Road, Rose Bay, Australia.

21.   Plaintiff Susan Chamberlain is a citizen of the state of Hawaii and residing at 320 Aina Manu Place, Kapaa, Hawaii 96746 .

22.   Plaintiff Erik Peterson is a citizen of the state of Washington and residing at 1120 184th Place, S.E., Bothell, Washington 98012.

23.   Plaintiff Arthur W. Sloggett is a citizen of the state of Oregon and residing at 16860 S. W. Blackberry Lane, Beaverton, Oregon  97007.

24.   Plaintiff Richard Sloggett, Jr. is a citizen of the state of Hawaii and residing at P.O. Box 844, Hanalei, Hawaii 96714.

25.   Plaintiff Gerald W. Fisher, Jr. is a citizen of the state of Hawaii and residing at 1935 Makiki street, Honolulu, Hawaii 96822.

26.   Plaintiff Barbara Perry Fisher is a citizen of Hawaii residing at 55 Mano Dr. Kula, Hawaii 96790.

27.   Plaintiff Patrick Fisher is a citizen of the state of Hawaii and residing at P.O. Box 437479, Kameula, Hawaii 96743.

28.   Plaintiff Scott Fisher is a citizen of the state of Hawaii and residing at 7 Hoolai Street, Makawao, Hawaii 96768.

29.   Plaintiff Michael Fisher is a citizen of the state of Hawaii and residing at 23 Makai Place, Kula, Hawaii 96790.

30.  By blood and/or marriage, each of the plaintiffs who is a natural person is a member of the Wilcox family.  Each of the plaintiffs owned and/or controlled shares of stock in the Company and/or is a successor in interest to a person who owned and/or controlled shares of the Company.

31.   Collectively, it is believed and therefore is alleged that the named Plaintiffs identified herein represent rights to approximately 61,000 shares of Grove Farm Company, Incorporated stock, or well over thirty percent (30%) of the 171,126 shares of the Company's issued and outstanding stock as of December 1, 2000.

32.  Non-parties the Arthur C. Sloggett, Jr., Margaret Fisher Trust, the Martha Combs Trust, the Gerald W. Fisher Trust , the Carole Anne Gibbs-Fisher Trust, the Charles Fisher Trust and the Elsie H. Wilcox Trust are trust chartered under the laws of Hawaii, California and other states.  On December 1, 2000, each held a large block of stock for the benefit of members of the Wilcox family, including a number of the plaintiffs.  On information and belief, they have since authorized the relevant plaintiffs to maintain this action for any of their respective shares not held directly as of December 1, 2000.  Accordingly, they are not

6

presently named herein as parties at this time.

**THE DEFENDANTS.**

33.  Defendant Stephen M. Case is an individual residing on 1207 Alps Drive, McLean, Virginia 22102-1550.  He is the son of Attorney Daniel Case and nephew of Attorney James Case.  According to the Forbes 400 list, Stephen M. Case is one of the wealthiest men in the United States.

34.  Defendant ALPS Investment LLC ("ALPS Investment"), is a Virginia limited liability company engaged in general investments having its principal place of business at 1711 N Street, N.W. Washington, D.C. 20036. It is an alter-ego of Defendant Stephen Case. It is wholly dominated and controlled by Stephen M. Case in general; and, in connection with the specific purchase(s) of Grove Farm stock in issue herein, Stephen M. Case (and his agent, Dan Case) treated Alps Investment LLC and Stephen M. Case as interchangeable and one and the same.  It is named as a defendant herein by virtue of its own wrongs and wrongs committed in its name and/or ratified after-the-fact by co-defendants who acted on its behalf, later acted through it and acted in its name.  Finally, it is named herein as relief defendant insofar as it holds or acquired title to assets title to which is in issue in this case.  At present, on information and belief, ALPS Investment LLC owns one hundred percent of the stock of Grove Farm.

35.  Defendant ALPS Acquisition Sub, Inc. ("Alps Acquisition")

is a Hawaiian corporation formed by Defendant Stephen Case as a wholly-owned subsidiary of ALPS Investment LLC as a transactional vehicle solely for the purpose of merging with and into the Company, which it is now know occurred.  On information and belief, its current mailing address is P.O. Box 9040, McLean, Virginia 22102.  It is named as a defendant herein by virtue of its own wrongs and wrongs committed by and through it by co-defendant Stephen M. Case and its other agents, Dan Case and John Agee acting through it and/or on its behalf.  Additionally, it is an alter-ego of Defendant Stephen M. Case.  Finally, it is named herein as relief defendant insofar as it holds or acquired title to assets title to which is in issue in this case.

36.  Defendant the Stephen M. Case Revocable Trust (the "Case Trust") is the owner of ALPS Investment LLC. On information and belief, its current mailing address and principal place of business are c/o Ka Po'e Hana LLC, PMB 249, 1718 M Street, N.W., Washington, D.C. 20036.  It is named as a defendant herein by virtue of its own wrongs and wrongs committed in its name by co-defendants acting through it and/or on its behalf.  Additionally, it is also named herein as and is alleged to be an alter-ego of Defendant Stephen Case.  Finally, it is named herein as relief defendant insofar as it holds or acquired title to or an interest in assets title to which is in issue in this case.  On information and belief, the owners of the Case Trust are Stephen M. Case and his wife, Jean

8

Case.

37.   Defendant Ka Po'e Hana LLC ("Ka Po'e Hana"), is a "family" company owned by Stephen Case or by Mr. and Mrs. Stephen Case.   As its status as a "family" company suggests and as sworn testimony of Ka Po'e Hana's agent John Agee corroborates, as a "family" company Ka Po'e Hana exists solely to serve Stephen Case's personal whims (and those of his family) and to further Case's personal financial needs.   On information and belief, its current mailing address and principal place of business are at PMB 249, 1718 M Street, N.W., Washington, D.C. 20036.   It is the nominal manager of ALPS Investment.   In turn, Ka Po'e Hana LLC is nominally run by John Agee, its "president".   However, in practice and in reality, the corporate forms and roles are ignored: Stephen M. Case exercises total dominion and control over the ALPS Investment, ALPS Acquisition, the Case Trust, and Ka Po'e Hana, LLC and gives direct day-to-day instructions to Mr. Agee as to how each of these business entities is run.   Documents and testimony already uncovered establish that Agee's true role at Ka Po'e Hana LLC is to carry out Stephen M. Case's orders.

38.   At all relevant times, defendants Ka Po'e Hana, the Case Trust, ALPS Investment and ALPS Acquisition were and have been controlled and utterly dominated by Stephen M. Case.   Each of these entities is an alter-ego of Stephen Case and collectively they form an integrated enterprise utilized by and controlled by Stephen Case

9

as though interchangeable with himself.  As used herein, the term the "Stephen Case Defendants" refers to Stephen M. Case, Ka Po'e Hana, LLC, the Case Trust, ALPS Acquisition and ALPS Investment.

**THE COMPANY.**

39.  Non-party Grove Farm Company, Incorporated ("GFCI") is a Hawaiian corporation having its principal place of business is 3-1850 Kaumualii Highway, Lihue, Hawaii 96766-7069.  Directly and through subsidiaries, GFCI is and at all relevant times has been a land owner and developer in the State of Hawaii with substantial land holdings on the island of Kauai.

**THE DIRECTORS (NON-PARTIES).**

40.  Hugh W. Klebahn ("Klebahn") was at all material times hereto the Chairman of the Board of Directors of the Company and its Chief Executive Officer ("CEO").  Donn A. Carswell ("Carswell"), Pamela W. Dohrman ("Dohrman"), Robert D. Mullins ("Mullins"), William D. Pratt ("Pratt") and Randolph Moore ("Moore") were at all material times also directors of the Company.

41.  Klebahn, Carswell, Dohrman, Mullins, Pratt and Moore are sometimes collectively referred to herein as the "Directors."  As used herein, when capitalized, the term "Directors" does not include Plaintiff Combs, though he was a director during some of the events discussed herein.  Except for Mullins and Moore, by blood and/or marriage, each of the Directors is a member of the Wilcox family.

10

THE ATTORNEYS (NON-PARTIES).

42.  Case Bigelow & Lombardi is a Hawaiian law corporation in the business of providing legal and other business services to the Grove Farm Company, Incorporated.   Its address is 737 Bishop Street, Suite 2600, Honolulu, Hawaii 96813.   It has been the Company's legal counsel for decades, predating even Daniel Case's career with the firm.

43.  Daniel H. Case ("Case") was at all material times the Chairman of the Case Bigelow Lombardi law firm.   Among his many roles, he is Stephen Case's father, longtime counsel to Grove Farm and a longtime shareholder in Grove Farm.

44.  James M. Cribley, Dennis Lombardi and Todd Tanaka are all attorneys.  At all relevant times, each was an equity holder in the Case Bigelow Lombardi law firm and counsel to Grove Farm.

45.  CB&L, Daniel Case, James Cribley, Todd Tanaka and Dennis Lombardi are sometimes referred to hereinafter collectively as the "Attorneys."

46.  At all relevant times, Daniel Case acted as an agent for his son, Stephen M. Case.  He executed documents related to the transaction(s) in question on behalf of Stephen M. Case "as his agent".  Stephen M. Case has testified that his father is and was at all relevant times his first most trusted agent for the acquisition of real property in Hawai'i.

47.  As head of the CB&L law firm which was and continues to

11

be Grove Farm's outside counsel, as long-time counsel himself to Grove Farm and by virtue of his law partner's fiduciary relationship(s) with Grove Farm, Daniel Case owed fiduciary duties to maintain in confidence – that is to not share with his son, Stephen M. Case – and to refrain from making profits for himself or family members from information about CB&L's client, Grove Farm, entrusted to or learned by CB&L in its capacity as Grove Farm's counsel. Furthermore, as a fiduciary to Grove Farm, CB&L and each and every one of its constituent attorneys owed Grove Farm to share information germane to valuing Grove Farm with all prospective buyers equally and fairly. This CB&L and fiduciary insider Daniel Case did not do.

JURISDICTION AND VENUE.

48. The Court has original jurisdiction to hear Plaintiffs' claims under federal law pursuant to 28 U.S.C. § 1331 (federal question), 15 USC § 78j(b) (prohibiting insider trading) and 15 USC § 78t-1(a) (codifying a private right of action for insider trading).

49. Venue is proper in this judicial district and division. Actions complained of in this Complaint occurred within this judicial district and division. Plaintiffs have satisfied all jurisdictional prerequisites to bringing the suit.

FACTS COMMON TO ALL COUNTS.

**PLAINTIFFS' DISCOVERY OF THE FACTS OUTLINED HEREIN BELOW.**

50.  Near the time of the sale(s) in question, Michael Sheehan – formerly a Wilcox by marriage, who divorced his Wilcox-spouse – the only shareholder who affirmatively voted against the sale, sued in state Circuit Court.  He framed his suit, *Sheehan v. Grove Farm Co., Inc.*, Civil No. 00-01-0211, as a class action. It was rejected as such; and, some time later, his suit was dismissed entirely (though it remains on appeal).  Most of the shareholders including some if not all of the Plaintiffs in this action were not contemporaneously aware of the *Sheehan* lawsuit.

51.  In the wake of the dismissal of *Sheehan*, in late 2002, an attorney representing Grove Farm Company, Inc. – then owned and/or controlled by Mr. Case – and for the directors wrote to shareholders, including plaintiffs, and assured them explicitly in a lengthy letter that there had been no fraud, no insider dealing and no wrongdoing of any sort.

52.  In November 2002, Guy St. Clair Combs, Marion Wilcox Combs, Carla N. Jordan, Jonathan Fisher, Anthony Hart Fisher, Timothy Wilcox Fisher, Kristen J. La Dow, Robert B. Jordan, the Scott Michael St. Clair Combs Trust and Catherine Anne Moore-Airth, each of whom is a plaintiff in the instant action, filed a lawsuit in Hawai'i's state court system.  Stephen M. Case was not a defendant in that action, which was captioned *Tsukamoto v. Grove Farm Company, Inc.*, Civil No. 02-1-0182 and lodged in the Hawai'i's

13

Fifth Circuit court on the island of Kauai.

53.   The *Tsukamoto* suit named as defendants Daniel Case, Alps Acquisition Sub, Inc. and the six directors identified above in paragraphs thirty nine (39) and forty (40).   The *Tsukamoto* complaint contained about a half dozen counts, all brought under state common law, largely alleged on information and belief and in general terms.

54.   The specific and detailed allegations set forth below are based upon and reflect information developed during discovery in the *Tsukamoto* case between the date it was filed and the date the instant suit was filed in November of 2005.

55.   At all times, the ten (10) plaintiffs *Tsukamoto* were represented by attorney Richard Wilson, Esquire.   By November of 2002, counsel for the ten (10) plaintiffs identified above as having joined the *Tsukamoto* lawsuit suspected there may have been some sort of insider dealing and possibly that inside information had been abused in connection with the sale(s) of their stock in the Company in November of 2002.

56.   Counsel's suspicions aside, these ten (10) "*Tsukamoto*" plaintiffs remained ignorant of the particulars pertinent to this lawsuit and necessary under the PSLRA.   Specifically, at the time they filed *Tsukamoto*, they lacked the knowledge necessary, sufficient and required to plead and maintain a federal securities lawsuit under the PSLRA.   At the time they joined *Tsukamoto*, these

14

ten (10) plaintiffs had been unable to obtain and on information and belief could not have obtained through reasonable investigation specific and detailed information of the sort detailed herein below.   It was and could only have been developed through litigation's compulsory discovery process.

57.  By virtue of their counsel's presence and participation in discovery, the ten (10) "*Tsukamoto*" plaintiffs obtained constructive knowledge of – and developed sufficient knowledge to understand the significance of – particular and specific facts alleged below.  On information and belief, much key evidence was uncovered in 2004, without which the allegations below could not have been pleaded.

58.  Guy St. Clair Combs gained actual knowledge of facts sufficient to understand and describe the events that occurred in the specificity contained herein below in early 2005; the other nine (9) "*Tsukamoto*" plaintiffs gained actual knowledge of said specifics in mid and late 2005.

59.  On information and belief, before 2004, no Plaintiff had sufficient information or access through reasonable investigation to sufficient information to plead a federal securities law claim sufficient to withstand scrutiny under the PSLRA.

60.  As distinct from the "*Tsukamoto"* plaintiffs, the non-*Tsukamoto* plaintiffs, that is the plaintiffs who joined this suit but who were never parties to *Tsukamoto*, were ignorant of the

15

misconduct alleged herein below until mid to late 2005.  Before

then, these plaintiffs remained unaware of the below outlined

facts.

61.  In 2005, these remaining non-*Tsukamoto* plaintiffs finally

learned information that caused them to suspect and ultimately

believe that they had been cheated.  For example, at various times

during 2005, these particular "non-*Tsukamoto*" plaintiffs learned

information about the value of Grove Farm as it stood in 2000, such

as the contents of Bank of Hawai'i's internal analyses of Grove

Farm from the time period just prior to the sale and close in time

to December 1, 2000 (and through such information, they ultimately

learned the true tax assessed value of Grove Farm in 2000).  By

late 2005, in or around the Fall (shortly before this action was

brought), these *non-Tsukamoto* plaintiffs had been given access

sufficient knowledge of facts showing misconduct to make out the

actionable claims under the federal securities laws outlined herein

below.

THE TRANSACTIONS.

62.  Acting in concert and led by Stephen Case, Stephen Case,

ALPS Acquisition and ALPS Investment purchased one hundred percent

(100%) of the stock of Grove Farm Company, Incorporated from its

owners, including plaintiffs, after a Shareholders meeting that

took place on December 1, 2000 at which Shareholders approved the

sale. The purchases of plaintiffs' securities began to take place

beginning mid-December of 2000 and were completed, on information and belief, in January of 2001.

63. In 2000, GFCI owned over 160 of kuleanas. Kuleanas are homestead rights that Hawaiian King Kamehameha III granted to royalty and commoners in the 19th century. These special historical rights that help expedite zoning changes. Without kuleanas, rezonings are much more difficult to pursue in the County of Kauai. With them, rezonings are much easier. This translates directly to value: land otherwise appropriately valued as "agricultural" can – indeed must – be valued as though it were easily convertible to other uses, like resort or residential, if kuleanas are available to it. On information and belief, because of the value they add to unentitled land, kuleanas are worth hundreds of thousands of dollars, each.

64. Shareholders were not told of the Company's kuleanas, and these valuable intangible assets were not reflected as assets on the Company's books. At the time Stephen Case purchased Plaintiffs' stock in Grove Farm Company, Inc. using ALPS Acquisition as a merger vehicle and ALPS Investment as a holding vehicle, he (and therefore the two ALPS companies he inserted into and used to further the acquisition transaction as parties to it in addition to himself) had access to non-public inside information about the Company's kuleanas, their intrinsic value and the substantial value they added to the Company's lands not reflected

on the Company's books and records and not known to the
Shareholders from whom they were buying. John Agee, agent for
Stephen M. Case and Ka Po'e Hana, LLC likewise knew this non-public
material information. Mr. Case and Mr. Agee – and therefore ALPS
Acquisition, ALPS Investment and Ka Po'e Hana – learned this non-
public information from Dan Case, who in turn had this information
by virtue of his role as head of the Company's counsel, the CB&L
law firm, and from his law partners, including *inter alia* Mr.
Lombardi and Mr. Cribley.

65. Specifically and among other things, in the several
decade period prior to Stephen M. Case's acquisition of Grove Farm
through ALPS Investment and ALPS Acquisition, Dan Case (both
personally and with his law partners) had represented Grove Farm in
quiet numerous title suits to gain title to the kuleanas. Dan Case
and his law firm had represented Grove Farm with respect to land
use issues extensively, including with respect to the use of
kuleanas.

66. In 2000, Grove Farm Land Company ("GFLC") held title to
the Kukui Grove Shopping Center (313,000 square feet) (the
"Shopping Center") and its two adjoining commercial villages.
In 1996, the Bank of Hawaii ("BOH") appraised the Shopping Center's
three land tracts as being worth $57 million. On information and
belief, prior to December 1, 2000, fiduciary insiders Daniel Case
and Hugh Klebahn informed Stephen Case and John Agee of this

18

material non-public information; the Shareholders were not told.

67.   As of 2000, GFPI held title to a 989 acre portion of Grove Farm commonly referred to as the Lihue-Puhi housing project (the "Estate Housing Project").   Among many other things, the Estate Housing Project includes the Billy Casper Golf Course and the Hyatt Golf Course (also referred to as Kawailoa Bay).   The $37 million owed to FHB was secured by some – but not all – of GFPI's assets.

68.   The 250 acre Kawailoa Bay course has valuable development potential that was not known to or understood by the Shareholders. In 2000, sixty-five lots were available to be developed on it, which could have been done at a minimal expense – all that was needed was to extend utilities and confirm the zoning, which was readily achievable due to the kuleanas available to the property. In today's dollars, these lots are believed to be worth about $1 million each.

69.   As of 2000, GFCI held title to the remainder of Grove Farm's 22,000 acre holdings.   These assets were substantially unencumbered.   GFCI's assets were not pledged as security for the debts of GFCI's subsidiaries.

SUMMARY OF EVENTS OF 1999 AND 2000.

70.   In 1998, CEO Klebahn caused Grove Farm to enter into a deal with James Glover Limited ("JGL").   The JGL-GFCI contract had a built-in structural quirk that could be expected to depress

GFCI's cash-flow for two or more years – after which Grove Farm's cash flow could be expected to jump dramatically and to thereafter remain at a high level.  Upon information and belief, the Stephen Case Defendants had been told by insiders Daniel Case and Hugh Klebahn material non-public information about the cash-flow from this license in 2000 and expected future cash flow projections for 2001 not known or revealed to the shareholders, including plaintiffs.

71.  On November 30, 1999, in a letter responding to shareholder inquiries about the value of Grove Farm stock, Klebahn wrote:

> The second question, and one which is highly subjective as we discussed, had to do with how to value [GFCI ]and more specifically your stock. As I told you, to the best of my knowledge, there have never been any formal appraisals done of Grove Farm as a company. **The only valuation of Grove Farm properties (land and buildings) that is available is the County Tax Assessed Valuations.** We have compiled the most recent assessments received in March 1999 and provide a summary of that data below along with some adjustments as explained.
>
> For the purpose of this analysis we have excluded property pledged as collateral for the [GFLC/BOH] loans and the [GFPI/FHB] loans ($62,409,000) as they are all full recourse to those properties. Again, the analysis is based on the 1999 assessed real property tax values assigned by the County of Kauai to unencumbered property and does not reflect any further reduction resulting from the successful appeals of 1998 valuations. The latter will show up in the new assessments to be received in March 2000.

(Emphasis supplied).  In his letter, CEO Klebahn indicated that the tax assessed value was a benchmark to look at when valuing the

20

Company.   Klebahn, whose own son-in-law made a tender offer for Grove Farm a few weeks later, did not disclose that the total 1999 tax assessed value of Grove Farm's real estate was in excess of $155 million.   He "excluded" entirely properties encumbered as security for $62 million in loans. What was left was largely land assessed as "agricultural", which Kauai County assessed at $27.5 million.   Over $70 million of the real property tax assessed value total just evaporated.

72. During 2000, at least $11 million was received by the Company from real estate sales, more than half of which sum Shareholders were not told about.   Upon information and belief, insiders Daniel Case and Hugh Klebahn disclosed this material non-public information to Stephen M. Case and his agent John Agee, and thereby to ALPS Investment, ALPS Acquisition, Ka Po'e Hana and the Case Trust prior to December 1, 2000.   But, Dan Case and his partner James Cribley concealed this information from other bidders and, in the Prospectus they authored, from Shareholders as well.

73. At a Shareholders meeting held on January 21, 2000, shareholders were told that the Company faced bankruptcy. Shareholders were told that if they did not sell their Company before the end of 2000, they faced a total loss of their equity.

74. As head of the firm that was and had been Grove Farm's legal counsel for decades, Dan Case, who acted at all times as agent for his son Stephen M. Case, ALPS Investment and ALPS

Acquisition knew or should have known that the parent company GFCI was never at risk of any sort of involuntary bankruptcy or of being insolvent in the sense that its fair market value was less than its debts.  Upon information and belief, insiders Daniel Case and Hugh Klebahn disclosed this material non-public information to Stephen Case, ALPS Acquisition and ALPS Investment and to John Agee and Ka P'oe Hana prior to December 1, 2000.

75.  After the January Shareholders meeting, the Attorneys and a Special Committee of the Board formed on the Attorneys' advice hired Aspen Venture Group, LLC to serve as a financial advisor to the Committee to opine as to the value of the Company and to analyze alternatives open to it.

76.  In April of 2000, the County of Kauai approved a proposed rezoning of 16.9 acres being used as a nursery to allow resort and residential redevelopment.  On information and belief, this rezoning represented tens of millions of dollars of value for the Company.  It had been achieved, on information and belief, in thirty months or less, using six (6) of the Company's kuleanas. Shareholders were not told of this rezoning at any time.  Upon information and belief, fiduciary insiders Daniel Case and Hugh Klebahn disclosed this material non-public information to Stephen M. Case, ALPS Investment, ALPS Acquisition and John Agee (agent of Ka Po'e Hana) prior to December 1, 2000.

77.  Hyatt wanted to lease the rezone 16.9 acre site for $1.2

million per year (plus future CPI increases).  All along, the Board and Attorneys continued to maintain that they were unable to locate tenants to lease company assets to improve cash flow, but did not inform shareholders of Hyatt's offer.  Upon information and belief, insiders Daniel Case and Hugh Klebahn disclosed this material non-public information to Stephen Case, ALPS Acquisition and ALPS Investment and to John Agee and Ka P'oe Hana prior to December 1, 2000.

78.  On information and belief, with the rezoning approval, the 16.9 acre site could have been sold outright for $10 to $30 million or more.  The Attorneys and Directors knew of the material improvement in the Company's outlook represented by the zoning approval.  CB&L was actively involved in the legal side of the Company's land management and oversaw the Belt Collins' firms land-use related efforts as well.  CEO Klebahn's subordinate, Grove Farm Vice President Michael Furukawa, had been working on it in earnest from August of 1999 on.  They did not disclose it to Shareholders, however.  Instead, they simply allowed shareholders to continue believe prior statements to the effect that the Company teetered on the edge of financial ruin with no way out in sight.

79. Net of debt, the Shopping Center properties held through GFLC alone had financial value greater than $20 million.  In April of 2000, BOH's Commercial Loan division appraised these properties.  It concluded that these assets were worth at least $49 million.

Defendants knew these facts; plaintiffs did not.

80.   In May, the Attorneys and Special Committee determined not to disclose Aspen's report on alternatives to a sale to Shareholders at a shareholders' meeting held May 8.  They invited Aspen to report to Shareholders its conclusions regard the value of Grove Farm Stock.  Aspen reported its opinion that the Company was worth less than $100 per share.

81.   However, in May, Aspen offered to buy the Company for $125 per share.  By July, it had offered $150 per share.  It structured its proposal in a fashion that was, on information and belief, contrary to the advice it had given in the strategic alternatives report that the Attorneys and Committee did not disclose to shareholders.

82.   The Attorneys and Directors knew or should have known that shareholders would not sell if they knew or even suspected that a sale was not necessary. .
The Company's financial situation and cash flow had improved substantially in 2000.  The Kauai economy was in full recovery. Yet, the Attorneys and Directors kept shareholders ignorant of all key developments.

83.  On July 25, 2000, Pacific Century Trust ("PCT") (a former name for BOH) wrote to Committee Chair Moore about flaws it had discovered in the Aspen valuation report:

84. On July 27, 2000, BOH's Commercial Loan department wrote

24

to formally notify the Committee about major flaws in the Aspen's valuation of the Company.  The bank had learned that the County of Kauai's real property tax assessment for all Grove Farm lands was $146 million for 2000.  The bank noted that this figure was "significantly different" than the $129 million that had been used in Aspen's report on valuation.

85.  Even the $146 million value used for tax assessments did not approach the assets' fair market value.  For example, the County assessed the Company's four miles of ocean frontage at values reflecting only agricultural usage (*i.e.*, a category at which land was assessed as being worth approximately $1,000 per acre); but, with its kuleanas, the Company could easily develop the so-called "ag" land into other vastly more valuable uses (*i.e.*, residential and/or resort uses).

86.  In August of 2000, Sears signed a lease for and took possession of an additional 42,150 square feet of expansion space and began to build it out.  This represented a huge coup for the Company: 42,150 square feet equaled over fourteen percent (14.2%) of the Shopping Center's total 313,000 square foot size.  Sears' expansion space opened to the public on December 3, 2000.  This was just two days after Shareholders voted to sell to Stephen Case; yet Sears' expansion was not mentioned to Shareholders before or in connection with the December 1, 2000 Shareholder vote.  In one day, occupancy at the Shopping Center went from under eighty-percent to

over ninety percent.  Rental income and thus the appraisal and market values of the Center increased.  CEO Klebahn had reported to Shareholders that the inability to find "national" tenants for the Shopping Center was a material negative fact contributing to the company's purported cash flow problem.  Yet, when in August Grove Farm signed this major lease for most of the vacant space in the Shopping Center, the Attorneys and Directors did not update the Shareholders to inform them of the Sears lease expansion.

87.  On information and belief, at the time Stephen Case, ALPS Acquisition and ALPS Investment purchased Plaintiffs' stock in Grove Farm Company, Inc., they had been told by insiders Daniel Case and/or Hugh Klebahn this material non-public information; they knew of the substantial value it added to the Company not reflected on the Company's books and records; and, they knew that the Shareholders from whom they were buying were unaware of it.

88.  Also in August, Schuler contracted to buy developed residential lots in the Estate Housing Project for $2.3 million. On information and belief, this deal closed before November 15, 2000.  As was the Sears' expansion, the Schuler sale was likewise not disclosed to Shareholders prior to the December 1, 2000 vote.

89.  On August 2, 2000, the Company and a would be buyer known as the Honu Group entered into a 45-day exclusivity period within which to negotiate a definitive agreement for the purchase of the Company. The offer was for all of the Company's stock, but

had a land-for-shares program to allow Grove Farm shareholders who might otherwise not want to approve a sale at that price an opportunity to redeem their shares for land.

90.    Multiple buyers were disappointed, surprised and/or frustrated to learn the Company was locked into exclusive talks, and were told it was not able to explore other possible deals, and requested the Company to contact them if the Honu deal was unsuccessful.

91.    In early August, Stephen Case and his family came to Hawaii.  During that trip, without permission from, without his client's knowledge and in violation of his and his firm's fiduciary duties to the Company, Daniel Case shared material non-public information about his client Grove Farm with his son, Stephen, and urged his son to make an offer for the property of his client. According to Stephen Case, "When [he and his family] were vacationing in Hawaii this past summer, [he] told [his] dad that if the pending Grove Farm deal fell through, it would be something [he would] like to pursue."  Not long after Stephen Case expressed interest in buying Grove Farm in August of 2000, the Company's negotiations with Honu stalled.

92.    Work on the Honu transaction progressed into early September.  During that work, a draft definitive merger agreement was being negotiated and a draft was committed to paper (the "Honu Agreement").

93.   Honu's financial backer, Lehman Brothers, pulled out on or about August 29, 2000.  The reasons for its withdrawal are as yet unclear.  However, it is known that in 2000, AOL-Time Warner had strong business ties to Lehman Brothers.  On information and belief, Lehman Brothers withdrew from the Honu-Grove Farm deal not due to any problem with the deal itself, but rather did so at the request of and/or under pressure from a third-party or third-parties other than Grove Farm or Honu.

94.   The Honu Agreement contained indemnification language which the Attorneys later altered in a way that materially favored Stephen Case over CB&L's client, Grove Farm.  When a competitor to Stephen Case's bid emerged, the Attorneys – acting as counsel to Grove Farm – demanded that the would-be competitor agree to the less buyer friendly language from the Honu Agreement.

95. Stephen Case knew or should have known that his father and his father's firm owed fiduciary duties to and were trusted by Grove Farm, its Board, its Special Committee and its Shareholders.  Stephen Case employed his father Daniel Case as his agent to get an inside track on Grove Farm.  Through Daniel Case and his law partners, Stephen Case obtained non-public material inside information about the Company including material information never disclosed to the Company's shareholders.

96.  Stephen Case is a sophisticated businessman, and knew or should have known of these duties and knew or should have known

28

that the Attorneys were breaching their fiduciary duties.  Stephen

Case fully appreciated his father's special position and how it

would give him unparalleled access and influence.  In his words:

> My father knows this asset [GFCI] well **because ... his
> law firm has represented them for quite some time.**

(Emphasis Supplied).

97.  Then, as now, Daniel Case was President of the CB&L law

firm.  He was or should at all relevant times have been fully

knowledgeable about the Company and aware of the efforts to sell

it.  From his partners and firm files, he presumably knew that

Honu's $24 million offer had totaled only $2 million more than the

net appraised value of just the Company's Shopping Center and the

associated one hundred ten (110) acres of ground.  The CB&L

attorneys knew that Kauai County valued – *i.e.*, assessed for tax

purposes – the Shopping Center and the Company's remaining tens of

thousands of acres at $146 million.  They knew that these holdings

included over four miles of ocean front property assessed only as

"ag" land.  They knew that the Company owned hundreds of kuleanas

and could easily develop for residential, resort and/or commercial

uses land being assessed at rates applicable to agricultural uses.

98.  At the time the Prospectus was mailed in November,

Defendants knew or should have known that both Aspen's strategic

plan and Aspen's valuation were unusable and entirely unreliable.

By no later than August 29, 2000, the Directors and Attorneys had

learned that Michael Burns was a convicted felon.  When his law

29

partners learned this fact, so too did Daniel Case. In turn, Stephen Case, ALPS Acquisition and ALPS Investment likewise learned this fact. They each knew Aspen had opined GFCI was worth about $98 per share, and then had almost immediately offered to pay one hundred and fifty percent (150%) highest range they had given in their capacity as a paid independent outside valuation advisor to Grove Farm. As explained below, Stephen Case, ALPS Acquisition and ALPS Investment controlled the content of Grove Farm's statements to its shareholders. Still, they made no disclosures to Shareholders and concealed their discovery. Instead, they continued to permit only communications to shareholders that urged them to continue to rely on the Aspen reports.

99. In September (and October) of 2000, Scott Parker of Trust for Public Lands ("TPL") offered to "purchase the entire Ahapuaa of Mahaulepu." This proposal was not pursued. Shareholders were never told it had been made.

100. On September 15, 2000, the Company received a letter of intent from Del Mar Pacific to buy Grove Farm for $27 million. Daniel Case was being fed insider information and knew of this offer within days of its being made. Shareholders, in contrast, were not told of this offer at or near the time it was made, and never would have been but for the fact its existence was leaked directly to shareholders by Del Mar shortly before the December 1, 2000 vote.

101.  Daniel Case soon told his son, Stephen, about the deal and warned that other sharks were "circling" Grove Farm, including one who had offered a $27 million offer.  He impressed upon Stephen the need to move swiftly.  Stephen Case got the message about the urgency.  The need to strike quickly comes through in an e-mail Stephen Case wrote his assistant Agee a short time later:

> We have what could be a unique opportunity to buy significant additional holdings in Hawaii. The Grove Farm company's being sold. [W]e have to move quickly. Other possible buyers are circling (one apparently lobbed in higher $27 million offer a few days ago) and the sellers seem predisposed to sell to us *** So I would like you to jump on this, talking first to my father to get more insight and get copies of documents and determine what the next steps are. [S]igning an agreement to have a lock on this for a few weeks makes sense - and then I'd like you to fly to Hawaii to look into this personally.
>                                  ***
> Below are a summary of issues sent by my dad ... review then call me [and] plan to call my father today... to discuss with him and determine where things stand and what we need to do next...

102.  The Company did not execute a definitive agreement with Honu during the exclusive period for negotiations with Honu.  On September 17, 2000 the period ended and the Company was freed to auction itself and negotiate with other interested parties.

103.  On September 18, the Board voted *inter alia* to put the Company up for sale on the open market.  Grove Farm was to be for sale to the world, in effect.  A letter was sent to shareholders, telling them that other bidders would be contacted, alternative strategies explored and professional advisors likely brought in.  But, by the time the letter arrived in shareholders' mailboxes the

auction to the world was over. The Company was truly for sale to the world for about two or three days – if it was ever really for sale after September 17 at all.  Stephen Case made an offer through his father Daniel Case almost immediately, and once he did the Attorneys and Directors never seriously considered selling to anyone else and worked exclusively to see to it that Stephen Case got the Company in as close to a no-bid context as possible.

104.  On September 19, Daniel Case told Attorney Cribley to have CEO Klebahn call him.  CEO Klebahn did so.  During the ensuing twenty minute conversation, Case advised Klebahn that if the Board would "invite" his son Stephen to look into purchasing the Company and waive unspecified conflicts, his son would make an offer for the Company.  On that call, Attorney Case assured CEO Klebahn that if his son did offer to buy Grove Farm, Stephen Case would obtain other counsel to represent him.

105.  On September 19, CEO Klebahn "[s]poke with Cribley about meeting with Daniel Case who wished to discuss acquisition of Grove Farm by his son Stephen Case" and "[a]greed ... to meet with Dan at 3:00 pm at Case's office."  Klebahn met face-to-face with Daniel Case at CB&L.  Again, Case wanted an "invitation" from the Grove Farm Board to make the offer.  He outlined for Klebahn how Stephen would make an offer for $140 per share on the terms offered by Honu and would close on more or less the same time frame as the Honu deal had contemplated.  To achieve this tight timetable, Daniel

Case wanted to use "most of the documentation already developed" for the "Honu deal."  Klebahn then reported to Randy Moore that Case was offering to "step into Honu's shoes" and do the deal using the same contract terms.

106.  On September 19, CEO Klebahn solicited advice from Cribley about "issues" surrounding a deal with Stephen Case. Daniel Case wanted a one week exclusive. In response to CEO Klebahn's query, Cribley indicated he would try and get his partner to drop the "exclusive" aspect of the proposal.

107.  Later, CEO Klebahn telephoned Cribley again, this time to ask what the Cases would learn in one week that Daniel Case "did not already know."  As this query illustrates, no "Chinese wall" was ever attempted at CB&L.  The Cases had full and unrestricted access to the CB&L firm's information about the Company, and Cribley did not say otherwise to Klebahn.

108.  CEO Klebahn also asked Cribley to let Daniel Case know that if Stephen offered a few dollars more per share than Honu, he could help make sure that the timing became less of a problem; and, he said he could sell the concept of an "exclusive" look period for Case by asking the Board to give special consideration to an existing shareholder.  Stephen Case was not a shareholder.  Daniel Case, however, was.  Attorney Cribley understood that because of Daniel Case's shareholder status, Stephen was being treated as though he were a shareholder.  In other words, Cribley knew that

33

his clients were behaving as if the buyer were equivalent to Daniel Case, one of Grove Farm's Attorneys.

109.   As of September 19, 2000, multiple qualified potential buyers in addition to Stephen Case were seriously interested in purchasing the Company. CB&L treated these third parties far less favorably than Stephen Case.  Indeed, they systematically favored Stephen Case and by deliberate acts and omissions frustrated, hindered and shut out other bidders and would-be bidders.

110.   On September 20 — just three days after Grove Farm was again free to court all suitors –  CB&L had CEO Klebahn sign a confidentiality agreement, purportedly to allow Stephen Case access to confidential information about the Company.

111.   On the day Daniel Case signed this agreement as "agent" for Stephen Case and had Klebahn countersign it, no attorney from CB&L informed Klebahn of any conflict related to its execution.  No intelligent, informed voluntary waiver was obtained.   The first Board Meeting at which Attorney Cribley even used the word "conflict" in connection with his partner Daniel Case was not until September 22, 2000, when Attorney Cribley advised the Board to pass a resolution purporting to waive some unexplained conflict related to Daniel Case's communicating to Grove Farm on behalf of his son, Stephen.

112.   Even before Daniel Case executed the confidentiality agreement for his son, both Cases already enjoyed complete and

unfettered access to the Company's confidential information. They enjoyed this access as a matter of fact. This access is also presumed as a matter of law. Daniel Case's many hats as Grove Farm's counsel, head of CB&L and Attorney Cribley's friend and law partner establish his access; he was his son's agent, so Stephen Case likewise had access.

113. On September 21, Kaikani Corporation reissued in writing an offer of $7.5 million to purchase just Puakea Golf Course. The offer was ignored, and Shareholders were not told of it.

114. Attorney Cribley did not withdraw as counsel, despite the fact that everything he knew  or thereafter learned or had in his files would be known to Daniel Case. As attorneys in the same firm, Daniel Case presumptively would know whatever Cribley knew about the sale of Grove Farm, including all information germane to Stephen Case's effort to buy Grove Farm. At each Board and Special Committee meeting held thereafter, Cribley was present. Daniel Case (and Case's son, Stephen) might as well have been standing in the room watching the company's inner-workings. Attorney Cribley advised the Board and Special Committee from May 8, 2000 onward to exclude Director Combs from discussions, efforts to sell and information about offers for parts of the Company. He did so on the stated rationale that Combs might leak information to shareholders or disclose information about the Company's

35

deliberations to someone with whom the Company was negotiating. Yet, Attorney Cribley did not withdraw or even mention the difficulties associated with his own presence. He did, however, continue to see that Combs was kept out of the loop and denied information that all other Directors had.

115.  On September 22, led by Attorney Cribley, the Board passed the following resolution:

> RESOLVED, that Stephen Case, through his agent Daniel Case, be invited to conduct a due diligence review at his expense in contemplation of the submission of an offer to purchase the stock of the Company. In connection therewith, upon the delivery of a confidentiality agreement, that he be authorized to meet with and receive Company information from current Company Officers and Directors, prior Company President David Pratt, Belt Collins, Chaney Brooks, and the Company's attorneys at CB&L. Further, on the understanding that if an offer is submitted by Stephen Case he will engage independent counsel, the Company waives the conflict of interest created by Daniel Case acting as agent for Stephen Case while CB&L represents the Company.

Shown this resolution in August of 2004, Daniel Case claimed he had never previously looked at it. However, he had co-authored shareholder proxy materials that discuss it in 2000.

116.  This resolution, drafted by James Cribley, itself demonstrates the insidious and insider-nature of Stephen M. Case's advantage. Other bidders were given information in the "Company's files". Daniel Case's intimate knowledge of the Company – and the material, insider edge such inside knowledge carried for his son, Stephen Case and his son's investment vehicles, ALPS Acquisition, ALPS Investment and Ka Poe Hana – is embedded in this very

resolution: Daniel Case knew to ask for and already had substantial crucial about information about the Company from the files of the Company's long-time real estate, land use and valuation advisor Belt Collins, Chaney Brooks.  Other buyers – and the Shareholders – did not have this information and did not know to ask for it.

117.  On September 23, 2000, Daniel Case wrote his son that the "Kauai economy is recovering", that "local economists" shared this view and that this should be a valuable "asset."  He informed his son that the Bank of Hawaii had – in April of 2000 – appraised the Shopping Center as being worth at least $22 million net of the debts on it.  Finally, Case pointed out GFCI's unencumbered ownership of the ultra-valuable 2,500 acre oceanfront Mahaulepu beach area.  Armed with this knowledge – and the knowledge that shareholders were ignorant of it – Stephen Case offered just $2 million more for all of Grove Farm than the appraised value of just the Shopping Center.

118.  In 2002, Michael Furakawa, Grove Farm's Vice President, stated to the Wall Street Journal that "Mahaulepu's mile-long golden sand beach flanked by limestone cliffs and sand dunes is probably our most valuable land."  Furakawa added, "the Farm's management hopes to build a resort complex, including a hotel, golf course and housing near the beach."  In 2000, this land – characterized as the Company's *most valuable* land – was zoned and assessed as agricultural, i.e. at only about $1,000 per acre.  As

explained above, the undisclosed kuleanas made (and make) this land easily developable and therefore fairly characterized as the "most valuable" despite the technical "ag" zoning status attached to it.

119.  Also on September 23, Daniel Case pointed out for his son the fact that revenue from the JGL rock crushing license had been $159,000 in 1999.  Daniel Case also urged his son to take care of Klebahn and suggested a top-management role for himself, as well:

> Chairman Hugh Klebahn (a Wilcox) [and his] team [manage most of Grove Farm's] properties ... **the CEO handles the financials for the entire company.** ...[**I**] **recommend retaining the entire team**[.]  I could oversee the management and move the operation into some sort of long term plan[.] Because you would own all of the stock, you would be able to move more quickly than is still the case with Maui Pine [a publicly traded company].

(Emphasis supplied).   Daniel Case also urged his son to move quickly to sign merger documents with Grove Farm.

120.   On September 29, 2000, the Company received another letter of intent, from Wattson-Breevast.   Wattson-Breevast's initial offer was for $21 million, but otherwise favorable to the Company.  Once again, Daniel and Stephen Case knew of this offer almost immediately.  Wattson-Breevast, however, was not told about the potential Case deal then under consideration.

121.  In September, Attorney Cribley provided Daniel Case with a first draft of the ALPS merger agreement which he "based" on the Honu agreement.   The ALPS Agreement prepared by CB&L in fact differed significantly from the Honu Agreement in several material

38

respects.

122.  For example, the ALPS Agreement prepared by CB&L does not contain the fairly broad, seller-friendly indemnification language from the Honu Agreement.  Instead, it provides in pertinent part as follows:

> [I]n no case shall Grove Farm Company be required [after being sold] to indemnify any Indemnified Party against any loss, expense, claim, damage or liability for any act or omission performed by such Indemnified Party...which seeks to challenge the actions of Grove Farm company and/or its officers or directors in entering into and/or carrying out the terms of this Agreement

Attorney Cribley wrote this, inserted it into the agreement and advised his Grove Farm clients about the agreement.  But, he cannot explain what the language means when asked about it today.

123.  Attorney Cribley reverted to the seller-friendly Honu language the next month while representing Grove Farm *vis a vis* buyer(s) other than Stephen Case. When dealing during this same time period with a would-be competitor to Stephen Case's bid, Attorney Cribley reinserted the seller-friendly indemnification language from the Honu Agreement.

124.  On October 5, Wattson-Breevast unilaterally increased its offer to $25 million or $146 per share.  On October 6, CEO Klebahn divulged the $25 million Wattson-Breevast offer to Stephen Case through Case's agent, John Agee.

125.  Neither Attorney Cribley nor CEO Klebahn conveyed to any potential or actual competing bidder any information concerning

Stephen Case, ALPS, or the amount of Stephen Case's offer(s).
Further, the terms and conditions of ALPS' definitive agreement
were fiercely guarded from other bidders.  Even after the ALPS
Agreement was sent out to all shareholders, Defendants continued to
maintain that th ALPS Agreement was somehow confidential when
bidders asked to see it.

126.  On October 6, Del Mar Pacific wrote to request that the
confidentiality agreement it was being asked to sign be bilateral,
since it was being asked to provide its own financials to the
Company.  It also pledged to remove the financing contingency from
its offer.  It provided a revised agreement with reasonable
revisions to implement its proposal to do a non-contingent deal,
and it desired to move forward with its competitive (in fact,
superior) offer on a non-contingent basis.

127.  On October 11, 2000, John Agee told Stephen Case that
Grove Farm's land was far more valuable than that of the adjoining
Lihue Plantation.  He also reported that he and Daniel Case
intended to meet with the Company's lenders the following day to
assess their willingness to "play ball" with Case:

> Steve's dad and I spent the past two days in due
> diligence touring every acre of the Grove Farm property
> and meeting with management. We also met with the
> Deliotte and Touche audit partner in charge of the Grove
> Farm account. We plan to see the Company's two major
> banks, First Hawaiian Bank and Bank of Hawaii tomorrow
> along with our environmental consultant but I do not
> expect those meetings to change my opinion of this deal.
>
> I am presently up in the air [about] the non-recourse

> debt of $34.6 million with First Hawaiian Bank ... [T]he
> underlying collateral is worth, at a minimum, the value
> of the outstanding loan balance ... One of the things I
> hope to accomplish tomorrow is the degree to which the
> Bank is willing to play ball with us....The economy...is
> on an up-swing and this trend is expected to continue.
> ... We looked at the 17,000 acre farm contiguous to Grove
> Farm called Lihue Plantation. The sale price is $26
> million. Your dad and I don't feel there is a great deal
> of urgency to move ahead on this property [it] is not
> nearly as valuable as Grove Farm.

128.  After a meeting with the banks on October 12, John Agee

and Daniel Case were shown an "Internal Real Estate Appraisal

Memorandum" dated August 17, 2000, authored by Gil Farias, Senior

Property Real Estate Analyst for BOH.  The purpose of this internal

appraisal memorandum was an "Evaluation of the Estimated Market

Value of Real Estate owned by various Grove Farm Companies, as

cited in the December 31, 1999 Aspen Ventures Group Appraisal

Report."  Mr. Farias concluded, in pertinent part, as follows:

> after considering the foregoing issues and value
> adjustments as described [above], I integrated such value
> adjustments into the PCT A/V spreadsheet in arriving at
> a revised value estimate.  As presented on the attached
> tables, the revised market value estimate of all
> properties by Grove Farm entities totaled $152,700,000.

Stephen M. Case and John Agee – and therefore ALPS Acquisition,

ALPS Investment, the Case Trust and Ka Po'e Hana – were furnished

this non-public information and considered it connection with the

acquisition of Grove Farm.  Daniel Case and CB&L had a fiduciary

duty to disclose it to CB&L's Grove Farm clients.  Also, Daniel

Case and his partner Cribley had statutory duties to divulge this

material information when (and because) they drafted the Proxy

41

Statement sent to shareholders in connection with the Transaction. At no time before December 1, 2000, however, were Director Combs or the Shareholders informed that BOH estimated Grove Farm's land to be worth at least $152,700,000 – a figure based on largely on the real property tax assessed value and one that did not even factor in the huge enhancements available to the Company through its kuleanas.

129. On October 12, CEO Klebahn accepted executed documents for the purchase of GFCI's stock from John Agee and Daniel Case together with a $100,000 deposit check.

130. Unlike other bidders, Stephen Case had his father, Daniel Case, and his father's law partners on the inside. He received inside information about competing offers and highly confidential insights into the internal workings and discussions and views of the Board. Case increased the ALPS offer twice in response to factors having nothing to do with appropriate arms-length negotiations. These bid increases had everything to do with the warped, biased and improper process his father and the CB&L law firm had engineered.

131. The first such increase from $140 per share occurred when CEO Klebahn told Daniel Case that if Stephen increased his bid to $25 million or $146 per share, that five directors could be expected support the bid and "freeze out" a dissident director. Stephen Case did so.

42

132.  The second such increase came after Agee was informed of the existence of the $25 million Wattson-Breevast offer, and it was suggested to Agee that if ALPS increased its offer to $26 million ($152 per share), the bid would "win the day" for ALPS and the Board would move to lock out or "squeeze" out the competition. Stephen Case increased the offer to $152 per share, and the Board cut short any bidding. In fact, $26 million indeed became the final price.

133.  After Wattson-Breevast had increased its offer to $146 per share, CEO Klebahn had immediately informed Stephen Case and told him how to cut the bidding war off.  Yet, after Case increased his offer to $152 per share, CEO Klebahn did not inform Wattson-Breevast that the Company had a higher offer, or from whom. Instead, he left Wattson-Breevast to believe that their $146 offer was sufficient and would be taken to the Board for a vote.

134.  Howard Hamamoto had been trying to negotiate with the Company during September and October of 2000.  His interest was not conveyed to the Board before the October 17, 2000 vote.  He was not told that that vote was even imminent, nor was he told of Case's existing bid.  He submitted a formal letter of intent on October 18 offering $160 per share for Grove Farm, and offering to allow shareholders who did not wish to sell at that price to trade shares for land.  On October 18, Hugh Klebahn spoke to Hamamoto.  Klebahn later bragged to Committee Chair Moore, who recorded the boast in

his notes, that he had told Hamamoto to "go fly a kite".

135.    Attorney Cribley and CEO Klebahn called a special meeting of the Board for October 17, 2000.   Their purpose was to obtain board approval of the ALPS Merger Agreement.    At the meeting, Klebahn and Cribley reported to the Board regarding negotiations with other bidders.

136.  With respect to Wattson-Breevast, Chairman Klebahn and Attorney Cribley told the other directors (including Combs) that:

> Wattson-Breevast has signed a confidentiality agreement, demonstrated its financial capability, and made a written proposal to enter into a letter of intent to acquire the shares at $125 per share. When told that the proposed priced was not in the ball game, [Wattson-Breevast] subsequently verbally agreed to increase that offer to $146 per share provided that the offer be acted upon by the Board at this meeting and that a 60 day exclusivity period be granted to [it].

Wattson-Breevast had only been told vaguely that "$125" was not in the "ball game". CEO Klebahn did not report that he had left Wattson-Breevast thinking its increased bid of $146 was the highest bid being taken to the Board; that he had not informed Wattson-Breevast that other, higher offers would be discussed at the meeting; that he had divulged Wattson-Breevast's increase to $146 to Stephen Case; or, that he had not divulged Stephen Case's increase to $152 to Wattson-Breevast and solicited a better offer. Of course, Cribley and Klebahn omitted to mention that Stephen Case had been told precisely how much he needed to bid to "win the day" without offering too much.  And, they neglected to explain that at

44

the time Stephen Case allowed his $152 offer to be taken to the
Board, he <u>knew</u> that Cribley and Klebahn had successfully stalled
Del Mar Pacific – which was offering $160 per share – at step one
of the "five step" process and <u>knew</u> that his bid was $6 per share
more than that of Wattson-Breevast.

137. Regarding Del Mar Pacific, Chairman Klebahn and Attorney
Cribley told the Board:

> Del Mar Pacific has not signed a confidentiality
> agreement. They have made a written proposal to enter
> into a letter of intent to acquire the shares at $160 per
> share subject to a long due diligence period and a
> financing contingency totaling 8 and a half months. Del
> Mar has not demonstrated its financial capability to
> complete the proposed transaction.

This report was important in several respects.  First, by letter
dated October 6, Del Mar Pacific had stated it would remove the
financing contingency from its offer.  Second, in that same letter,
Del Mar Pacific had sent CEO Klebahn a bilateral confidentiality
agreement with the sole additional requirement being that its own
financial data be kept confidential, too.  Del Mar Pacific's act of
October 6 – more than ten days prior to the October 17 meeting – in
sending a revised contract and offering to sign it if the Company
would, or to sign another document the Company preferred, was
tantamount to signing a confidentiality agreement – it provided a
copy of an agreement it was offering to sign, and even offered to
sign a different one if the Company preferred.  Had CEO Klebahn
signed the document or said that it was acceptable, Del Mar Pacific

45

would have immediately countersigned and provided its financial statements to Grove Farm. Finally, the full Board was told that Del Mar Pacific's offer had a financing contingency. However, in fact, Del Mar Pacific had committed in writing two weeks previously to remove the financing contingency.

138. As for ALPS, Cribley and Klebahn reported:

ALPS has signed a confidentiality agreement, conducted due diligence, tendered a formal offer in the form of a definitive agreement at $152 per share and made a $100,000 deposit subject only to (1) satisfactory environment due diligence by November 6th (2) shareholder approval and (3) PUC and bank consents. Closing would be no later than year end. The ALPS' offer would be subject to a break up fee in the amount of $1,000,000 (which is slightly lower than the prior HonuGroup negotiated term) in the event that a superior acquisition offer were to be accepted by the Company, and it would also provide ALPS the right to match any subsequent offers. These provisions in favor of ALPS would allow the Company to negotiate for a higher price with any third party who makes a superior acquisition offer, and if such a third party offer is accepted, the Company would be subject only to the liquidated amount of the break up fee in lieu of unknown damages otherwise possible for breach of contract.

Of course, ALPS had no reason to take issue with the unilateral nature of the confidentiality agreement because it had not had to provide its financials to Grove Farm.

139. Against this backdrop, the Board proceeded on October 17 to vote 6-1 to approve entry into the Merger Agreement with ALPS, whereby ALPS would purchase all of the shares of the Company for $152 per share.

140. Neither Klebahn nor any other Company representative

46

passed to other interested parties information concerning the substance and amount of the ALPS offer.  Case was given the Honu agreement to work with, for the stated reasons that it would allow him to move quickly and inexpensively to a final Merger Agreement. No would-be competitor of Stephen Case was provided a copy of the Honu agreement to work from.  Stephen Case was given up-to-the minute intelligence on competing offers.  But, no competing bidder was given such information about Case and none was informed before the October 17 vote that ALPS and the Company had a draft form merger agreement poised for approval (much less told it ALPS was offering $152 per share).  No competing bidder was informed that the ALPS Merger Agreement would be presented to the full Board for consideration at its October 17, 2000 meeting.

141.   CEO Klebahn and Attorney Cribley provided both Daniel Case and Agee with confidential information concerning the Company to ensure that ALPS Investment would be the successful purchaser; Daniel Case and CB&L also gathered other information that Daniel Case as co-author of the Prospectus and as counsel to Grove Farm owed a duty to tell Shareholders.  In all, the wealth of non-public material information that was not provided to other potential suitors and which was not provided to the Shareholders, but which was provided to Stephen Case, ALPS Acquisition and ALPS Investment included *inter alia*:

    a.   That Saxon-Ravenscraig had offered to invest $40 million in GFPI in return for a fifty-five percent (55%) equity

stake in the Estate Housing Project and was willing as part of the deal to release to Grove Farm full unencumbered ownership of (1) the Hyatt golf course <u>and</u> (2) the Company's headquarters;

b.   that the real property tax assessed value of Grove Farm was $146 million in 2000;

c.   that Sears had signed the expansion lease in August of 2000;

d.   that prior to the Sears expansion lease, the BOH had purchased a professional MAI appraisal the Shopping Center and related commercial villages which showed that these assets were worth $22-$23 million more than the debt against which they were secured <u>after</u> the cost of the investment needed to bring the center back to a condition commensurate with it status as the largest center on Kauai;

e.   that the ALPS bid was a mere $3-$4 million greater than the MAI certified net value  of the Shopping Center alone, leaving Case to pay just $162 to $186 per acre for the other 21,490 acres of Grove Farm;

f.   that 16.9 acres had just been rezone for resort and residential use;

g.   that the owners of the Kauai Hyatt wanted to lease the 16.9 acres for $1.2 million per year, had exchanged draft lease agreements with Grove Farm to this end and planned to come to Hawaii to execute the final lease in November of 2000;

h.   that the owners of the Kauai Hyatt wanted to buy the Kawailoa golf course at any time but was not allowed to do so;

i.   that on September 21, Kaikani Corporation had offered $7.5 million for the ten-hole  Billy Casper golf course;

j.   that the lenders for GFLC and GFPI had no real claim to GFCI's directly held assets;

k.   that FHB had not yet even been asked to extend the payment due at the end of 2000;

l.   that as of November 3, Grove Farm had approximately $5

48

million in cash and another $5 million in current assets;

m.   that Grove Farm had only $1 million of current liabilities;

n.   that the $15 million FHB "B" Loan was not a real debt of $15 million because if the "A" Loan were repaid, the "B" Loan would convert to an unsecured payment stream whereby FHB would share part of the net cash flow from the Housing Project up to a fixed ceiling;

o.   that Grove Farm had buyers under contract for approximately $3.5 million property sales contracted for in 2000 set to close during December 2000;

p.   that JGL had sold off most of the inventory it had purchased and that the royalties  from JGL had reached the $650,000 level in 2000 and would continue at or above this level going forward;

q.   that Grove Farm had over 160 kuleanas , the value of which was hundreds of millions of dollars;

r.   that cash flow from the Shopping Center had materially improved in 2000;

s.   that Grove Farm had received several offers for the Shopping Center;

t.   that GFCI had 31 unencumbered commercially and industrially zoned lots in Puhi Town that had yet to even be put on the market locally;

u.   that cash flow from operations was a positive $2 million by August 31,2000;

v.   that the Board was inclined to sell to ALPS over the other potential purchasers;

w.   that the Board would give ALPS a free exclusive look at the Company;

x.   that there were other offers which exceeded ALPS' offer;

y.   that the Board had discussed a minimum sales price that would freeze out a potential dissenting director and what that price was;

49

z.  that there was a price that would cause the Board to close out the competition and end the "auction" without a bidding war.

Just as the foregoing information was not provided other bidders or potential bidders, so too did Defendants keep and conceal it from Grove Farm's shareholders.  On the day the Shareholders voted to accept Stephen Case, ALPS Acquisition and ALPS Investment's merger agreement and concomitant offer of $152 per share (December 1, 2000), none of the foregoing information had been disclosed to the Shareholders.  This information was material to the Shareholders' decision whether to vote to approve and tender their shares for the ALPS merger.

142.  On October 27, 2000, BOH questioned the fundamental accuracy of the Aspen reports in a letter to Chairman and CEO Klebahn:

> According to the Aspen report, the tax assessed values for all properties, before adjustments, owned by the Grove Farm entities totaled $129.3 million. *** In an attempt to confirm the total tax assessed value indicated in the Aspen report, our real estate department independently requested the same information from Grove Farm personnel.  Ana Diogo [a Grove Farm employee] provided us with a computer spreadsheet  of tax assessed value for all properties totaled $146.4 million, excluding the adjustments, and excluding the industrial parcels, which were recently sold to Kamehameha Schools. Grove Farm personnel have confirmed to us that the $146.4 million figure is correct for the most recent tax assessment period [i.e., 2000].*** [If the $146.4 million figure is correct and the $129.3 million figure is not] we must assume that the per share value opined in the Aspen report is erroneous, based on your personnel's assertions to us that the $146.4 million figure provided to us is accurate.

This was just one week before the proxy materials for the December 1, 2000 vote on the ALPS deal were sent to shareholders.

143.  The ALPS Agreement contained a "fiduciary out" provision that allowed Grove Farm to entertain and pursue unsolicited superior acquisition offers.  On October 30, 2000, Wattson-Breevast tendered such a superior acquisition offer of $170 per share.

144.  Wattson-Breevast's superior acquisition offer was not mentioned in the Prospectus sent to shareholders four days later urging them to vote to sell to Stephen Case for $152 per share. When word of the offer leaked out to shareholders despite efforts to suppress it, the Attorneys and Directors actively discouraged shareholders from giving it any credence.  They characterized Wattson-Breevast's offer to shareholders as a shadowy unsubstantial offer that should be disregarded as the grist from which baseless "rumors" start.

145.  The conflict resolution stated that Daniel Case could act as agent for his son up till the time he made an offer.  Only after Wattson-Brevast's superior acquisition offer did Daniel Case bring in his brother, Jim Case of Carlsmith Ball LLP to nominally represent Stephen.  Daniel Case continued actively to represent his son's interests and those around him on both sides of the deal continued to look to him for orders on how to proceed.

146.  Once Wattson-Breevast submitted its October 30 superior acquisition offer, Defendants recognized that  with the December 1,

51

2000 shareholder meeting fast approaching, Wattson-Breevast had precious little time.  So, CB&L, just ran the clock out.

147.  Attorney Cribley took *two weeks* to present Wattson-Breevast with a draft merger agreement.  The draft merger agreement Attorney Cribley finally did provide to Wattson-Breevast was a new draft document into which he had inserted a host of onerous provisions, including one calling for Wattson-Breevast to "loan" Grove Farm $5 million of dollars if its offer was not approved by shareholders and another requiring a $4 million dollar deposit. And, he reverted to the seller-friendly indemnification language from the Honu draft merger agreement.

148.  On October 31, 2000, a Board meeting was held to review the informational materials to be sent to shareholders about the December 1, 2000 vote on the ALPS transaction.  At that meeting, other bidders were pointed out by name as having not demonstrated their financial ability to do a deal for the purchase of Grove Farm.  Daniel Case's law partner did not point out that ALPS had not done so either.

149.  At the October 31, 2000 meeting, the Board discussed Wattson-Breevast.  With Daniel Case's partner Cribley present as legal counsel, the Board refused to treat the Wattson-Breevast offer as what it was: a superior acquisition offer and one which the Board (and company counsel) had fiduciary duties to aggressively pursue.

150.   According to Donn Carswell's sworn testimony in another litigation, he had been under the impression from his participation in the Honu dealings and familiarity with the Honu Agreement that the "superior acquisition offer" language left the Company free to negotiate with any person who offered a higher price after the agreement was signed but before the shareholders voted.   He understood and had believed that "superior acquisition offer" meant simply that the offer was higher. On information and belief, Attorney Cribley actively advised the Board to the contrary and counseled them to not consider Wattson-Breevast's offer. According to Cribley's minutes, the Board refused to even consider any offer that did not contain a host of burdensome and onerous terms – including many that ALPS should have but had not had to meet itself.

**THE PROSPECTUS.**

151.   The shareholder information packet for the December 1, 2000 vote (the "Prospectus" or "Proxy Statement") was sent to shareholders on November 3, 2000.  The Prospectus, previously filed by Defendants in this action as an Exhibit in support of their Motion for Judgment on the Pleadings pursuant to FRCP 12(c), is incorporated herein by reference and prayed to be taken as a part hereof.

152.   Stephen M. Case, ALPS Acquisition and ALPS Investment had absolute control over the content of the Prospectus.   These

defendants had such control (1) as a matter of in fact by virtue of Dan Case's loyalty to his son and insider-position as head of the firm that authored it and (2) as a matter of law under section 5.7 the ALPS Merger Agreement, which gave the buyers control over – and even veto authority over – all communications sent by Grove Farm to its shareholders after the ALPS Merger Agreement was executed.

153.  Had Shareholders known of all material information germane to the value of the Company, the proposed sale to ALPS would not have garnered approval of the requisite seventy-five percent (75%) supermajority of the Shareholders.  On information and belief, a fully informed Wilcox family, collectively, likely would not have voted to sell at all or would not have voted to sell to anyone bidding less than nine or ten figures.

154.  The principal drafters of the Prospectus were Daniel Case (acting as Stephen's agent) and James Cribley (Daniel Case's partner).  The Prospectus materially misrepresented the financial condition of the Company, its relationship to CB&L and ALPS, and the increasingly positive condition of the recovering Kauai economy.  The Prospectus is rife with other material misstatements and omitted many material facts known to Defendants.  Nevertheless, it recommends the ALPS Merger to Shareholders as advisable and fair and urged that it was Shareholders' "best interest" "that [they] vote for approval of the Merger Agreement".

155.  The Company's available kuleanas, as well as projects

54

already in the pipeline like the seventeen acre parcel of beachfront lot next to the Hyatt in Poipu rezone in April of 2000, were hugely valuable assets.  On information and belief, Daniel Case knew these facts long before his son succeeded in buying Grove Farm for a pittance; his law partners also knew these facts. Attorney Case's son, Stephen Case, looked to his dad for information and inside knowledge about Grove Farm.  In contrast, Grove Farm Shareholders did not know this information – yet, they were being asked to sell to Stephen Case and were relying directly and indirectly on the attorneys at CB&L to protect, counsel and inform them in connection with that decision. Likewise, bidders trying to compete with Stephen Case's $152 per share offer for Grove Farm's stock were not given material information germane to their evaluation of the Company.  The information kept from bidders other than Stephen Case would have caused them to tender much higher bids had it been made known to them.

156.  Daniel Case and his partners were intimately familiar with Grove Farm.  They wrote the Prospectus and materials provided to Shareholders in connection with the vote on Stephen Case's offer in November 2000.  As counsel to Grove Farm, these attorneys had actual knowledge of all such assets; yet, if they did not they knew generally that Grove Farm was vastly more valuable than $152 per share and willfully blinded themselves to the particulars as to why.  CB&L and its managing attorney, Dan Case, are chargeable with

such knowledge as is Daniel Case's son and principal, Stephen M. Case, and John Agee with whom Daniel Case worked intimately at all relevant times on Stephen M. Case's behalf.

157.   In drafting the shareholder Prospectus materials, the law firm and its constituent attorneys were under fiduciary and statutory duties to inform themselves as to what the Company's assets consisted of and to disclose all assets along with material information – like special zoning rights – germane to shareholders' assessment of the value of those assets.   On information and belief, Daniel Case and his partners at his direction simply omitted this "gold" from the Prospectus and related materials in order to push the deal through at a fraudulently low price for the purpose of enriching Daniel Case's son, Stephen M. Case at the expense of the shareholders of Grove Farm.

158.   Stephen M. Case and John Agee – and therefore ALPS Acquisition, ALPS Investment and Ka Po'e Hana – as buy-side participants in the transaction being aided by CB&L, knew or should have known that material information was omitted from the prospectus materials provided to Shareholders.   Each of these defendants is chargeable with the knowledge of Daniel Case, head of the CB&L firm.   Stephen Case knew that his father and his father's law firm owed fiduciary duties to Grove Farm.   He knew or should have known that his father's law firm had omitted material information from the prospectus materials.   Instead of ensuring the

56

prospectus being presented to shareholders by the Buyer and Seller was accurate, he stood silent and allowed the shareholders to vote – knowing full well that they lacked crucial information about their Company.

159.   On page seven, the Prospectus contains the following statements:

> For the past several years, the Company's management and Board of Directors have been reviewing the Company's performance, strategic direction and prospects in light of the poor economic conditions on Kauai, the physical condition of the Company's properties, and the Company debt burden and cash needs. **In his letter to stockholders dated September 15, 1999, the Chairman and Chief Executive Officer provided a detailed review of these matters. We urge you to review it carefully.** We also urge you to review the Company's 1998 and 1999 annual reports, and the 1999 audited financial statements and the September 20, 2000 unaudited interim financial statements.

(Emphasis supplied). Read as it must be in the context of express statements in the Prospectus and other statements referenced and effectively incorporated into and/or adopted as part of the Prospectus, these statements are false and misleading in many respects and on multiple levels.

   a.   First, they repeat and perpetuate the idea that the Company was unable to sustain itself and had to be sold in 2000.  This was not true. The Company did not have to be sold in 2000.  As detailed above, it had sufficient cash, revenue and improved asset value and cash flow to survive well beyond 2000, in fact indefinitely.  Moreover, even Committee Chair

57

Moore admits as much.  When asked (post-transaction) by what day the Company had to be sold, Moore admitted, under oath, as follows:  "No, the Company didn't have to be sold.  We needed to come up with a credible resolution that would have been credible to the bank."

b.   Second, this statement is false and misleading in that it incorporates and/or adopts the contents of CEO Klebahn's September 15, 1999 letter to Shareholders.  As outlined above, that letter was false and misleading when sent.  It was rendered further false and misleading by events subsequent to September 15, 1999 outlined above – events about which the Shareholders were not informed, despite repeated written promises by the Attorneys and Directors to keep shareholders informed about material developments.  By adopting the September 15, 1999 letter in the Prospectus, Defendants renewed (and promptly breached) their obligation to provide material information omitted from and/or that occurred subsequent to that letter necessary to make it true and accurate as of the December 1, 2000 vote.

160.  On pages nine and ten, the Prospectus discusses the 1998 JGL licensing deal and "rock crushing" revenues for 1999, but not for 2000.  It states that $225,000 of the 1999 revenues from the rock crushing operation was from "liquidation of final rock inventories from the Company's discontinued rock quarry operations"

sold to JGL – implying that the revenues for 1999 were artificially high by this amount and would not be sustained at this level because the $225,000 portion of the 1999 income was non-recurring. It goes on to state that total "[r]oyalty revenue of $322,000 in 1999" resulted in a "gross loss of $369,000 [being] realized in 1999 for this segment, as compared to a $454,00 gross profit in 1998." These statements are materially incomplete and misleading. The year to date 2000 figures are not explained or given as of the date of the Prospectus; nor are the projected year 2000 totals. In fact, revenues from JGL's license had blossomed in 2000 and were projected to hit $650,000 in 2001. These facts are material, but are not mentioned in the Prospectus.

161. Many or substantially all statements in the Prospectus about "losses" – and other performance related totals given therein – were misleading in that losses were magnified and profits artificially depressed *via* accounting charge offs, paper losses, depreciation charges and the like. The paper nature of these losses, as distinct from losses resulting from actual payments or costs that actually impact cash-flow, was particularly significant and material to the decision whether to sell in view of the fact that Shareholders were being told the Company lacked sufficient cash and cash flow to sustain itself. This is illustrated by the "loss" of $369,000 in the rock crushing segment against real cash income of $322,000 in 1999. It is also illustrated by the fact

that Daniel Case wrote his son on September 23, 2000 to characterize the rock crushing operation as having generated a positive $159,000 to the Company in 1999, a figure that appears nowhere in the Prospectus he co-authored; correspondingly, Daniel Case did mention any loss in this segment to his son when advising Stephen whether to buy or not.

162.   Particularly in the context and atmosphere created by Defendants, the Prospectus should have referred to and explained cash on hand in the banks, particularly given that, on information and belief, the Company had $4 to $8 million (or more) on hand during most of 2000 and as of December 1, 2000.  It should also have referred and explained in summary form and in detail the Company's year 2000 cash-flow, but did not.  What was provided instead was "Net Income (Loss)" which showed a loss of about $1.9 million for the first nine months of 2000.  However, on information and belief, this "loss" was all or in part a product of depreciation charges  associated with costs incurred and paid for during prior years.

163.   Because of accumulated and/or unapplied depreciation rights deriving from historical costs, the Company actually had the ability to offset its income against huge depreciation charges to minimize taxes.  However, real cash flow was quite strong.  In 1999, the last of a series of bad years, cash had been $3 million stronger than net income.  On information and belief, before

60

depreciation and other accounting charges against income, the cash flow during 2000 was substantially positive; on information and belief, it was positive $2 million or more through August 31, 2000 and, on information and belief, the Company had more than enough income coming in during the last quarter of 2000 to cover its obligations for some time.

164.  Defendants used unaudited financial statements for 1999 and 2000, and further provided only selected financial data from these unaudited financials rather than providing the underlying data.  The data selected were misleading and, on information and belief, were actually fraudulent and inaccurate in and of themselves.

165.  The Prospectus does not identify or explain known subsequent material events Defendants knew would occur or should have anticipated would occur in the coming months (ninety (90) days).  There were in fact material events upcoming about which Defendants knew or should have known, including but not limited for example the Sears expansion that opened on December 3, 2000 and closings on the above-identified real estate deals contracted before December 1, 2000 but scheduled to close after that date. Likewise, the April 2000 rezonings of the 16.9 acre parcel discussed above and never disclosed to shareholders become final on or about November 21, 2000.  Defendants knew or should have known this was forthcoming.  Defendants did not inform Shareholders of

the initial rezonings approval; and, they failed to apprise

Shareholders of the rezonings and its financial significance even

once it was final, which occurred before the December 1, 2000 vote.

Shareholders were unaware of these upcoming material events, but

Defendants knew or should have known of them.

166.   On page ten, the Prospectus further states:

On September 15. 1999, [Chairman and CEO Klebahn] sent a
letter to the stockholders reporting the results of the
1999 annual meeting and advising the stockholders of the
Company's financial condition and how he viewed the
outlook for the Company given the continuing depressed
economic conditions in the State. He advised the
stockholders that the Company would require substantial
amounts of cash in the near term and the Company did not
have the capital resources to meet those needs.

As noted in the 1999 financial statements, the Company's
continuance as a going concern is dependent upon its
ability to generate sufficient cash flow to meet its
obligations on a timely basis, to comply with the terms
and covenants of its financial agreements, to obtain
additional financing or refinancing as may be required,
and ultimately to attain profitable operations.  During
the years ended December 31, 1999 and 1998, the Company
incurred operating losses of $4,898,714 and $1,728,000,
respectively. As of December 31, 1999, the Company's
total liabilities exceeded its total assets by
$3,643,000. The Company is substantially leveraged and
significant principal maturities on its indebtedness are
payable to the near term. These factors, among others,
may indicate that the Company will be unable to continue
as a going concern for a reasonable time.

For the reasons explained herein throughout in some detail, these

statements – particularly as they are based on and reiterate events

of 1999 while ignoring material improvements in 2000 catalogued

herein – are false, incomplete and materially misleading.  Briefly,

by November of 2000, the economy had long since turned around; the

real estate market was hot; the Company had sold and contracted to sell comparatively small amounts of its acreage for millions of dollars; the Company had succeeded in rezonings a key 16.9 acre parcel using six kuleanas; Sears had leased most of the vacant retail space in the Shopping Center; numerous buyers were practically begging to be allowed particular assets worth of land by November of 2000, Company was not in 2000 in any danger of bankruptcy or cessation of business.

167.   The Prospectus contains no reference whatsoever to Wattson-Breevast or its superior acquisition offer.  It fails to mention that multiple third parties were interested and willing to pay more for the shares than ALPS had offered.  Instead, it falsely emphasized that a fair auction was conducted and that all other potential bidders were not only communicated with but sought after.

168.   The Prospectus misstates and mischaracterizes the Board's resolution regarding a "waiver" to permit Daniel Case to convey the Board's invitation to Stephen.  Defendants continued to actively lead Shareholders to believe that the deal with Stephen Case had been negotiated independently and at arm's length with appropriate independent, competent advisors when in fact this was untrue.

169.   Page six of the prospectus identifies Stephen M. Case under the heading "Parties to the Merger" and states in pertinent part that:

63

> Stephen M. Case is the chairman of America Online, a publicly traded provider of online services. Mr. Case has a substantial net worth and has provided the company with evidence of his financial capability to consummate the transaction.

Stephen Case used his name and its aura to cause his alter-egos, the ALPS entities, to be treated as though equivalent to himself. The statements that any of Stephen M. Case, ALPS Acquisition and ALPS Investment had provided the Company with proof of their ability to consummate the transaction and/or with proof comparable to that demanded of other would-be bidders is false.  In turn, these statements are further misleading in that they falsely imply that Stephen Case and his two ALPS acquisition entities had had to proceed through the five step process about which shareholders had been told.  In context, it also bolsters the false impression that Stephen Case, ALPS Acquisition and ALPS Investment had been treated equally to and no more favorably than other bidders.

170.  Also on page six, the Prospectus states that ALPS:

> intends to hold the stock and assets of the Company as a long-term investment. Upon completion of merger, ALPS Investment LLC plans to infuse sufficient capital into the Company to meet its current cash needs and to repair and remodel the Kukui Grove Shopping Center and to commence certain infrastructure improvements.

Particularly when read, as it must be, in the context of other statements made to Shareholders described herein many of which were restated or incorporated by reference in the Prospectus, this statement was untrue and misleading in at least three respects.

a.  First, it falsely implies that the Company lacked

64

cash or access to cash sufficient to meet its needs and maintain its properties. As outlined above, this was untrue.

b.   Second, it falsely implies that the Kukui Grove Shopping Center needed immediate repairs that the Company could not afford. This is untrue, both because the Company had cash and ready access to cash it could use to pay for the repairs and because the repairs did not need to be done early in 2001, the time when page ten of the Prospectus states this must be done. By December 1 of 2000, Defendants knew or should have known that the repairs did not have to be commenced at the beginning of 2000. In fact, Stephen Case did not even cause Grove Farm to commence these improvements and repairs to the Shopping Center until mid-2002.

c.   Third, on information and belief, the above-quoted statement is false and misleading because it misrepresents ALPS Investment (and Stephen Case's) then presently held future intentions. The Company's shareholders would not have sold to someone they knew, believed or even suspected would break up Grove Farm. All Defendants knew this, and so they led Shareholders to believe that the Company would be infused with capital and Grove Farm left whole. In fact, on information and belief, Stephen Case and ALPS Investment LLC intended to break up and sell off Grove Farm and never intended to keep it whole. Daniel Case's advice to his son as

to how to behave for a cooling off period after the sale in his September 23, 2000 e-mail illustrates the Cases' hidden intentions regarding Grove Farm, including the intention not to keep it whole. Likewise, Agee's private e-mails to Stephen Case show that they were willing and actively contemplating giving certain assets back to the bank rather than infuse them with additional capital. Their intentions are further illustrated by the facts outlined below demonstrating that after the sale, they began to break up Grove Farm and have now sold off or are in the process of selling off the crown jewels of Grove Farm. While they could have remained silent in the Prospectus as to Stephen Case's and ALPS Investment's future plans chose to speak on this subject in a false, incomplete and misleading manner.

171. Similarly, on page 10, the Prospectus states,

Based on inspection by the Company's engineers, management estimates that the Company will have to spend $4,000,000 to $5,000,000 through early 2001 to repair termite damage in the Kukui Grove Shopping Center.

Once again, for the reasons stated in subparagraphs a and b of the preceding paragraph, these statements are misleading and false.

172. On page seven, the following statements are made:

The Company has land holdings which are entitled for residential, industrial and commercial development. In light of the stagnant economy on the Island of Kauai and the generally unfavorable market in the State for the last ten years, the Company's current strategy is to offer certain of its entitled lands for sale to other builders and developers.* * * The period involved in

66

bringing to market a real estate project on unentitled lands can be ten years or more from the time the project is conceived through the process of obtaining necessary entitlements, installing infrastructure and then either selling the developed lots or building and selling homes. This land development process requires a substantial investment of money and time before any cash flow is generated by the project.

Once again, these statements are false and misleading in multiple respects and on many levels.

a.   First, as detailed elsewhere herein in more detail, these statements  mischaracterized to shareholders the actual state of the economy, are contrary to Defendants' own privately held beliefs about the economy and falsely imply that Defendants were qualified to or retained advisors qualified to advise shareholders about the economy.

b.   Second, and of critical importance here, the second half of this quoted passage is false  in that it misrepresents – and in fact conceals – the huge value and availability to the Company of its 160 kuleanas.  It misstates the time needed to  obtain  entitlements  and  then  sell  land  to  others  to develop, which was the Company's business by 2000 after all. It misstates the investment needed to do so.  The Belt Collins plans referenced above illustrate this inaccuracy.  So too does Company's own experience with its efforts to rezone the 16.9 acre parcel discussed above: that process had been completed  through  the  efforts  of  Company  Vice  President Michael Furakawa in a small fraction of the ten year time

frame for obtaining approval and developing unentitled lands identified in the Prospectus.  On information and belief, through the use of six kuleanas, he was able to rezone and entitle land — thereby converting fallow "ag" land into entitled land, a liquid commodity readily saleable to developers for cash — in two to three years, or less.

173.  The Prospectus is false and misleading in that <u>it does not reference the Company's kuleanas, anywhere.  The word "kuleana" does not appear in the body of the Prospectus.</u>  Period.[1] Yet, Grove Farm's kuleanas represented a major, precious — and potentially liquid — intangible asset or set of rights not carried anywhere on the Company's books or list of assets.  Omitting all references to kuleanas from and failing to provide any discussion or explanation of their nature and worth in the Prospectus was akin to selling the Coca-Cola Co. in a deal where the headquarters and hard assets are shown in the prospectus, but the value of the brand "Coca-Cola" is not mentioned, contained or even reflected in the balance sheets — similar, except that Coca-Cola shareholders are fully aware of

---

[1] The word "kuleana" does appear in the packet of materials sent to Shareholders – once. The ALPS Agreement was attached to the Prospectus.  As part of that agreement, Grove Farm covenanted to donate certain items and historical documents to Grove Farm Homestead Museum (ALPS Agreement §5.20).  Exhibit C to the ALPS Agreement is a twenty-four page single spaced table-formatted listing of documents to be donated to Nuhou Corporation to this end.  Page twenty of this list references a map being donated as follows: "Map showing Kuleanas of Haiku - G.M. Lydgate, Surveyor - May 1907".  Also donated were "Noxious Weeds of Hawaii" (page 13) and "Insects of Guam" (page 5).  Obviously, this is not the sort of disclosure of the Company's kuleanas required in this context.

their brand's prize status and value and would probably know to question any valuation of their company that did not account for the brand's value, whereas Grove Farm's shareholders were ignorant of the Company's kuleanas or even what such a thing is when they sold their Company.  On information and belief, as of December 1,2000, most or all non-insider Grove Farm shareholders were unaware of what a kuleana is or even suspected that Hawaiian law retains this unique historical and cultural zoning vehicle which is unlike anything available to land owners (and developers) in the rest of the United States.

174.  Similarly, as Daniel Case and the other co-authors of the Prospectus knew, Stephen Case did not hire "independent" counsel.  Daniel Case's brother, Jim Case and Carlsmith Ball LLP were not hired to negotiate the ALPS Merger Agreement.  They were not retained until after that contract  was complete, signed by the CEO and approved by the Directors.  They had no real role in transaction – except as last minute cover to help mask the fact that the Transaction was not the product of an arms length process.

175.  James Cribley and Daniel Case – agent of Stephen Case, ALPS Investment and ALPS Acquisition – knew that Grove Farm's management and Board of Directors had not independently negotiated the Merger Agreement. The Definitive Agreements and the Proxy Statement were negotiated and written behind closed doors – outside the board meetings – primarily by Case, Cribley and Klebahn.  The

major economic terms were arrived at in a closed, tainted and entirely arbitrary process – a process Defendants deliberately cut short to prevent a bidding war, which Stephen Case wanted to avoid.

176.   The Prospectus cites and holds out as reasonable and reliable Aspen's valuation of all of GFCI as being with $15 to $17 million.  But, it makes no mention of Aspen's conflicted conduct, Aspen's actions that contradicted its own opinions or known material errors in that valuation.  Burn's felony conviction is also not mentioned.

177. Defendants did not disclose Burn's conviction.  Instead, they sanitized Burns' name from the Proxy Statement and sought to cloak Aspen's valuation as solely John Candon's work as an "independent" consultant:

> On April 7, 2000, the Committee met with John Candon, an independent valuation consultant retained by the Aspen Venture Group, to review his preliminary analysis and draft form of the report.  The report included an extensive review of the relevant financial information and documents, including, but not limited to, the Company's financial statements, the First Hawaiian and Bank of Hawaii loans, and the stock trading price history.  Aspen identified four strategic alternatives: (1) orderly liquidation of the Company with minimal risk; (2) restructuring debt and a commitment to continued short term development; (3) status quo; and (4) sale of all or substantially all corporate assets to a single buyer or sale of 100% of the stock of the Company.  The Committee engaged in extensive discussions regarding the draft report, the Company's prospects and financial condition, the Company's strategic alternatives, the impact on the Company, the community, and the Stockholders of each alternative, various legal considerations and other relevant factors.  After considering these factors, the Committee determined that the best strategic alternative available to the Company

70

> was to sell the Company as a whole.  The Committee authorized counsel to contact Mr. Blum's counsel about the possibility of renewing negotiations. *** On April 17, 2000, the Committee received the final report of the Aspen Venture Group.  The report included a finding by Mr. Candon that the fair market value of the Company's common stock was in the range of $86 to $98 per share.  The report also concluded that the best strategic alternative available was to sell the Company as a whole. *** On May 1, 2000, the Committee met and discussed the status of discussions with Mr. Blum and reviewed the final report of the Aspen Venture Group.  After discussion, the Committee reaffirmed its determination that the best strategic alternative available was to sell the Company as a whole.

Further, Defendants did not correct or explain to Shareholders known material errors of basic math or any other flaws in Aspen's valuation; and, they did not disclose or explain other known factors that they knew rendered Aspen's report unreliable. Defendants also failed to disclose information about myriad material improvements in the Company's cash flow, revenues, long-term prospects and asset base that occurred during the last quarter of 1999 and the first eleven months of 2000, including improvements during the second, third and fourth quarters of 2000 which were not and/or could not have been known to Aspen's Burns and Candon at the time of Aspen delivered its final valuation report to the Company on April 17, 2000.

178.  In the Prospectus, Defendants told Shareholders – many of whom lived out-of-state -- that the Kauai economy remained bad. By doing so, Defendants falsely implied they or the Board possessed (or had hired someone with) expertise to opine about the economy.

In fact, no one involved with the prospectus was qualified to give such advice and no expert was hired.   The   statements   in   the Prospectus regarding the Kauai economy were contrary to Defendants' own assessments of the economy and public reports about the economy.

179.   Just weeks before he authored the Prospectus, on September 28, Daniel Case had privately reported to his son, Stephen, that the "Kauai economy is recovering and it should be" a valuable asset and that "[l]ocal economists seem to think that we are in a recovery with Kauai doing the best because it was hit the worst."  During his on-site visit for Stephen in October of 2000, John Agee reported to Stephen Case that Kauai's "economy...is on an up-swing and this trend is expected to continue."

180.   Daniel Case and his law partners knew or should have known that the GFCI was in no danger of insolvency (or of going bankrupt).   In communications with shareholders leading up to the Prospectus and in that document, they concealed that the cash flow was essentially positive and the debt was entirely manageable. They insisted on the irrelevance of an appraisal of any of the Company's real estate.

181.   Agee had written to Stephen Case on October 11 that "Grove Farm is some of the most beautiful land I have ever seen. I think the long-term potential for commercial and residential development is exceptional.  The economy is on an up-swing and the

trend is expected to continue." Yet, the Case Defendants and CB&L allowed the Prospectus to state the opposite.

182.    The Prospectus also falsely represents that the Directors had made sincere, good faith, reasonable efforts to market the Company.  It implies that immediately after the Board met on September 18, "the Company sent letters to all parties who had previously expressed an interest in the Company and other persons who might be interested."  However, the letters were actually mailed significantly later.  And the Company did not seriously pursue the brokerage firms once the Defendants knew Stephen Case wanted to  purchase the Company.

**DEL MAR QUITS THE FIELD UPON LEARNING IT HAD BEEN TILTED TO FAVOR CASE.**

183.    In mid-November, Del Mar Pacific increased its offer to $175 per share for Grove Farm.  The Attorneys and Directors continued to fashion barriers and manipulate the process to delay and frustrate Del Mar, however.

184.    Del Mar Pacific grew frustrated by the lack of a response from the Attorneys and Directors to its written offer to purchase the Company.  On November 15, Del Mar provided a copy of its proposal to a shareholder and informed the shareholder that the Attorneys and Directors had refused to respond to it.  Instead of simply responding to the offer, the Attorneys and Directors responded by threatening Del Mar Pacific with accusations it had thereby violated the confidentiality agreement.

73

185.   When Del Mar Pacific finally learned during a telephone call on November 17 that Stephen Case had been given breakup fee rights and the right to match any offer Del Mar Pacific might make, they *immediately* withdrew from contention.

**WATTSON-BREEVAST CONTINUES TO ATTEMPT TO BID FOR GROVE FARM.**

186.   Throughout November, Wattson-Breevast continued to attempt to enter into a definitive agreement.

187.   On November 29, a conference call between Wattson-Breevast's attorneys and Attorney Cribley and CEO Klebahn took place.   Klebahn and Cribley tried to throw up barriers and to sabotage Wattson-Breevast's superior acquisition offer – at one point even questioning whether or not the entity with which Wattson-Breevast was associated was even the "real Lehman Brothers".

188.   That same day, Wattson-Breevast's counsel wrote to Attorney Cribley as Grove Farm's counsel to convey Wattson-Breevast's willingness to meet all of the onerous terms Cribley had thrown at Wattson-Breevast in his efforts to frustrate its effort to bid:

> [Wattson-Breevast's] offer would be:  $170/share less the $1M Break-up Fee so $164/share net
>
> This is in response to your email that was received today at 11:05 a.m. I was disappointed with the overall message in the email and the subsequent telephone call with you and Hugh Klebahn. I feel that **many of the points and questions raised in the email and telephone call were designed to create reasons not to deal with us** (e.g. [Klebahn's comment] "How do we know this is the real

Lehman Brothers?  We need a signed definitive agreement and deposit in Hawaii by tomorrow.")

**We were also quite surprised to find the substance of the ALPS Agreement to be much more Buyer favorable than the draft Agreement submitted to us - why would your Board direct you to do that when we indicated we would be making a Superior Acquisition Offer?** At a minimum, to encourage an offer which maximizes Shareholder value, we would have expected an Agreement for us which was comparable to ALPS in terms of fairness.

I thought we were working cooperatively with you to meet your requirements but your timing is unreasonable. I would like to address each of the points set forth in your E-Mail:

Our client has agreed to [your demand for] a $4.5mm deposit in escrow (in BOH or FHB) in the email and telephone call when the definitive agreement is approved by your Board, executed and delivered.

As to rescheduling the Shareholders meeting, our offer is significantly higher than the existing offer backed by substantial financial resources. Delaying the Shareholders meeting for ten (10) days to permit us to finalize an agreement in order to realize millions of dollars more for your Shareholders should be an easy decision. **As I read the ALPS Agreement (Sections 2.02, 2.05 and 5.11), the Shareholders' meeting can be postponed until December 11, 2000 without jeopardizing the ALPS transaction! In fact, I could find  nothing in the ALPS Agreement that would  adversely impact by such a postponement.** Presumably your client's board is well counseled on its fiduciary duties to maximize Shareholder value.

We have indicated our willingness to meet any reasonable timeline and provided a markup of the definitive agreement  to you Tuesday morning after our telephone call Monday evening. This morning we received 198 pages of disclosure schedules and attachments to the ALPS Agreement but not adapted to our agreement. Is it reasonable that we could review and approve (not in a form that matched our agreement) by tomorrow morning? We are nonetheless in the process of reviewing the materials.

[W]e have completed [our due diligence] (except for reviewing the July 31, 2000 financial statements that I requested from you by E-Mail earlier).

Wattson-Breevast is a Delaware limited liability company and its members are the Wattson Group, Inc. a California corporation and Breevast California, Inc. , a California corporation. I am advised that you and your client have previously been provided with detailed information regarding the financial capabilities of the buyer group.

As to Honu - we assumed Section 8.04(ii), which you drafted, allayed your concern. We can and will obtain the requested release.

As to a conference call with FHB, we do not feel this is necessary in light of your requirements and our acquiescence to the $3.5 million escrow deposit. If you would like to have the call, we are willing to participate.

As to a signed definitive agreement, I proposed that we use the ALPS template and adjust it only for our different economics and timing. **If the Board decides to postpone the Shareholders' meeting and you adopt this proposal, a signed definitive agreement can be completed in a few days.**

Finally, as to the guaranty requirement, we will provide a payment guaranty along with the definitive agreement.

(Emphasis supplied).

189. On November 27, 2000, Cribley retained Morrison-Foerster out of Los Angeles on the Company's behalf. He later claimed that they were retained to assist in case there were rush issues at the last minute. But, a contemporaneous e-mail from CEO Klebahn provided a different reason. As he put it to the other directors (except Combs, who never received the e-mail), the Morrison-Foerster firm was retained to give the appearance of a greater

sense of distance from the Case firm and to "cover" the charge of conflict of interest.

190.    Wattson-Breevast's $176 offer per share was nowhere near the true value of the Company.   None of the defendants responsible for negotiating on behalf of the Company countered Wattson-Breevast's offer.   Attorney Case knew that $152 per share was not the "best price" even his own son Stephen was willing to offer. No one pushed to find that outer limit.   One recently uncovered "in-house" bank appraisal for the lender's own purposes conservatively put the fair market value of the Company's real estate of a price equivalent to $591 per share in 2000.   It omits to value or account for the value of key assets; so, as of December 1, 2000, even a $591 share-price valuation is far too low.

191.   When faced with Wattson-Breevast's $176 offer, Stephen Case responded by promising the Directors that ALPS would "honor" the indemnification of them.   The Directors refused to move the December 1, 2000 vote to pursue the Wattson-Breevast competing offer.

192.   Instead of informing Wattson-Breevast of the decision not to postpone the vote, the Attorneys and Directors simply ignored and did not respond to Wattson-Breevast until after the December 1, 2000 vote.

193.   Concerned that shareholders had some knowledge of Wattson-Breevast's superior offer, on November 21, Defendants

caused a "supplement" to the Prospectus to be sent to the Shareholders:

> The Board has reviewed developments since the Proxy Statement was mailed on November 3, 2000 and determined to advise you of certain matters to dispel misinformation which may have been provided by third parties to some Shareholders.

**ALPS Investment LLC.**

> The October 17, 2000 Merger Agreement with ALPS Investment LLC ("ALPS") remains in full force and effect. The December 1, 2000 Shareholders meeting which was called for the purpose of voting on the ALPS transaction is still scheduled to take place on that date.

> Although the Board has received other non-binding proposals which it will discuss below, the ALPS transaction is the only transaction for which the Company has signed, written, binding agreement, and the Board continues to recommend approval of the ALPS transaction. If you have not sent your proxy, the Board urges you to do so.

> If the ALPS transaction is not approved by the Shareholders, at this time the Company has no other binding written agreement with any other party for the sale of the Company. Moreover, notwithstanding the existence of other proposals and the rumors about such other proposals, no assurances can be given that the Company will be able to enter into any other binding agreement on terms at least as favorable as those in the ALPS transaction if the ALPS transaction is not approved.

**Del Mar Pacific.**

> After the Merger Agreement with ALPS was approved by the Board on October 17, 2000, a notice was sent to all of those parties who had previously expressed their interest in purchasing the Company or its assets. The notice advised that the Merger Agreement required the Company to terminate all existing activities, discussions and negotiations with other interested parties and included a copy of Sections 5.18(a)(b)(c) and (d) of the Merger Agreement which lists those requirements.

> Under 5.18(d) of the Merger Agreement, new

discussions and negotiations are permitted by the Company when an unsolicited acquisition offer is received that the Board reasonably believes is likely to be a "Superior Acquisition Offer". On October 20,2000, and unsolicited offer, in the form of a non-binding letter of intent, was received from DMP. the Del Mar letter of intent provided for a price per share which was superior to the Merger Agreement but included several conditions to closing, including a 120-day due diligence period. The letter also precluded disclosure of the letter to any third parties. This restriction would have prevented the Company from complying with its obligations under Section 5.18(b) of the Merger Agreement, which requires the Company to provide notice of any acquisition offers within one day of receipt. The contractual obligation to provide such disclosure was identified to Del Mar by letter faxed to them on October 23, 2000. Del Mar responded permitting the disclosure and the disclosure was made to ALPS on October 24, 2000.

By letter mailed and faxed on October 25, 2000, Del Mar was advised that while the disclosure problem was solved, the Company was unable at that time to evaluate whether or not the terms they proposed would likely be a Superior Acquisition Offer since the Company had not received information to establish the financial capability of Del Mar to complete the transaction, without financing contingencies. The letter also advised Del Mar that the Merger Agreement transaction was scheduled to close on or about December 1,2000. The Del Mar letter expired by its terms on October 27, 2000.

Two and a half weeks later, on November 13,2000, the Company received a renewed proposal from Del Mar Pacific dated November 10, 2000 to enter into a letter of intent at a price higher than the Merger Agreement which was stated by Del Mar at $175 per share subject to certain unspecified offsets. Del Mar also then provided form of confidentiality agreement signed by Del Mar and information with respect to financial partner who Del Mar represented was capable of performing the transaction. The confidentiality agreement included a provision which precluded disclosure of the terms of the proposal to ALPS, as required by the Merger Agreement. On November 14, 2000, the Company faxed a request for confirmation that the Company would be permitted to disclose the letter to ALPS as required by the Merger Agreement, notwithstanding the language of the confidentiality

agreement. On November 16, 2000, Del Mar confirmed that the Company could disclose the proposal to ALPS. A conference call was scheduled for November 17, 2000 between Del Mar, the Company and their counsel.

After the call had been scheduled, the Company learned from a shareholder that a copy of the Del Mar proposal had been sent to a shareholder on November 15, 2000 by an agent of Del Mar, and the shareholder was told that the Company had refused to respond to the proposal. This disclosure violated the terms of the confidentiality agreement executed by Del Mar. upon learning this information, the Company contacted Del Mar during the afternoon  of November 16, 2000, and Del Mar agreed to contact its agent and advise him that such disclosure was not proper and in violation of the confidentiality agreement.

On November 17, 2000, the conference call was held with Del Mar and its counsel. Del Mar was advised of the provisions of the Merger Agreement applicable to subsequent acquisition offers, including the provisions providing for payment of the Termination Amount and ALPS' right to match any subsequent offers. Upon learning  of these provisions, Del mar advised that there was no need for any further discussions. Within minutes thereafter, Del Mar faxed a notice to the Company revoking its confidentiality agreement.

Based on the revocation of the confidentiality agreement by Del Mar and as a result of its concern that some Shareholders may be misled that there is a higher offer on the table from Del Mar, the Company has determined to provide this detailed review of the matter to the Shareholders.

**Other Proposals.**

As previously outlined in the Proxy Statement, the Merger Agreement does permit discussions and negotiations with a party who makes an unsolicited acquisition offer that the Board reasonably believes is likely to be a Superior Acquisition Offer. However, in each case confidentiality of the proposal has been important to both the Company and the interested party. The Company is also concerned about prematurely disclosing terms of any proposal which is non-binding, subject to financing or due diligence contingencies and the like, or is from a

> party which has not provided evidence of financial
> capability to perform within the time constraints
> involved. To do so would be misleading  and contrary to
> the Company's obligations under the Merger Agreement.
>
> This having been said, the Board wishes to advise
> you that the Company has received a written proposal from
> another interested party. At this time, this proposal is
> non-binding and in the form of a letter of intent. The
> Company has entered into discussions and negotiations the
> Company executes a definitive agreement regarding a
> Superior Acquisition Offer, the Shareholders will be
> promptly notified. However, until so notified, the
> Shareholders should continue to vote on the ALPS
> transaction and send their proxies. If the Board does
> execute a definitive agreement regarding a Superior
> Acquisition Offer, it will seek shareholder approval of
> that transaction at the appropriate time.

194.   Before the vote on the Transaction, a shareholder (Patricia Wilcox Sheehan) posed several questions about the upcoming vote to the Directors.  In a letter authored by Attorney Cribley and sent out over CEO Klebahn's signature dated November 29, 2000, the Attorneys and Directors responded:

> [Y]our questions seem to indicate that you have misread
> the dire circumstances under which the Company is
> operating at this time, and the real risk that in
> flirting with potential third party buyers who are not
> prepared to close by year end or make other substantial
> arrangements to deal with the First Hawaiian Bank loan
> and shopping center expenses that the Company could lose
> the ALPS Agreement and not have a substitute buyer.  That
> would probably lead to a bankruptcy filing for the
> Company.

Bankruptcy for GFCI was not a probable result should Shareholders decline to sell.   (GFCI was never close to insolvency or bankruptcy, at all.)  Further, by implication, the dissemination of this letter on the eve of the Shareholder vote misled shareholders

to believe that Wattson-Breevast was not *bona fide* and serious about its superior acquisition offer.  It was also misleading in that it directly implied that December 1 was a drop dead date when in fact the Shareholder vote could be postponed <u>without</u> impairing the Company's rights to force to close under the ALPS Agreement.  Thus, CB&L (through Klebhan) falsely stated to a shareholder that the Company was going bankrupt, had no serious alternatives to ALPS and could not postpone the vote.

195.  At the time Shareholders voted to accept Stephen Case's offer, they had not been told and did not know that four months earlier the Bank of Hawaii had estimated that the "market value" of the real estate was $153 million or that as of the date of that estimate the Company had millions in cash (with millions more coming in December of 2000 alone).  In contrast, at the time Stephen Case purchased Grove Farm stock for $152 per share, he and John Agee – and therefore ALPS Acquisition, ALPS Investment, the Case Trust and Ka Po'e Hana – had been furnished with this information and had considered it and other non-public material information discussed herein.

196.  At the time Shareholders voted to approve the transaction, Defendants knew but Shareholders did not know: that the County's assessed value on Grove Farm was about $150 million; the County had given final rezoning approval changing 16.9 acres next to the Hyatt to allow its development for residential or

resort uses; of the BOH commercial appraisal of the shopping center and villages for $22 million; of the Belt Collins Hawaii master plans for Keoniloa Bay and Mahaulepu; the Company's kuleanas, believed and alleged to have numbered in excess of 160; of the Saxon-Ravenscraig offer; that the Company had ample cash on hand to last at through April of 2001; that repairs to the Shopping Center did not need to begin until mid 2001; and, above all, the absolutely critical basic fact that Grove Farm simply did not need to be sold at all.

197.  This hard reality cannot be over emphasized: the Company did not need to be sold in 2000.  Defendants knew this basic material fact.  Shareholders did not.  Had shareholders realized that they were not faced with a choice between a sale or a total loss of their equity, they would not have sold their shares.

SELECTED POST-DECEMBER 1, 2000 EVENTS NOW KNOWN TO PLAINTIFFS.

198.  Days after Stephen Case acquired Grove Farm, however, CB&L finally did negotiate with FHB for a restructuring of GFCI's debts.  *With just a single phone call* with Walter Dodds, chairman of FHB, Daniel Case of CB&L obtained a "Blue Plate Special" whereby FHB forgave $8.5 million of the Company's debt.

199.  Stephen Case rewarded the Directors who made his takeover of Grove Farm possible.  For example, Donn Carswell and/or his children were given exclusive eco-tourism rights over Kauai land controlled by Stephen Case.  William Pratt and/or his family

were given *exclusive* rights to Grove Farm's real estate listings –
rights worth hundreds of thousands if not millions of dollars.
Other Director Defendants (including Pratt and Moore) were made
paid members of the Board of Directors of Grove Farm, post
acquisition.  But for Moore, this was actually nothing new: he had
been for some time a Director at Maui Land and Pineapple (a company
controlled by Stephen Case).  Stephen Case installed Defendant Pam
Dohrmann's sister's husband, David Pratt, as "President" of Grove
Farm.  (David Pratt is also Defendant William Pratt's father and
Defendant Carswell's "calabash" cousin.)  CB&L continued as legal
counsel, of course, and continues to occupy this lucrative position
to this day.  As he had asked Stephen to do, Daniel Case himself
was appointed Grove Farm's chairman.

200.  Two days after the December 1, 2000 vote, Sears opened
its expansion at the Shopping Center.  As a result, the Company's
cash flow improved, on information and belief, by $500,000 to $1
million per year.

## COUNT I
### (Insider Trading - Stephen Case Defendants)

201.  Plaintiffs incorporate all prior paragraphs as if fully
reinstated herein.

202.  Stephen Case violated 15 U.S.C. § 78j(b) by engaging in
insider trading.  He did so in his own individual name through his
agent, his father Daniel Case, and did so by and through the
investment vehicles he owns and controls, co-defendants ALPS

84

Acquisition and ALPS Investment LLC.

203.   ALPS Investment, LLC violated 15 U.S.C. § 78j(b) by engaging in insider trading as outlined herein.

204.   ALPS Acquisition Sub violated 15 U.S.C. § 78j(b) by engaging in insider trading as outlined herein.

205.   Stephen Case and his investment shell vehicles, ALPS Acquisition and ALPS Investment contracted as buyers to acquire and in fact acquired one hundred percent of the stock in Grove Farm. Mr. Case did so by and through a transaction or series of inter-linked transactions utilizing ALPS Acquisition and ultimately placing legal title to the stock in his other shell company, ALPS Investment.  Stephen Case purchased stock owned by or held for the benefit of plaintiffs, directly and therefore contemporaneously.

206.   Stephen Case also purchased stock owned by or held for the benefit of plaintiffs' predecessors in interest in whose shoes plaintiffs stand.  All plaintiffs and any predecessors in interest, where applicable, are and/or were at all relevant times members of the Wilcox family by blood or by marriage.

207.   Stephen Case, ALPS Acquisition and ALPS Investment purchased the Company's shares while in possession of material, non-public information about the Company's assets and financial affairs, which information was not known to or understood by the shareholders who sold to them.  At the time they so acquired stock in Grove Farm, Stephen Case, ALPS Acquisition and ALPS Investment

used inside information they gleaned from Daniel Case and Hugh Klebahn as outlined above knowing that such information was non-public, that Daniel Case and Hugh Klebahn held such information as fiduciaries to Grove Farm and that Daniel Case's use of said information to enrich his son or himself was a particularly serious and insidious breach of fiduciary duty.  Stephen Case, ALPS Acquisition and ALPS Investment's actions caused a detriment to the Company's shareholders, including the Plaintiffs in this case, and unjustly benefitted each and every one of the Stephen Case Defendants, and ultimately Stephen M. Case himself.

208.  Plaintiffs have a private right of action against each of the Stephen Case Defendants under 15 U.S.C. § 78t-1(a).

209.  Defendants were unlawfully benefitted and enriched in a very substantial amount.  On information and belief, they benefitted from their above-described insider trading by a sum in excess of $750 million ($750,000,000).  Plaintiffs (as well as predecessors in interest to some plaintiffs) were directly and proximately damaged in proportion to their respective stock ownership in like amounts.

WHEREFORE, pursuant to all counts above, Plaintiffs respectfully demand declaratory relief, judgment and rescission in their favor as follows:

a.   A DECLARATORY JUDGMENT declaring that Plaintiffs are entitled to RESCISSION;

b.   An order granting Plaintiffs RESCISSION of the Transactions and restoring the *status quo ante* by restoring Plaintiffs to their prior status as Stockholders of GFCI together with the rest of the Wilcox family retroactive *nun pro tunc* and effective as of December 1, 2000; in the alternative, Plaintiffs respectfully request to be restored to their *pro rata* status as part owners of GFCI retroactive *nun pro tunc* and effective as of December 1, 2000;

c.   An award to Plaintiffs of compensatory damages in the amount to be proven at trial and punitive damages in an amount proven at trial to be sufficient to punish and deter Defendants' conduct;

d.   An award to Plaintiffs of the costs and disbursements of this action, including reasonable attorney's and expert's fees; and,

e.   Granting such other and further relief as this Court may deem just and proper.

DATED: June 5, 2006

_____/s/_____
MATTHEW H. SIMMONS, *pro hac vice*
Co-counsel for Plaintiffs