IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

GUY ST. CLAIR COMBS; ET AL.,      )
     )
              Plaintiffs,      )      Civil No. 05-00741 REJ-KSC
     )
         v.      )      <u>OPINION AND ORDER</u>
     )
STEPHEN M. CASE; ET AL.,      )
     )
            Defendants.      )

Damon M. Senaha
LAW OFFICE OF DAMON SENAHA
95-214 Hoakua Place
Mililani, HI  96789

John L. McDermott
Century Square
1188 Bishop Street, Suite 711
Honolulu, HI  96813

Matthew H. Simmons
Seann P. Malloy
SIMMONS & ASSOCIATES, CHARTERED
7347 Wisconsin Avenue, Suite 200
Bethesda, MD  20814

  Attorneys for Plaintiffs

Paul Alston
David A. Nakashima
Stephen M. Tannenbaum
ALSTON HUNT FLOYD & ING
ASB Tower
1001 Bishop Street, Suite 1800
Honolulu, HI  96813

    Attorneys for Defendants

JONES, Judge:

Plaintiffs filed this action on November 30, 2005,[1] against defendants Stephen Case, ALPS Investment LLC, ALPS Acquisition Sub, Inc., The Stephen M. Case Revocable Trust, and Ka Po'e Hana LLC, seeking $750 million in damages[2] and other relief, including rescission, for defendants' alleged violations of sections 10(b) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t-1.  Plaintiffs' claims arise out of a privately negotiated transaction in which, during December 2000 and January 2001, plaintiffs and their predecessors in interest sold 100 percent of their shares in Grove Farm Company, Inc. ("Grove Farm") for $152.00 per share, for a total of approximately $26 million, to defendant Stephen Case and his alleged alter ego companies, ALPS Investment and ALPS Acquisition.[3]  Plaintiffs allege that in conjunction with the sale and merger, defendants possessed material non-public insider information about the true value of Grove Farm's holdings that was not known by or revealed to the plaintiffs at the time of

---

[1]      Due to conflict issues within the district court of Hawai`i, on May 11, 2006, the case was assigned to me.

[2]      Before trial, plaintiffs' counsel suggested plaintiffs' damages were more in the range of $2.5 billion.

[3]      Stephen Case testified that the $26 million was the initial investment.  He also took on $60-$65 million in existing debt and made emergency repairs, for a total commitment of around $100 million.  Transcript ("Tr.") 2619.

PAGE 2 - OPINION AND ORDER

the defendants' stock acquisition.

Motion practice earlier in these proceedings resulted in the following rulings:

1.      I denied defendants' motion for summary judgment based on the two-year statute of limitations set forth in 28 U.S.C. § 1658(b)(1), holding that genuine issues of material fact remained for trial;

2.      I granted defendants' motion to dismiss plaintiffs' claims under section 20A, 15 U.S.C. § 78t-1;

3.      I allowed those plaintiffs whose claims rest on assignments to proceed to trial;[4]

4.      I denied defendants' motion for summary judgment based on the five-year statute of repose set forth in section 1658(b)(2);

5.      I granted defendants' motion to dismiss defendants The Stephen M. Case Revocable Trust and Ka Po'e Hana LLC; and

6.      I granted defendants' motion to dismiss plaintiffs' claims for punitive damages, but denied as premature defendants' motion to dismiss plaintiffs' claims for rescission.

In the weeks leading up to and during the final pretrial conference held April 23, 24, and 28, 2008, in Hawai`i, counsel cooperated with the court in settling several important trial procedures.  First, the parties agreed to waive a jury and try the case to the court.  Second, I

---

[4]      During the pretrial conference and during the trial itself, I made the following rulings concerning certain assigned claims:  (1) I dismissed claims related to shares assigned from Bank of Hawaii to the Guy St. Claire Combs III Trust and Marion W. Combs; (2) I dismissed claims related to shares assigned from Lydia Sloggett to Anne Hamilton Sloggett and Arthur W. Sloggett; and (3) I dismissed claims related to shares assigned from Ralph Fisher and Sally Fisher to Timothy Fisher, Jonathan Fisher, Anthony Fisher, and Galen Fisher.  I also dismissed plaintiff Susan Chamberlain on stipulation of the parties, and dismissed plaintiff Galen Fisher because he held no shares directly.  (See ## 500, 527).

bifurcated the trial into phases.  In Phase 1, I heard evidence on defendants' statute of limitations defense.[5]  In Phase 2, I heard evidence on the merits of  plaintiffs' case for liability on insider trading.  I reserved Phase 3, the issues of damages and rescission, until after I decided the issue of liability.

After the three-day final pretrial conference, I conducted a bench trial commencing April 29, 2008.  During four weeks of trial, the parties submitted and I considered hundreds of exhibits, and I heard the testimony of fifty witnesses, including several experts.  In addition, the parties designated and cross-designated numerous deposition excerpts for my consideration. After closing arguments on May 23, 2008, I took the issue of defendants' liability under advisement.  In the weeks after trial, the parties submitted additional briefing on a variety of issues, including proof of reliance on "half-truths" and liability based on forward-looking statements.

I have now completed my review of the evidence and the parties' arguments, and for the reasons explained below, conclude that plaintiffs have failed to meet their burden of proving insider trading liability as to Stephen Case, ALPS Investment LLC, and ALPS Acquisition Sub, Inc.  Specifically, I conclude that plaintiffs failed to prove by a preponderance of the evidence key elements of both primary violator liability and tipper/tippee liability as to all defendants.

BRIEF BACKGROUND OF THE LITIGATION

In early November 2000, the Board of Directors of Grove Farm ("Board") sent a Proxy Statement to all shareholders concerning a proposed merger between Grove Farm and ALPS

---

[5]       I ruled against the defense from the bench.  See discussion in section II of this opinion, infra.

PAGE 4 - OPINION AND ORDER

Investment ("ALPS")[6], notifying them that "[a]s a result of the merger, each of [Grove Farm's] stockholders . . . will receive $152 for each share of common stock that they own."  Exhibit ("Exh.") 1345.  Among other things, the Proxy Statement recounted negotiations with other potential buyers beginning with an unsolicited letter of intent in November 1999, and ending with approval of a merger agreement with ALPS.  The Proxy Statement further notified the shareholders of a meeting to be held on December 1, 2000, to vote on the merger proposal, and recommended that "you vote FOR approval of the Merger Agreement."  Id.  The Board circulated a Supplemental Proxy on November 21, 2000, Exh. 1369, which made certain additional disclosures.  On December 1, 2000, shareholders owning 98.9 percent of the shares voted in favor of the merger.  Exh. 2196.  The stock sale was completed in December 2000 and January 2001.

Shareholder grumbling began immediately.  On November 30, 2000, Michael Sheehan, who did not join this litigation, filed a class action complaint in Hawai`i state circuit court against Grove Farm, ALPS Acquisition, and officers and directors of Grove Farm, seeking, in essence, to enjoin or rescind the proposed merger stock sale on allegations of  breach of fiduciary duty and self-dealing.  Sheehan v. Grove Farm Co., Inc., Civil No. 00-01-0211 (5th Cir. Haw.).  The circuit court declined to certify the class, and ultimately dismissed the case for lack of subject matter jurisdiction.[7]  The appellate court affirmed those rulings in a written decision dated August 30, 2005.  See Sheehan v. Grove Farm Co., Inc., 114 Hawai`i 376, 163

---

[6]     In this opinion I refer to ALPS Investment and ALPS Acquisition Sub together as "ALPS."

[7]     The state circuit court evidently dismissed Sheehan in April 2003.

PAGE 5 - OPINION AND ORDER

P.3d 179 (Hawai`i App. Aug. 30, 2005).[8]

Meanwhile, on November 29, 2002, a group of shareholders, including twelve of the plaintiffs in this action, filed a second action in Hawai`i state circuit court, Tsukamoto v. Grove Farm Company, Inc., Civil No. 02-1-0182 (5th Cir. Haw.).  The named defendants were the same as those in Sheehan with an additional defendant, Daniel Case of the Case Bigelow & Lombardi law firm and the father of Stephen Case, the primary defendant in this action.  Similar to the allegations in Sheehan, but more detailed, the Tsukamoto second amended complaint alleged claims for breach of fiduciary duty, negligence, fraud and misrepresentation, and conspiracy to defraud, all arising out of the stock sale and merger.  Tsukamoto remained a viable case into at least 2007.

On November 29 and 30, 2005, certain shareholders filed two more complaints, the first in the Hawai`i state court for the Fifth Circuit (Kauai), and the second in the federal district court for the district of Hawai`i.  With two exceptions, the plaintiffs in both actions are identical,[9] and each complaint adds defendants not named in Sheehan or Tsukamoto; specifically, Stephen Case, The Stephen M. Case Revocable Trust, Ka Po'e Hana LLC, and ALPS Investment.  In a departure from all three state court complaints, which allege only state law claims, the federal court plaintiffs allege only violation of federal securities law.  The 2005 state court action, Combs et al. v. Stephen M. Case, et al., Civil No. 05-1-0166 (5th Cir. Haw.), remains pending.

---

[8]    The Hawai`i Supreme Court granted certiorari in Sheehan on October 19, 2005, and dismissed certiorari as improvidently granted on July 31, 2007.  Sheehan v. Grove Farm Co., Inc., 115 Hawai`i 200, 166 P.3d 373 (Hawai`i Jul. 31, 2007).

[9]    There are two additional plaintiffs in the state court action, The Martha Combs Trust and Steven Auerbach.

DISCUSSION

I.   LEGAL FRAMEWORK

Plaintiffs' sole claim in this action is an insider trading claim under section 10(b) of the

Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities Exchange Commission ("SEC")

Rule 10b-5.  See Combs v. Case, 05-741 REJ-KSC (Minute Order, April 4, 2008 (# 362)).

Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --
>
> * * *
>
> (b)      To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Promulgated pursuant to that section, SEC Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)      To employ any device, scheme, or artifice to defraud,
>
> (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Neither section 10(b) nor Rule 10b-5 mentions "insider trading," but insider trading is

recognized as a theory of liability for securities law violations. This case does not present

"classic" insider trading, in which a corporate insider violates section 10(b) and Rule 10b-5 when

he or she trades in the securities of his or her corporation on the basis of material, nonpublic

information. S.E.C. v. Talbot, 530 F.3d 1085, 1091 (9th Cir. 2008)(citing United States v.

O'Hagan, 521 U.S. 642, 651-52 (1997)).

In essence, plaintiffs' theory in this case is that Stephen Case and ALPS were "tippees"

who unlawfully used insider information in purchasing Grove Farm. Tippees are not insiders,

and as the Ninth Circuit in Talbot explained, liability under the classic theory does not reach

trading by an outsider who owed no fiduciary relationship to the corporation in whose shares he

or she traded. 530 F.3d at 1091. In Chiarella v. United States, the Supreme Court clarified that

there is no "general duty between all participants in market transactions to forgo actions based on

material, non-public information." 445 U.S. 222, 233 (1980). Instead, a duty to disclose or

abstain from trading "'arises from a specific relationship between two parties.'" Talbot, 530 F.3d

at 1091 (quoting Chiarella, 445 U.S. at 233); see also Dirks v. S.E.C., 463 U.S. 646, 654 (1983)

("We were explicit in Chiarella in saying that there can be no duty to disclose where the person

who has traded on inside information 'was not [the corporation's] agent, . . . was not a fiduciary,

[or] was not a person in whom the sellers [of the securities] had placed their trust and

confidence.'")(quoting Chiarella, 445 U.S. at 232) (alterations in original)).

In 1997, the Supreme Court recognized a theory of liability for corporate outsiders

"complementary" to the classical theory, which the Court referred to as the "misappropriation

theory." Talbot, 530 F.3d at 1091 (citing O'Hagan, 521 U.S. at 652). Under the

misappropriation theory, "a person commits fraud 'in connection with' a securities transaction,

and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."

<u>O'Hagan</u>, 521 U.S. at 652.  According to <u>Talbot</u>,

> The misappropriation theory reaches trading by corporate outsiders, not insiders; therefore, as a corporate outsider, the misappropriator owes no duty to the investor with whom he trades, a requirement for liability under the classical theory of insider trading.  Rather, "[i]n lieu of premising liability on a fiduciary relationship between [a] company insider and purchaser or seller of the company's stock, the "misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information. Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation . . . ."

<u>Talbot</u>, 530 F.3d at 1091-92 (<u>quoting</u> <u>O'Hagan</u>, 521 U.S. at 655).

Tipper liability, and the tippee liability derived from it, "is a species of the 'misappropriation' theory."  <u>U.S. v. Evans</u>, 486 F.3d 315, 322 (7th Cir. 2007).  According to the Supreme Court in <u>Dirks</u>, <u>supra</u>, although "[t]he need for a ban on some tippee trading is clear," 463 U.S. at 659, "only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information":

> Because the disclose-or-refrain duty is extraordinary, it attaches only when a party has legal obligations other than a mere duty to comply with the general antifraud proscriptions in the federal securities laws.  * * *  A duty to disclose arises from the relationship between parties . . . and not merely from one's ability to acquire information because of his position in the market.

<u>Dirks</u>, 463 U.S. at 657-58 (internal punctuation and citations omitted).  The <u>Dirks</u> Court explained that

> [i]mposing a duty to disclose or abstain solely because a person knowingly

PAGE 9 - OPINION AND ORDER

receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market.  It is commonplace for analysts to "ferret out and analyze information," and this often is done by meeting with and questioning corporate officers and others who are insiders.  And information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities.  * * * It is the nature of this type of information, and indeed of the markets themselves, that such information cannot be made simultaneously available to all of the corporation's stockholders or the public generally.

463 U.S. at 658-59 (footnotes and citation omitted).

In formulating a test for tippee liability, <u>Dirks</u> recognized that "some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*."  <u>Id.</u> at 660 (emphasis in original).  Thus,

a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information <u>only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach</u>.

<u>Dirks</u>, 463 U.S. at 660 (emphasis added); <u>see also</u> <u>U.S. Evans</u>, 486 F.3d at 322 (adopting two-part test for tippee liability).[10]

Finally, <u>Dirks</u> made clear that "[n]ot 'all breaches of fiduciary duty in connection with a securities transaction' . . . come within the ambit of Rule 10b-5.  There must also be 'manipulation or deception.'  In an inside-trading case, this fraud derives from the 'inherent unfairness involved where one takes advantage' of  'information intended to be available only for a corporate purpose and not for the personal benefit of anyone.'"  <u>Dirks</u>, 463 U.S. at 654 (citations omitted).

---

[10]     This court has located only one unpublished Ninth Circuit case that cites <u>Dirks</u>, but the reference recognizes "the two-part test for tippee liability set forth in <u>Dirks</u>."

With this legal framework in mind, I turn to the specific proof requirements of plaintiffs'
claim.

A.       Basic Elements of Plaintiffs' Section 10(b) Claim

The basic elements of plaintiffs' section 10(b) claim are:  (1) a false statement or
omission with regard to a material fact; (2) in connection with the purchase or the sale of a
security; (3) made with scienter; (4) upon which plaintiffs reasonably relied; and (5) that
proximately caused the alleged loss.  See Metzler Inv. GmbH v. Corinthian Colleges, Inc., ___
F.3d ___, 2008 WL 3905427 at *8 (9th Cir. Aug. 26, 2008); Binder v. Gillespie, 184 F.3d 1059,
1063 (9th Cir. 1999).

B.       Proof of Primary Violator Liability Required

Section 10(b) does not allow recovery for aiding and abetting.  Central Bank of Denver,
N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177-78 (1994).  Thus, a plaintiff
pursuing a private action under section 10(b) and Rule 10b-5 "must satisfy each of the elements
or preconditions for liability" as to each defendant.  Stoneridge Inv. Partners, LLC v. Scientific-
Atlanta, 128 S.Ct. 761, 769 (2008); see also Simpson v. AOL Time Warner Inc., 452 F.3d 1040,
1047 (9th Cir. 2006).  Although the Supreme Court vacated and remanded Simpson in
Stoneridge,[11] I agree with and therefore adopt the Ninth Circuit analysis of "primary violator"
liability in Simpson:

> [T]o be liable as a primary violator of § 10(b) for participation in a 'scheme to
> defraud,' the defendant must have engaged in conduct that had the principal
> purpose and effect of creating a false appearance of fact in furtherance of the
> scheme.  It is not enough that a *transaction* in which a defendant was involved

---

[11]        On remand, the Ninth Circuit vacated the district court opinion and remanded for
further proceedings.  Simpson v. Homestore.com, Inc., 519 F.3d 1041 (9th Cir. 2008).

> had a deceptive purpose and effect; the defendant's *own conduct* contributing to
> the transaction or overall scheme must have had a deceptive purpose and effect.

Id. at 1408 (emphasis in original).  The "principal purpose" aspect of that test is related to but different from the element of scienter required for a section 10(b) claim. Id. at 1408 n. 5.  The principal purpose prong "examines instead whether the challenged conduct of the defendant had a principal purpose, and not just an accidental effect, of creating a false appearance as part of a deceptive transaction or fraudulent scheme."  Id.

> The Simpson court further explained that:

> A test that examines the purpose and effect of a defendant's conduct in an alleged
> scheme to defraud, as a means to assess whether the defendant used or employed
> a deceptive device, ensures that the defendant's conduct is sufficiently deceptive
> to justify imposing primary liability.  Thus, when determining whether a
> defendant is a "primary violator," the conduct of each defendant, while evaluated
> in its context, must be viewed alone for whether it had the purpose and effect of
> creating a false appearance of fact in the furtherance of an overall scheme to
> defraud.

Id. at 1450.

C.     Proof of Each Defendant's Scienter Required

The requirement that plaintiff prove primary violator liability as to each individual defendant mandates proof that each individual defendant acted with the requisite state of mind. See, e.g., Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365-66 (5th Cir. 2004); Teachers' Retirement System of LA v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007).  With respect to Stephen Case, the non-corporate defendant, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency."  Southland, 365 F.3d at 366; see also 15 U.S.C. § 78u-4(b)(2).  In other words, proof of scienter as to Stephen Case

may not be imputed to him by proof of the requisite mental state in his agents.

With respect to the corporate ALPS defendants, a corporation is "deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . .." Southland, 365 F.3d at 366 (citation omitted); see also Teachers' Retirement, 477 F.3d at 184. In view of plaintiffs' theory, the corporate officer here is Stephen Case.

II.   PHASE 1:  STATUTE OF LIMITATIONS

After a week of trial on the statute of limitations affirmative defense, I ruled from the bench that the defendants had failed to sustain their burden of proof. See Combs v. Case, 05-741 REJ-KSC (Minute Order, May 12, 2008)(# 536). I address the issue here only to put to rest any notion that the defense has continuing viability.

Under section 804(a) of the Sarbanes-Oxley Act of 2002 (codified at 28 U.S.C. § 1658(b)), plaintiffs' claims for securities fraud had to be filed "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." "Either actual or inquiry notice can start the running of the statute of limitations." Betz v. Trainer Wortham & Co., 519 F.3d 863, 874 (9th Cir. 2008). With respect to inquiry notice, which is relevant here, the Betz court adopted the "inquiry-plus-reasonable-diligence" test used by the Tenth Circuit, see 519 F.3d at 876,[12] which is as follows:

> [T]o determine when the statute of limitations begins running, we first determine when the plaintiff had inquiry notice of the facts giving rise to his or her securities fraud claim. A plaintiff is on inquiry notice when there exists sufficient suspicion

---

[12]   With respect to adoption of the Tenth Circuit test, Betz cites Berry v. Valence Technology, Inc., 175 F.3d 699, 704 (9th Cir. 1999), which in turn discusses the Tenth Circuit test set forth in Sterlin v. Biomune Sys., 154 F.3d 1191, 1201 (10th Cir. 1998).

of fraud to cause a reasonable investor to investigate the matter further. * * *
[W]e caution that inquiry notice should not be construed so broadly that the
particular plaintiff cannot bring his or her suit within the limitations period.  The
facts constituting inquiry notice "must be sufficiently probative of fraud -
sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim
to investigate."  Once a plaintiff has inquiry notice, we ask when the investor, in
the exercise of reasonable diligence, should have discovered the facts constituting
the alleged fraud.  The answer to that second question tells us when the statute of
limitations began to run.

Betz, 519 F.3d at 876-77 (citations omitted).

In 1995, as a check against abusive securities litigation by private parties, Congress

enacted the Private Securities Litigation Reform Act.  Telltabs, Inc. v. Makor Issues & Rights,

Ltd., 127 S.Ct. 2499, 2504 (2007).  Under the PSLRA, for these plaintiffs to plead in good faith

their section 10(b) claim, they were  required to meet the "formidable" pleading requirements for

two key elements of their claim, falsity and scienter.  Metzler, ___ F.3d at ___, 2008 WL

3905427 at *2.  As pertinent to the statute of limitations issue before me, to comport with the

PSLRA pleading requirement for scienter, plaintiffs were required to allege "with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2).  In the Ninth Circuit, the required state of mind is that "the defendant

acted with an intent to deceive, manipulate, or defraud."  Metzler, ___ F.3d at ___, 2008 WL

3905427 at *8; see also Betz, 486 F.3d at 593 (to adequately plead scienter, "a § 10(b) plaintiff

'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately

reckless or conscious misconduct'" (citation omitted)).

As I explained in my decision denying summary judgment on the statute of limitations

defense, plaintiffs suspected wrongdoing on Stephen Case's part by mid-July 2003.  See

generally Combs v. Case, 05-741 REJ-KSC (Opinion, Sept. 20, 2007 (# 144)).  By then,

PAGE 14 - OPINION AND ORDER

plaintiffs had accused Grove Farm board members of conspiring with Dan Case, alleged to be

Stephen Case's agent, and of providing Dan Case with insider information to assure ALPS would

be the successful bidder.  But even after a full week of trial, defendants failed to prove that

plaintiffs should or could have discovered the facts necessary to support a sufficient

section 10(b) allegation of scienter against Stephen Case and his companies before November

30, 2003.  Indeed, the fully developed record bore out plaintiffs' argument that the information

necessary for them to credibly allege all elements of their insider trading claim did not come to

light until the state court actions reached the discovery phase in 2004 and thereafter.

Stonewalled before then in their efforts to obtain relevant information, plaintiffs finally were

able to use the power of the court to depose the key players involved in the December 2000

merger; notably Hugh Klebahn (Chairman of the Board and CEO of Grove Farm), and Dan

Case.  In addition, plaintiffs finally obtained nonpublic information from Dan Case's files and as

well as those of his law partner, James Cribley.  I am persuaded that without the information

developed in 2004-2005, plaintiffs could not credibly and in good faith plead a valid securities

fraud claims in federal court that would satisfy the mandates of the PSLRA or Federal Rule of

Civil Procedure 11.

　　　　As plaintiffs' counsel repeatedly stated during trial on the limitations defense, until the

information developed in 2004-2005 became available, "there was no there there."  And for the

reasons explained below, after weeks of trial and the accumulation of mounds of evidence, I

conclude that there never was any "there there."

III.　　　PHASE 2:  LIABILITY FOR INSIDER TRADING

　　　　A.　　　The ALPS Merger Transaction

PAGE 15 - OPINION AND ORDER

Founded in 1864, Grove Farm is a property management and development company on Kaua`i. It is one of the island's largest land owners, comprising some 22,000 acres. The unrebutted testimony of several witnesses revealed that the 22,000 acres ALPS acquired included three golf courses (one was a 10 hole Billy Casper course that after the sale was enlarged to 18 holes), a termite-infested shopping center that ALPS reconditioned and later sold, large beach areas adjoining a potential recreation area, Maha`ulepu, which to this day remains undeveloped due to local resistance, portions of Poipu, Koloa plantation, Lihue, uninhabited mountainous areas, and former sugar plantation agricultural lands, some of which may be suitable for homes, condominiums, and similar developments.

In 1992, Hurricane Iniki devastated all of Kaua`i, including Grove Farm, causing substantial economic loss and turmoil. By late 1999, Grove Farm was experiencing grave financial difficulties, including $62 million in debt with significant principal repayments coming due in the near term. One of its lenders, First Hawaiian Bank, had placed restrictions on Grove Farm's use of cash. Kukui Grove Shopping Center, one of its major assets, was in a state of serious structural disrepair due to termite damage, corrosion, and dry rot. In a September 15, 1999, letter to shareholders, Grove Farm CEO and Board of Directors Chairman Hugh Klebahn estimated that repairs would cost $1.5 million over two years; Grove Farm also needed money to construct a surface water treatment plant to permit continued sales of residential lots in its Lihue-Puhi project. Grove Farm was selling assets to sustain itself, and had reduced its employees from 11 in 1998, to eight in 1999. In his letter, Klebahn emphasized that

> THIS IS NOT BUSINESS AS USUAL. Grove Farm Company today has only the cash flow available to do the bare minimum required to keep this Company operating. We are deferring expenditures which are not absolutely necessary to keep the doors open. * * * The challenge for management now is to find ways to

PAGE 16 - OPINION AND ORDER

fund the minimum required maintenance and operating costs to maintain our assets in this time of economic adversity.  The challenge for the Board is to determine a policy for finding a permanent infusion of capital into the Company so that it can take advantage of opportunities as they arise.  <u>No alternative will remain unexplored.</u>

Exh. 103, p. 5 (emphasis added).

1.   <u>Scott Blum Offer</u>

In December 1999, Scott Blum, a Grove Farm shareholder and Klebahn's son-in-law, made an unsolicited proposal to purchase all of Grove Farm's stock.  Exh. 1126.  Grove Farm formed a Special Committee of "disinterested directors" (which excluded Mr. Klebahn) to consider that offer.[13]  Exh. 107 (January 6, 2000, letter to shareholders).  After negotiations with the Special Committee, on January 6, 2000, Blum signed a revised letter of intent, offering to purchase all outstanding shares of Grove Farm stock for $125 per share.  One of Blum's conditions in the letter of intent was that his proposal be submitted for preliminary approval by the shareholders and that 75 percent vote their approval.  Exh. 107.  At a special meeting of the shareholders on January 21, 2000, approximately two-thirds of the shareholders voted to approve the sale, therefore Blum's letter of intent terminated by its own terms.

After the meeting, the Board determined that "a very large majority of the shareholders -- perhaps 90% -- were willing to sell their shares provided the price was at least $125 per share, some of the shareholders could receive land instead of cash for their shares, and the shareholders were comfortable that a higher price was not attainable."  Exh. 1170.  Accordingly, the Special Committee began to examine strategic alternatives, including re-contacting Scott Blum about

_____

[13]    The Special Committee was created to respond to Blum's offer because of his relationship to director Hugh Klebahn.  The Special Committee consisted of Donn Carswell, Pamela Dohrman, Randolph Moore, Robert Mullins, Wilcox Patterson, and William Pratt.

PAGE 17 - OPINION AND ORDER

purchasing Grove Farm as a whole.  Exh. 1194 (Special Committee Minutes, April 7, 2000).

     2.   <u>Honu Offer</u>

On May 3, 2000, the Special Committee sent a letter to the shareholders, notifying them

that Aspen Venture Group, LLC,[14] a financial advisor to the Special Committee, had completed a

valuation of Grove Farm and identified and evaluated alternative strategies for the company.

The letter summarized Aspen's recommendations as follows:

> Based on its valuation of the Company and its analysis of the foregoing
> alternatives, Aspen has concluded that the value of the Company is in the range of
> $86 to $98 per share and that the sale of the Company as a whole is the best
> alternative to pursue at this time.

Exh. 113.

The Special Committee then contacted a number of parties who had expressed interest in

acquiring Grove Farm and adopted a procedure for evaluating proposals.  As a result of that

process, in early August 2000, the Board – which by that time included plaintiff Guy Combs –

unanimously approved executing of a letter of intent with Honu Group at $140 per share.[15]  <u>See</u>

Exh. 1345 (Proxy Statement, pp. 14-16, describing extensive negotiations with Honu Group

from June through August 2000).

---

[14]    That members of the Board and Special Committee eventually learned that
Michael Burns, president and owner of Aspen, was a criminal is not material to plaintiffs' claim
against Stephen Case and ALPS.

[15]    The Special Committee conducted some further negotiations with Scott Blum, but
nothing came of the negotiations.

PAGE 18 - OPINION AND ORDER

The Special Committee began negotiations with Honu over the terms of a Definitive Merger Agreement, the related disclosure schedules, and the Proxy Statement, and Honu undertook extensive due diligence.  While the negotiations were ongoing, on August 29, 2000, Lehman Brothers, Honu's purported financial partner, notified the Special Committee that it was "not prepared at this time to proceed, as a member of a joint venture or otherwise, with or support the acquisition (by merger or otherwise) of stock in Grove Farm Company."  Exh. 1280. After receiving that letter, the Committee asked for evidence of Honu's ability to perform.  Honu was unable to provide evidence, and the letter of intent expired on its own terms in mid-September 2000.

On September 18, 2000, the Special Committee notified the shareholders that the Honu deal had fallen through, and also notified them that because Scott Blum had unequivocally stated that he was not interested in purchasing Grove Farm, the Board had disbanded the Special Committee as no longer necessary.  <u>See</u> Exh. 1619B.[16]

3.   The Case/ALPS Offer

Stephen Case's family has long and strong ties to Grove Farm.  Grandfather Case worked for Grove Farm for over 20 years.  Dan Case grew up there and later became a partner in Case Bigelow & Lombardi, the law firm that served as Grove Farm's principal legal counsel for decades.  Dan Case himself held 20 shares of Grove Farm.  According to his testimony, by the time of the merger, Dan Case had not actively performed legal services for Grove Farm for six to ten years.

---

[16]   Multiple copies of certain exhibits appear in the record with different exhibit numbers.  The court will cite to the copy most easily identified and located within the record.

In 1999 and 2000, Stephen Case was one of the wealthiest people in America.  Having founded AOL and having led that company into merger talks with Time-Warner, his net worth was well over $1 billion, according to publicly-available sources.  Because his wealth was concentrated in AOL stock, Stephen Case began a diversification program.  Stephen Case testified that each year after 1992, when AOL went public, he planned to sell five percent of his stock to diversify.  For that purpose, he set up an investment holding company and hired John Agee to manage it.  In 1999, he bought land in Maui, and he continued to be interested in making real estate investments in Hawai`i.

In April 1999, Scott Blum met with Stephen Case "to talk to [Case] about joining him in buying Grove Farm."  Exh. 1566 (4/26/99 e-mail).  In a message to his parents, Stephen reported:

> Apparently Grove Farm has had difficulty diversifying into real estate and their commercial ventures are losing money (and indeed they are about to lose 1200 acres to the bank as they are defaulting on a loan).  The Wilcox family is apparently inclined to sell out so they don't continue to have to absorb operating losses, but want to somehow "keep it in the family" and as an in-law Scott is viewed as being part of the family. * * *  He thinks it would cost $20-30 million and for that you would get 22,500 acres which he thinks is a steal.

> He left me with a lot of info on this and frankly it sounds appealing -- I am looking for some non-stock investments, esp. real estate, and investing in Hawaii has particular appeal, and buying Grove Farm would of course be interesting as well.

Exh. 1566.  Dan Case responded by e-mail the same day.  Among other things, he explained what he knew about Grove Farm's financial situation as it stood then, suggested that because the economy was "so down" the price should be attractive, but also expressed concern about Scott Blum:  "I would definitely encourage you to pursue it if you are very comfortable with Scott Blum.  I didn't like him from the Fortune article and I don't think his quick ideas and buying GF

PAGE 20 - OPINION AND ORDER

and making a [bunch] of quick moves make sense at all." Exh. 1566. Dan Case further

remarked that:

> Although I have never met Hugh Klebahn, I have talked to him a few times [on] the phone, I knew his parents and he has an excellent reputation. If you are interested, you should come out to get a personal view before you go too fast. Also, I would have to disclose my conflict and get it cleared even though I have not told you anything learned from the Company.

Exh. 1566 (4/26/99 e-mail). The following day, April 27, Stephen Case responded, stating that:

> I can not say I am comfortable with Scott Blum as I don't know him and agree that he may be inclined to move fast not take his time.

> I tend to agree that this is best thought of as a land banking opportunity. Hawaii is so beat down right now, probably Kauai especially, it seems like a good time to be buying if you have cash and can take a long term view (and if the interim costs of operations, taxes etc. aren't burdensome).

Id. (4/27/99 e-mail).

As mentioned, Scott Blum's deal fell through, and Grove Farm entered into extended

negotiations with Honu. After Dan Case learned from newspaper reports that the Honu proposal

had failed, on September 19, 2000, he told Klebahn that his son Stephen might be interested in

completing a transaction on terms similar to those negotiated with Honu if invited to do so. On

September 22, 2000, the following events took place:

a.      The Board held a special meeting. Klebahn reported Dan Cases's contact with

him, and described his conversation as follows:

> He [Dan] reported that if Stephen were now invited to do so, he would conduct a fast track review of the proposed Honu transaction, and seek to execute a Definitive Agreement for a similar transaction on Friday, September 29th. He would contemplate that the agreement would provide for two weeks of post execution due diligence and [an] additional two weeks if needed subject to the deposit of a non-refundable $500,000. The goal would be to seek to meet the closing schedule contemplated under the Honu proposal. A waiver of conflict with respect to Case Bigelow & Lombardi and authorization to contact various

PAGE 21 - OPINION AND ORDER

persons would be necessary.

After discussion, the Board, including plaintiff Guy Combs, unanimously adopted the following

resolution:

> RESOLVED, that Stephen Case, through his agent Daniel H. Case, be invited to
> conduct a due diligence review at his expense in contemplation of the submission
> of an offer to purchase the stock of the Company.  In connection therewith, upon
> the delivery of a confidentiality agreement, that he be authorized to meet with and
> receive Company information from current Company Officers and Directors,
> prior Company President David Pratt, Belt Collins, Chaney Brooks, and the
> Company's attorneys at Case Bigelow and Lombardi.  Further, on the
> understanding that if an offer is submitted by Stephen Case he will engage
> independent counsel, the Company waives the conflict of interest created by
> Daniel H. Case acting as agent for Stephen Case while Case Bigelow and
> Lombardi represents the Company.

Exh. 1619F.

b.      Grove Farm and Dan Case, as Stephen's agent, executed a Confidentiality

Agreement.  Among other things, the agreement acknowledged that negotiations "may involve

the disclosure and communication of information by the parties, some of which may contain

certain financial, proprietary and other information concerning the business and affairs of the

Company."  Exh. 1619C.  The agreement authorizes disclosure of confidential material "to your

representatives who have a need to know such information for the purpose of evaluating the

Proposed Transaction . . .."  Id.

c.      Grove Farm sent a series of letters authorizing, for example, Belt Collins, David

Pratt, and Cheney, Brooks,[17] to "meet with Mr. Daniel H. Case and discuss any and all matters

pertaining to the business of the Company . . . [and] furnish him with copies of any materials he

---

[17]      Three of the letters appear as Exh. 1619D.  Other authorization letters exist
elsewhere in the record.

PAGE 22 - OPINION AND ORDER

might wish to have . . .."  Exh. 1619D.

Dan Case and John Agee, as Stephen Case's agents, then engaged in an accelerated "big picture" due diligence process that lasted less than a month.  Dan Case obtained several due diligence binders from James Cribley, a partner in his law firm who represented Grove Farm. Dan Case and John Agee also obtained routine information about Grove Farm's assets and financial condition, such as annual reports, financial statements, and appraisals, as well as the draft Honu merger agreement and due diligence schedules attached to that agreement.  Agee and Dan Case toured Grove Farm's properties, met with its employees, and met with its lenders, accountants, and real estate agent.

Stephen Case had no direct involvement in this phase and spent a mere five to ten hours reading and responding to e-mails.  Transcript ("Tr.") 2614.  He testified that he thought he would simply step into Honu's shoes, but was urged to offer a higher price per share even though the Board had already approved Honu's price of $140 per share.   He further testified that had decided to buy Grove Farm if there were "no gotchas" in the due diligence, and he had John Agee to "kick the tires."   Tr. 2612.  Once he decided to buy -- "it made sense from a diversification standpoint to acquire Grove Farm" (Tr. 2615) -- he had Dan Case and John Agee focus on whether the purchase was a good idea.  He had no contact with the shareholders. According to his testimony, Stephen Case's style is "hands off," and that at that time, the Grove Farm deal represented a relatively small (two percent) portion of his net worth.  He planned to make investments, and his interest in Grove Farm was in the context of that plan.  Tr. 2619.

On October 12, 2000, ALPS presented Klebahn with a $100,000 deposit and a binding offer in the form of a Definitive Merger Agreement that was virtually identical in almost all

PAGE 23 - OPINION AND ORDER

material respects to the previously approved Honu agreement.  Compare Exhs. 2018 and 2096

(ALPS and draft Honu merger agreements, respectively).  The offer, for $152 per share, was

contingent on completion of environmental due diligence, approval by 75 percent of the

shareholders, consent of Grove Farm's lenders, and approval from the Public Utilities

Commission (because Grove Farm operated a water utility).[18]  On October 17, 2000, with the

exception of director Guy Combs, the Board voted to approve the ALPS merger agreement.

Exh. 160 (Oct. 17, 2000, Minutes).

The minutes of the October 17th meeting are revealing.  At trial, plaintiffs argued that the

ALPS merger agreement was "buyer friendly" and that the "friendly" terms somehow constituted

overreaching by the ALPS team.  The minutes actually show that the Board considered the

"buyer friendly" provisions, specifically, a $1 million break up fee (lower than the Honu

negotiated term of $1.25 million) in the event Grove Farm accepted a superior acquisition offer,

and ALPS' right to match any subsequent offer, to benefit Grove Farm:

> [The provisions] allow the Company to negotiate for a higher price with any third
> party who makes a superior acquisition offer, and if such a third party offer is
> accepted, the Company would be subject only to the liquidated amount of the
> break up fee in lieu of unknown damages otherwise possible for breach of
> contract.

Exh. 160, p. 2.  The minutes also are revealing concerning Guy Combs' attitude about the

merger:

---

[18]      The ALPS offer was substantially higher than the Blum or Honu offers ($125 and
$140 per share, respectively), significantly higher than earlier private Grove Farm stock sales
($40 to $125 per share), the fair market value of the stock as determined by the Aspen appraisal
($86 and $98 per share), and more than a Bank of Hawaii internal valuation performed in the
summer of 2000 ($138 to $150 per share).

Mr. Combs stated his opposition to the ALPS offer because (1) in his view the Company was not milking the negotiation for a higher price, (2) the Hawaii economy has recovered, (3) if he were able to obtain land for his shares, he would be entitled to over 2,000 acres which would be worth five to six million dollars, and (4) the Company has not obtained an MAI appraisal of the land.

Mr. Pratt asked Mr. Combs how he rationalized his support of the Honu proposal at $140 per share and his opposition to ALPS at $152 per share.  <u>Mr. Combs responded that the difference was the land availability.</u>

Exh. 160, p. 3 (emphasis added).[19]

The merger agreement contained certain provisions germane to events between October 17, 2000, and the shareholder vote on December 1, 2000.  ALPS had the right under section 5.12 of the merger agreement to approve any shareholder communications concerning the merger, including "all shareholder notices and proxy solicitation material" before they were sent,[20] "which approval shall not be unreasonably withheld."  Exh. 2018.  Section 5.18 of the merger agreement prohibited Grove Farm from soliciting any other offers, but if Grove Farm received an unsolicited offer that the Board "reasonably believes . . . is likely to be a Superior Acquisition Offer," the Board could engage in discussion and negotiations with the source of the offer.  Exh. 2018, section 5.18(d).[21]  As defined, "Superior Acquisition Offer" meant:

---

[19]     Other than the increase in share price from $140 to $152 per share, the most significant difference between the Honu proposal, which Guy Combs promoted, and the ALPS merger agreement was the so-called "land for shares" provision that was a subject of much debate during Honu negotiations.  The "Land Sales Program," section 5.18 of the Honu agreement, was eliminated in the ALPS agreement.  Testimony revealed that a land for shares option would have drastically complicated the transaction and reduced the value of the land itself.

[20]     This common provision in merger agreements was carried over from the Honu agreement.  <u>See</u> Exh. 2096, section 5.12.

[21]     Again, this common provision was identical to section 5.19 (d) of the Honu agreement.  <u>See generally</u> Exh. 2096, section 5.19.

any bona fide Acquisition Offer to acquire, directly or indirectly . . . at least 75%
of the common stock of [Grove Farm], then outstanding or all or substantially all
of the assets of the Company (I) on terms that the Board of Directors of Grove
Farm Company determines in its good faith reasonable judgment to be more
favorable to Grove Farm Company's shareholders than the Merger and (ii) for
which the board of Directors of Grove Farm Company determines (after
consultation with outside legal counsel or the Board of Directors' outside counsel)
that the failure to negotiate with the offering Person would result in a breach of
the Board of Directors' fiduciary duty.

Exh. 2018, section 5.18(g).

Finally, as pertinent here, if the Board of Directors determined that a competing offer

constituted a Superior Acquisition Offer **and** Grove Farm executed a definitive agreement

regarding the offer, section 5.19 granted ALPS an absolute right of first refusal.  Exh. 2018,

section 5.19.

On October 17, 2000, Grove Farm notified the shareholders that it had signed a merger

agreement with ALPS and described the anticipated timetable for closing.  Exh. 1685

(DC-546).[22]  The letter also invited shareholders to attend one of three scheduled informal

meetings to discuss the merger agreement before the formal shareholder vote.  Exh. 1685

(DC-547).

Shortly after executing the merger agreement, ALPS completed the environmental due

diligence and waived the environmental contingency.  At that point, ALPS transmitted the

remainder of the deposit, $400,000.  Exh. 1619LL.  With plans to close by the end of the year,

Tod Tanaka, one of Grove Farm's attorneys, drafted a shareholder notice and proxy statement for

the ALPS merger that in substantial part duplicated the Honu documents.  On October 25, 2000,

---

[22]      Plaintiffs' Exhibit 1685 consists of more than a hundred pages of a mixture of
documents from Dan Case's file.  Lacking page numbers, the specific pages of the exhibit will be
identified by the "DC" numbers in the lower right-hand corner of each page.

PAGE 26 - OPINION AND ORDER

James Cribley, another of Grove Farm's attorneys, submitted the draft to ALPS, through Stephen Case's counsel, Steve Egesdal of Carlsmith Ball,[23] and Dan Case, for approval, as required. Exh. 1685.  John Agee reviewed the draft, and reported to Stephen Case that "except for minor changes, it was in good shape and ready to go.  I thought the document clearly outlined why the Board had approved your offer and why the Board was urging shareholders to vote for approval of the merger agreement."  Exh. 1619MM.

On November 3, 2000, Klebahn mailed the proxy materials to the shareholders of record, then holding 171,122 shares of common stock, inviting them to a special meeting of the stockholders on December 1, 2000, to "consider and vote on a proposal to approve the Agreement and Plan of Merger dated October 17, 2000."  Exh. 1345, p. 1.  Among other things, the proxy materials fully disclosed Dan Case's role in the transaction.  Exh. 1345, p. 17.

In the meantime, Grove Farm continued to receive unsolicited proposals.  It appears that of the unsolicited proposals during the relevant time frame, two potentially had merit.  On October 20, 2000, Grove Farm received a non-binding letter of intent from Del Mar Pacific Group LLC.  Del Mar's price per share was superior to ALPS', but the letter of intent included several conditions to closing, including a 120-day due diligence period.  Additionally, "[t]he letter also precluded disclosure of the letter to any third parties.  This restriction would have prevented the Company from complying with its obligations [to ALPS] to provide notice of any acquisition offers within one day of receipt."  Exh. 1369, p. 2 (Supplemental Proxy Statement). The first Del Mar letter of intent expired on October 27, 2000.  On November 13, 2000, Grove

---

[23]    Steve Egesdal testified that Stephen Case retained his firm in October 2000 to "handle his interests as part of a merger; set up a company to do an acquisition."  Tr. 3183.

Farm received a renewed proposal at a price of $175 per share.  On November 16, 2000, Del Mar confirmed that notwithstanding its confidentiality requirement, Grove Farm could disclose the proposal to ALPS.[24]  On that day, James Cribley transmitted the Del Mar communications to John Agee.  Exh. 1685 (DC-572).

On November 17, 2000, Grove Farm, Del Mar, and Del Mar's counsel held a conference call.  After Grove Farm explained the merger agreement provisions concerning subsequent acquisition offers, payment of the termination amount, and ALPS' right to match any subsequent offers, Del Mar withdrew from negotiations.  See generally Exh. 1369.[25]

Meanwhile, on October 30, 2000, Klebahn received an unsolicited proposal from Wattson-Breevast to purchase 100 percent of Grove Farm shares at $170 per share.  Exh. 1685 (DC-626).[26]  In a special meeting of the Board held on October 31, 2000, in which, among other things, the Board reviewed and approved the ALPS proxy materials, the Board discussed the criterion for a Superior Acquisition Offer in the context of the Wattson-Breevast proposal.  The minutes reflect the following:

---

[24]     It appears that despite Del Mar's confidentiality requirement, John Agee learned of the Del Mar proposal on October 25, 2000, and conveyed the information to Stephen Case. Exh. 1619HH.

[25]     At about this time, Grove Farm engaged outside counsel, Michael Connell and Michael Cohen of Morrison & Foerster, to advise the Board.  Specifically, Michael Connell testified that he and Cohen were retained to advise the Board as to the fairness of the process, the fairness of the price, and "in particular to look at whether or not all bidders were being -- and other interested parties -- were being treated equally."  Tr. 3249.

[26]     The letter recounts Wattson-Breevast's earlier unsolicited proposals to Grove Farm, on September 29, 2000, for $125 per share, and October 6, 2000, for $146.20 per share. Exh. 1685 (DC-626).

PAGE 28 - OPINION AND ORDER

> [I]t was determined that in addition to a higher price such an offer (1) must allow for all the disclosure requirements of the October 17th Definitive Agreement with ALPS, (2) must demonstrate the financial ability of the offeror to complete the transaction, (3) must include a non-refundable deposit larger than the non-refundable deposit from ALPS and provide the funds for payment of the break-up fee, and (4) if it has any possibility of not closing in December, it must have a non-refundable deposit or other mechanism of dealing with the Company's financial obligations and the shopping center.

Exh. 146.  On November 2, 2000, Wattson-Breevast waived its confidentiality requirement, Exh. 609, and on November 3, 2000, Klebahn acknowledged the waiver and informed Donald Wattson that the Board "has made a determination under Section 5.18(d) that management is to engage in discussions and negotiations with your group."  Exh. 1343.

On November 7, 2000, Grove Farm, represented by Klebahn, Cribley, and Tanaka, met with Wattson-Breevast, represented by Tony Wattson and Joe Warner.  Klebahn's notes of the meeting record the following:

> I explained to Wattson that inasmuch as I was concerned about not violating the terms of the current agreement and since we wanted to be sure to not deprive Wattson of any information or rights, Grove Farm's lawyers would do most of the talking.

> Jim Cribley began by describing the current situation and asking for clarification on Wattson's current situation.

> The discussion then focused on how to proceed with Wattson's current interest at $170/share.  It is now apparent that Wattson has done no due diligence.  This would have to be done, done quickly and at considerable cost according to Wattson.  This is an issue with Wattson as they feel they should be reimbursed through a breakup fee for this risk if a third party made a higher offer or Case matched their offer.  We explained that it was possible to enter into an agreement with them providing a breakup fee to be paid by any new third party, but to have Case pay a fee under the current agreement was not possible.

> The timeframe was explored with them in the context of upcoming Grove Farm cash requirements (FHB principal payment 12/31 and commencement of Shopping Center repairs in January 2001).  They indicated the possibility of doing due diligence in three weeks, we explained the 10-day matching period, the need

for a 20-day notice period to shareholders for a new offer and the currently scheduled 12/2 Shareholder's Meeting.

* * *

The remaining discussion focused on how to provide Wattson with a means of getting a breakup fee from the current buyer.

Exh. 2171, p. 1.

After the meeting terminated, Grove Farm and its attorneys continued the discussion, focusing on the Board's "fiduciary responsibility of trying to obtain for the shareholder[]s the highest price for their stock." Exh. 2171. Klebahn noted:

> It would seem that the focus for Grove Farm should be on fiduciary responsibility and risk to the Grove Farm shareholder. We obviously need and want to have this group make a superior offer. The risk involved is what needs to be carefully weighed. Wattson is not prepared to make a noncontingent offer today. They do not seem to be willing to proceed without some form of indemnification from both the current buyer and from any other party who might come along. Their timeline is still open. Their price needs clarification as to any payment of the Case breakup fee. Grove Farm could extend the timeline, but not commit to the payment of the breakup fee. There is also the question of the deposit, refundable or non-refundable and the amount. We also must remember that Grove Farm is looking at this in the context of facing bankruptcy from a cashflow standpoint. The underlying asset value is there, but the ability to meet its financial obligations [is] coming at year-end. Time is of the essence.

Exh. 2171, p. 2.

Because of the interest of Del Mar and Wattson-Breevast, and with the advice of counsel, the Board unanimously decided to make additional disclosures to the shareholders. Exh. 1364 (Minutes of November 20, 2000, Board meeting). According to the testimony, James Cribley and Tod Tanaka drafted the supplemental proxy, and Connell and Cohen were "very much involved" in the final product. Tr. 3253. Connell testified that he did not recall any input or changes by any ALPS representative or the Carlsmith law firm. Tr. 3253. Connell explained the

PAGE 30 - OPINION AND ORDER

decisions with respect to the content of the final product as follows:

Q       What was the purpose of the supplemental proxy?

A       Let's start off with [what] it wasn't.  It wasn't because there was some big material change of events.  What it was, was that information concerning the Del Mar letter had leaked to the shareholders.  In fact, the leak was found.  It was a Del Mar person who had delivered a copy of the letter to at least one or maybe possibly more of the shareholders.

So what we had was a situation where the information was uneven.  Some shareholders knew about Del Mar and others did not.  There w[ere] also indications that were reported to us by Mr. Klebahn in particular and Mr. Cribley that some shareholders thought it was a viable transaction and why weren't the board of directors pursuing a $175 offer, which is a pretty reasonable thing to be concerned about.  In fact, it was never a real offer.  And secondly, by the time of the 20th, actually on the 17th, Del Mar had withdrawn.

So we now had shareholders who were out there with information which, at best, was misleading, and it was the consensus view that we should cure that; that we should make sure that everybody had the same information and that that information should be accurately portrayed rather than inaccurately portrayed.

Q       And were you personally in favor of issuing a supplemental proxy?

A       I was.  In fact, both Michael and I were encouraging this, but I think everybody agreed that something had to go out.  We were not in agreement as to necessarily what it should say, but we were in agreement that something should go out.

Q       Well -- when you say there were] differences or disagreement, who was that between?

A       [I]t was Mr. Klebahn, in particular, and I think Mr. Cribley agreed with him, were reluctant to include in the supplement the mention of the $175 or any mention of Wattson Breevast.

We were of the view that, look, the letter that was already out there had that number in it.  If you didn't put the number in with reasonable explanation, it continued to be confusing.

So both Michael Cohen and I -- we actually had an internal exchange on this, but between the two of us, we were very much of the view that this ought to happen.

Now, with respect to Wattson Breevast, it was kind of a difficult situation, because in these situations you would almost never disclose a letter of intent exchange like the one that was going on with Wattson Breevast. The reason for that is that there is no deal and everything you put out would be subject to change and change without notice. So you would end up -- once you start coming up with more and more information everyday, in theory at least, and the cases have long recognized that you don't have to go out with that so long as there is an indication that somebody is leaking the information, like the Del Mar situation, and there was no indication that people were -- had encountered the Wattson Breevast information and were somehow relying on it.

But we actually ended up on the other side of that and encouraged that they disclose the existence of this, because we thought by telling people that Del Mar had gone away, and then being silent, that there was a strong implication there were no other indications of interest.

So we did encourage something to go in. There was a first draft that I think was undertaken by Mr. Cribley on the subject. We had comments that we thought that he had perhaps gone too far with this. All we really wanted to do was show that there was an indication of interest. We didn't want to tell people -- we didn't want to encourage or discourage people about the proposal.

Tr. 3253-56.

The exhibits reveal that negotiations between Grove Farm and Wattson-Breevast continued over the next several weeks. Tanaka prepared a draft merger agreement for Wattson-Breevast and forwarded it to its counsel.[27] As of November 29, 2000, however, just two days before the scheduled shareholder meeting, Wattson-Breevast had yet to provide Grove Farm with a signed Definitive Agreement and acceptable evidence of a deposit. Exh. 2191. In a letter to Wattson-Breevast's attorney on that date, James Cribley outlined multiple areas in which information had yet to be forthcoming, including:

the description of the Wattson-Breevast entity to be used in the proposed

---

[27]     Tanaka's transmittal message appears as Exhibit 10 in the notebook titled "Documents Relating to Wattson Breevast Proposals." The court was unable to locate a marked copy of the exhibit.

PAGE 32 - OPINION AND ORDER

transaction and its principals.

written confirmation of your agreement to indemnify [Grove Farm] from any claims by Honu in connection with [Grove Farm's] consent to your use of their due diligence materials.

whether Wattson-Breevast is moving forward with the urgency necessary if the proposed transaction is to be concluded within the time frame imposed upon [Grove Farm] by its obligations and by its agreement with ALPS.

Exh. 2191.

On Grove Farm's request, on October 30, 2000, Klebahn, Connell, John Agee, Dan Case, and two attorneys from Carlsmith Ball met on Oahu.  The purpose of the meeting, which the Board authorized, was to see if ALPS would increase the share price by $3, to $155 per share.  Tr. 3048.  According to Klebahn, the ALPS representatives "were not at all pleased."  Id.  According to Steve Egesdal, "we went down to Dan Case's office and got Steve Case on the phone, and it didn't take very long.  He said no.  It was thumbs down on that and that was it."  Tr. 3193.

By December 1, 2000, Wattson-Breevast still had not provided Grove Farm with a signed Definitive Agreement; consequently, the Board did not consider the Wattson-Breevast proposal to be a Superior Acquisition Offer.  Nevertheless, the minutes of the December 1, 2000, special shareholders' meeting reveal that Klebahn disclosed further details about Wattson-Breevast's interest, including the $170 share price, and explained to the shareholders that the Board had met and discussed in detail the status of discussions with Wattson-Breevast on both November 30 and December 1, and that

[a]fter reviewing the Company's upcoming financial needs as well as the failure of Wattson-Breevast to provide either a deposit or an offer in the form of a signed definitive agreement, it was determined by the Board not to postpone this meeting.

PAGE 33 - OPINION AND ORDER

Exh. 2196.  When called to vote on the ALPS agreement, the shareholders voted 98.9% of their shares in favor of the ALPS merger.  All of the present plaintiffs voted with the majority.[28]

B.    ANALYSIS

At the outset, I recognize the tremendous expense and effort plaintiffs invested in pursuing their claims against these defendants.  But despite four grueling weeks of trial, extensive testimony, and massive numbers of exhibits, plaintiffs managed to prove little more, in this case, than possible poor judgment on the part of Grove Farm's Board of Directors.  As explained below, plaintiffs' proof fell far short of establishing primary violator liability on the part of Stephen Case or ALPS, or of proving the elements of their insider trading claim.

Plaintiffs dedicated weeks of testimony picking apart and second-guessing the Board's representations about, among other things, the value of Grove Farm, its financial condition and amount of its debt, the urgency of the need to find capital or sell, the location and potential value of kuleana[29] on Grove Farm property, the rock crushing operation revenue, the condition of the Kukui Grove Center, etc.  In the end, however, that evidence largely is not relevant to my decision.  In my order precluding plaintiffs from presenting alternative theories of liability, I ruled that plaintiffs could present relevant evidence of alleged misrepresentations and omissions

---

[28]    Even if all of the plaintiffs in this action had voted against the merger, they could not have blocked it as together they owned less than 22 percent of the shares.  Tr. 1208 (statement of counsel; no evidence to contrary).

[29]    As the court was told repeatedly throughout the trial, kuleana are special land rights of native tenants that survived after the Great Mahele separated and defined the undivided land interest of King Kamehameha III and other high-ranking chiefs in 1848.  See, e.g., Jon J. Chinen, The Great Mahele:  Hawaii's Land Division of 1848 (Univ. of Hawai`i Press 1958).  In one of the court's favorite bits of testimony, plaintiff Guy Combs testified that as far as he knew, a kuleana "could have been a hat you put on your head."  Tr. 747.

in the proxy statement, but they must first establish as a foundation Stephen Case's and the ALPS defendants' involvement in those misrepresentations and omissions, "specifically, that defendant Case and the ALPS defendants 'had absolute control over the content of the [proxy]. . ..'" Combs v. Case, 05-741 REJ-KSC (Minute Order, April 4, 2008 (# 362))(quoting Amended Complaint, ¶¶ 152, 202, 207).

As the facts surrounding the merger transaction and the roles of the various parties to the transaction set forth in detail above amply demonstrate, plaintiffs did not establish the required foundation of these defendants' absolute control; indeed there was a complete failure of proof that Dan Case, John Agee, or Stephen Case played anything more than a minor role in reviewing the merger documents.  And although the merger agreement did grant Stephen Case and ALPS approval rights over shareholder communications, that right was subject to the requirement that it not be unreasonably withheld, a provision contrary to the notion of "absolute control."

Because of that failure of proof, plaintiffs' evidence concerning alleged misrepresentations and omissions in the proxy materials and the supplemental proxy is not relevant to these defendants' potential liability.  Recognizing this problem early in the trial, I repeatedly asked plaintiffs' counsel to focus on and specify what insider information was at issue, who passed it to whom, and what evidence demonstrated the requisite scienter.  Eventually, plaintiffs submitted a chart entitled "Nature of Inside Information," which the court received in final form on May 15, 2008, more than two weeks into the trial.  I found the chart, which relied heavily on the proxy statement as the source of misrepresentations and omissions, to be argumentative, rather than factual, in nature, and it largely did not answer the question of what insider information Stephen Case and ALPS improperly obtained that was not known to the

shareholders and that the defendants wrongfully used in the merger.

Turning to the specific elements of plaintiffs' claim, for the reasons explained below, I find that plaintiffs failed to prove the basic elements of a section 10(b) claim against Stephen Case and ALPS, and also failed to prove the elements of the "tippee" insider trading theory as set forth in Dirks, supra.

1.    Primary Section 10(b) Liability

As described in detail earlier in this opinion, to establish their claim under section 10(b), plaintiffs must prove the primary liability of Stephen Case and/or ALPS.  To do so, plaintiffs must prove a misrepresentation or omission in connection with the purchase or the sale of a security, made with scienter, upon which plaintiffs reasonably relied and that caused the alleged loss.  See, e.g., Metzler, supra, ___ F.3d at ___, 2008 WL 3905427 at *8.  Additionally, plaintiffs must prove that Stephen Case's and ALPS' own conduct had a principal purpose of creating "a false appearance as part of a deceptive transaction or fraudulent scheme."  Simpson, supra, 452 F.3d at 1408 n.5.

Plaintiffs' evidence fell short in all respects.  Specifically, there is no evidence from which this court rationally can find that Stephen Case, his agents, or ALPS, themselves, made misrepresentations or omissions with respect to facts material to the merger transaction or acted with a principal purpose to do so.  But more critically, there was a total failure of proof of scienter, i.e., that Stephen Case or ALPS, through Stephen or anyone else, acted "with an intent to deceive, manipulate, or defraud."  Metlzer, ___ F.3d at ___, 2008 WL 3905427 at *8.  Moreover, to the extent that plaintiffs attempted to prove that Dan Case or John Agee, Stephen Case's agents, acted with the requisite state of mind, that attempt was unsuccessful and

ultimately would have been fruitless, because scienter cannot be imputed under ordinary agency principals.  See, e.g., Southland Sec. Corp., supra, 365 F.3d at 365-66; Teachers' Retirement, supra, 477 F.3d at 184.

Interestingly, the chief proponent of the first state action, Michael Sheehan, and the chief proponent of this action, Guy Combs, both testified, in essence, that they believed Stephen Case simply was looking for a good deal.  In response to my question as to why Sheehan had not sued Stephen Case, he responded:

> The reason was I believed that he was looking for business opportunities and a business opportunity presented itself.  Now, the circumstances that led up to his being made aware of this business opportunity may be [a] subject for further discussion, but I don't believe that Mr. Stephen Case was doing anything but looking for a good deal.

Tr. 488.  Similarly, plaintiffs' counsel brought out this testimony from his client, Guy Combs:

> Q      So you state here [in Exhibit 21] that there is a fraud and conspiracy of the management and board.  Do you see that?
>
> A      I do.
>
> Q      Why didn't you name Steve Case there?
>
> A      I didn't believe that -- there was no evidence.
>
> Q      To the best of your knowledge, is there any law against picking up a good bargain?
>
> A      No.

Tr. 871.

In summary, plaintiffs' complete failure of proof on the elements of purpose and scienter defeats their section 10(b) claim against Stephen Case and the ALPS defendants.

2.      Tippee Liability Under Dirks

PAGE 37 - OPINION AND ORDER

The theory of tippee liability under Dirks appears to stand as an alternative route to recovery for securities fraud, but I need not resolve how the two theories coalesce to address plaintiffs' "tipper/tippee" claim.  As the Supreme Court in Chiarella explained, there is no "general duty between all participants in market transactions to forgo actions based on material non-public information."  445 U.S. at 133.  Instead, "some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*."  Dirks, 463 U.S. at 660 (emphasis in original).  Thus,

> a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

Dirks, 463 U.S. at 660; U.S. v. Evans, 486 F.3d at 322.

a.      The Insider

As plaintiffs' theory of the case evolved during trial, it became less, rather than more, clear whom plaintiffs claimed to be the insider.  If the alleged insider was a member of Grove Farm management or the Board of Directors, then plaintiffs' claim is defeated because the Board itself authorized the disclosures to the ALPS team for ALPS and Stephen Case's use in deciding whether to pursue the merger and acquisition.  Exh. 1619F; see Talbot, supra, 530 F.3d at 1091- 92 ("Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation.").  Moreover, the evidence established that most, if not all, of the material disclosed to the ALPS team had been disclosed to or compiled by Honu during its due diligence process, and the Board expected the ALPS team to use the information in deciding whether to enter into the transaction.

PAGE 38 - OPINION AND ORDER

Plaintiffs also contended at trial that the alleged "insider" was Scott Blum, a theory not supported by any case law and too attenuated to make legal sense. Scott Blum was an outsider to Grove Farm. During his bid to purchase Grove Farm, Blum may or may not have received material non-public information from his father-in-law. Even assuming that Blum passed along non-public insider information to Stephen Case,[30] plaintiffs failed to explain or prove that Blum owed anyone a fiduciary duty and that Stephen Case knew or should have known Blum breached that duty. Moreover, there is not a scintilla of evidence that Stephen Case used any information he obtained from Blum in April 1999 in connection with the merger in 2000.

Finally, plaintiffs paint Dan Case as both insider and outside agent. Dan Case's position as an insider arose from his partnership in the law firm that represented Grove Farm, Case Bigelow & Lombardi. Dan is a life-long resident of Kaua`i; that, combined with his earlier representation of Grove Farm and his position in the law firm, permits me to rationally conclude that Dan Case likely knew some material non-public information and passed that information along to Stephen Case and John Agee. Dan Case also obtained Grove Farm information during negotiations, which he again passed along, but the evidence established that those disclosures were made under the auspices of a confidentiality agreement and were authorized by the Grove Farm Board. Indeed, as stated, most if not all of the information Grove Farm provided to Dan Case during merger negotiations was given to or developed by Honu Group.

b.  Insider's Breach of Fiduciary Duty

As discussed above, plaintiffs' evidence failed to establish a breach of fiduciary duty by

---

[30]     Blum gave some documents to Stephen Case, but no evidence established the content.

PAGE 39 - OPINION AND ORDER

Grove Farm directors or managers with respect to disclosures of material non-public information in connection with the merger.  Instead, the evidence only served to underscore the ordinary business nature of the disclosures.  Plaintiffs' evidence also failed to establish that Blum ever owed a duty to the shareholders or to Grove Farm, much less breached it.

As to Dan Case, he recognized his potential conflict of interest should Stephen become interested in investing in Grove Farm.  In communications between Dan and Stephen in late April 1999, when Scott Blum first approached Stephen about Grove Farm, Dan told Stephen that "[i]f you are interested, you should come out to get a personal view before you go too fast.  Also, I would have to disclose my conflict and get it cleared even though I have not told you anything learned from the Company."  Exh. 1566.

Nothing came of Stephen's interest at that point; consequently, Dan had no reason to obtain a conflict waiver.  In September 2000, after Dan Case learned that the Honu offer had fallen through, he approached Klebahn and told him of Stephen's interest in Grove Farm.  As set forth in detail above, at a special meeting of the Board on September 22, 2000, Klebahn reported Dan Case's contact, the approach Dan proposed for the process, and that "[a] waiver of conflict with respect to Case Bigelow & Lombardi and authorization to contact various persons would be necessary."  Exh. 1619F.  After discussion, the Board resolved to invite "Stephen Case, through his agent Daniel H. Case," to conduct a due diligence review of Grove Farm, and further "waive[d] the conflict of interest created by Daniel H. Case acting as agent for Stephen Case while Case Bigelow and Lombardi represents the Company."  Id., p. 2.

In the final pretrial conference and early in the trial, I heard argument about the validity of the Board's waiver.  I ruled that the waiver was not valid, finding the conflict to be of a kind

that cannot be waived.  Defense counsel argued that my ruling did not comport with Hawai`i law, but ultimately the validity of the waiver is not controlling.  This is because even assuming that Dan Case's involvement in fact breached a fiduciary duty he owed to Grove Farm by virtue of his law practice, the evidence unequivocally established that the alleged "tippee," Stephen Case, did not know and had no reason to know that there had been a breach.  See Dirks, 463 U.S. at 660 (emphasis added); see also U.S. Evans, 486 F.3d at 322.  At trial, Stephen Case testified on this issue as follows:

> Q      And in 2000, did your father indicate to you that he would approach the company to see about clearing the conflict or waiving the conflict?
>
> A      Yes.
>
> Q      And after he said he was going to do that, what happened next?
>
> A      I believe he talked to the company and the company came back and said: We will waive the conflict and we would be delighted if Steve made an offer.
>
> * * *
>
> Q      At the time, in 2000, did anybody suggest to you that there was anything inappropriate about the waiver of conflict?
>
> A      No.
>
> Q      Did you have any idea that there was any limitation on your father's role going forward after the waiver was obtained?
>
> A      No, not really.  I mean, he made it very clear that he did not want to go forward unless I was highly interested, and so it was something that was going to happen, and that the company formally waived the conflict. Once that was done, I presumed that he was working with John, was able to do whatever they felt they needed to do, to help manage the process.

Tr. 2610, 2613-14; see also Tr. 2609-10.

Nor was there evidence that Stephen Case's agents, Dan Case and John Agee, knew or

PAGE 41 - OPINION AND ORDER

should have known that there had been a breach.  The most that came out at trial was that Dan Case had a soft spot for his son and Grove Farm, and wanted Stephen Case to pursue the merger if he so desired.  This is evident from an e-mail Dan Case wrote to his son on September 23, 2000:  "Mom reminds me that I enjoy working on deals but usually it is for clients and so doing it for family might get me overly enthusiastic.  Also I must confess to an ego problem when my son is involved in being a big player in Hawaii, particularly when the subject is GR which has always had a soft spot in my heart."  Exh. 1619I (unredacted; some punctuation omitted).

In summary, plaintiffs' claim for tippee liability fails for lack of evidence that as an outsider, Stephen Case ever assumed a fiduciary duty to the Grove Farm shareholders under Dirks, because plaintiffs failed to prove the prerequisite for such a duty:  that Stephen Case or his agents knew or should have known that there had been a breach of duty by an insider in disclosing information to them.  Dirks, 463 U.S. at 660.

## CONCLUSION

For the reasons stated above, I conclude that plaintiffs have failed to prove that Stephen Case, ALPS Investment, or ALPS Acquisition Sub engaged in securities fraud in violation of section 10(b) and Rule 10b-5.  Accordingly, judgment will be entered against plaintiffs and in favor of defendants on all claims set forth in the Third Amended Complaint.  Any pending motions are denied as moot and this action is dismissed with prejudice.

IT IS SO ORDERED.

DATED this 17th day of September, 2008.


/s/ Robert E. Jones_____
ROBERT E. JONES


PAGE 42 - OPINION AND ORDER

U.S. District Judge