1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

  GUY ST. CLAIR COMBS; MARION   )  CV-05-741 REJ-KSC
4 WILCOX COMBS; THE SCOTT       )
  MICHAEL ST. CLAIR COMBS       )         Volume 21
5 IRREVOCABLE TRUST; THE GUY    )
  ST. CLAIR COMBS III           )
6 IRREVOCABLE TRUST; CATHERINE  )
  ANNE MOORE-AIRTH; STEVEN      )
7 AUERBACH; CHARLES SLOGGETT;   )
  CARLA JORDAN; KRISTEN J.      )
8 LA DOW; ROBERT B. JORDAN;     )
  MICHAEL P. JORDAN; JONATHAN   )
9 WATERS FISHER; ANTHONY H.     )
  FISHER; GALEN M. FISHER;      )
10 TIMOTHY WILCOX FISHER;       )
  RICHARD SLOGGETT, JR.;        )
11 GERALD W. FISHER;            )
  THE CATHERINE ANNE MOORE-     )
12 AIRTH REVOCABLE TRUST; THOMAS )
  JOHNSTON; ANNE SLOGGETT       )
13 HAMILTON; ARTHUR W.          )
  SLOGGETT; BARBARA PERRY       )
14 FISHER; SCOTT G. FISHER;     )
  SUSAN CHAMBERLAIN; ERIK       )
15 PETERSON; PATRICK FISHER;    )
  and MICHAEL FISHER,           )
16                              )
            Plaintiffs,          )
17                              )
      vs.                        )  May 22, 2008
18                              )
  STEPHEN M. CASE; ALPS         )
19 INVESTMENT, LLC; ALPS        )
  ACQUISITION SUB, INC.; THE    )
20 STEPHEN M. CASE REVOCABLE    )
  TRUST and KA PO'E HANA, LLC,  )
21                              )
            Defendants.          )  HONOLULU, HAWAII
22

23

24

25

```
1                TRANSCRIPT OF COURT TRIAL PROCEEDINGS
1                BEFORE THE HONORABLE ROBERT E. JONES

2            UNITED STATES DISTRICT COURT SENIOR JUDGE

3                           APPEARANCES

4    FOR THE PLAINTIFFS:   Matthew H. Simmons
                           Seann Malloy
5                          Alex Shubin
                           Simmons & Associates, Chartered
6                          4833 Rugby Avenue, Suite 100
                           Bethesda, Maryland  20814
7
                           Damon M. Senaha
8                          Attorney at Law
                           95-214 Hoakua Place
9                          Mililani, Hawaii  96789

10

11   FOR THE DEFENDANTS:   Paul Alston
                           David A. Nakashima
12                         Stephen M. Tannenbaum
                           Jason Kim
13                         Alston Hunt Floyd & Ing
                           1001 Bishop Street
14                         American Savings Bank Tower, 1800
                           Honolulu, Hawaii  96813
15

16

17

18

19

20

21

22   COURT REPORTER:       Dennis W. Apodaca, RMR, RPR, FCRR
                           1000 S.W. Third Ave., Room 301
23                         Portland, OR  97204
                           (503) 326-8182
24

25
```

```
1                              INDEX

2    Witnesses:  (For the Defendants)   Direct    Cross      ReD

3    Michael Connell                    3243      3281       3327

4    Michael Klausner                   3328      3340

5    Danton Wong                        3354      3379       3392

6    Robert Hastings                    3394      3402

7    Mary O'Connor                      3415      3422       3431

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         (May 22, 2008)

2                    **P R O C E E D I N G S**

3           (Open court:)

4           THE COURT:  Good morning, everybody.  This

5    beautiful Oregon weather makes us homesick.

6           (The witness was duly sworn.)

7           THE WITNESS:  Michael Connell.  M-I-C-H-A-E-L,

8    C-O-N-N-E-L-L.

9           MR. ALSTON:  Your Honor, before we begin with

10   the witness, we have a couple of housekeeping matters.

11          THE COURT:  Yes.

12          MR. ALSTON:  You will recall, when Ms. Gloria

13   Chang was testifying, there was some controversy about the

14   date of her memorandum.  We have agreed to submit an

15   additional exhibit consisting of materials provided by

16   First Hawaiian Bank, after her testimony, that bear on the

17   date of her memorandum, which was disputed.  Included is a

18   printout of the properties of the document from the Excel

19   program that shows it was created in December of 2000.  We

20   have offered that by stipulation with the redactions as

21   Exhibit 2372.  I'll make the redactions with the Court at

22   the break.

23          In addition, Your Honor, we talked about last

24   week, the Web site of the Malama Maha`ulepu activist

25   group, which is also coming in by stipulation, and also

the one from the Maui Explorer Web site is coming in by

stipulation.  We will mark those at the next break.

Mr. Simmmons also --

MR. SIMMONS:  I have a couple of things, Your

Honor.  We have checked, and they agree to stipulate that

the "E" documents are from Faegre Benson.  There was some

question about that.

I agree to the First Hawaiian Bank documents

coming in.  I will argue a very different construction

what they mean as to the timing, but we agree they are

real and authenticate and so forth, and they are what they

purport to be, pursuant to the e-mail that will be

attached to them.

We also got a copy of Dennis Nakahara's redacted

report.

We had a written offer of proof concerning

Tom Johnston's testimony attached to which the Court will

find a Ninth Circuit case, which we think is instructive

as to the admissibility and relevance of what I would have

done with testimony in this context.  We offer those two

things.

THE COURT:  Thank you.

MR. SIMMONS:  To the extent he needs to be made

available for cross, I think I can get Mr. Johnston today,

if the Court would like to hear from him.  The case has

1   been highlighted in everyone's copy.

2           THE COURT:  Well, I think you told us what he is

3   going to say.

4           MR. SIMMONS:  This is a little more detailed,

5   but yes.

6           THE COURT:  Okay.  Anything further?

7           MR. ALSTON:  No, Your Honor.

8           MR. SIMMONS:  Oh, we have a joint -- we have a

9   joint stipulation on our exhibits.  We will probably have

10  to deal with the rest today, and I think it needs to be

11  signed, I guess.  We have two more exhibits that we are

12  going to offer.  I conferred with my colleague; I will do

13  that later.

14          THE COURT:  Thank you.

15          MR. NAKASHIMA:  For the record, we ECF filed our

16  exhibit list, which included all the exhibits entered by

17  stipulation as well.

18          THE COURT:  Thank you.

19          MR. NAKASHIMA:  May I proceed, Your Honor?

20          THE COURT:  Please do.

21                    DIRECT EXAMINATION

22  BY MR. NAKASHIMA:

23  Q    Good morning, Mr. Connell.

24  A    Good morning.

25  Q    Can you briefly tell us where you were born and

M. Connell - Direct

1  raised, your education and your employment generally

2  through, let's say, the year 2000.

3  A    I was born in Southern California, in Pasadena,

4  California.  I was raised, for the most part, at least

5  from the age 7 on in that area.  I went to high school,

6  college and law school all in Massachusetts.  In high

7  school, I went to Phillips Academy in Andover,

8  Massachusetts.  I graduated in 1957.  I then went to

9  Harvard College, took a degree, a bachelor's degree, but

10  it was in applied science, which was mathematics,

11  chemistry, astronomy and physics and graduated there in

12  1961.

13          I then went to Harvard Law School and graduated

14  in 1964.  After leaving law school, I went to work for the

15  firm of Paul Hastings Janofsky & Walker in Los Angeles and

16  worked first as an associate, specializing in corporate

17  matters, principally mergers, acquisitions, mostly

18  involving private companies, although there were two

19  significant clients who actually did public work,

20  acquiring public companies, acquiring private companies.

21          Then as M & A type work slowed down at the end

22  of the '60s and early '70s, I became more and more

23  involved in a real estate type practice as well.

24          In 1978, I left Paul Hastings and went to the

25  Securities & Exchange Commission in Washington, D.C.  I

1    spent approximately six months in the Office of the

2    General Counsel where I worked on all kinds of issues,

3    mostly involving appellate litigation or advisory

4    memoranda to the Commission itself.

5         At the end of that stint, I became the associate

6    director of the Division of Corporation Finance in charge

7    of legal affairs.  Now, that's a long-winded -- the

8    Government only comes up with names like that.  The

9    Division of Corporation Finance oversees the filings by

10   registered companies and securities offerings that are

11   made on a public basis and proxy materials, tender offers

12   and other activities.

13        My particular function with the commission in

14   that division was to oversee the rule-making function.

15   That was the most important of the things.  The Office of

16   the General Counsel of that division, which passes out

17   advice and handles inquiries to the general public.  The

18   Office of Tender Offers -- and we were involved in a

19   reorganization for a short time.  I handled liaison with

20   the Division of Enforcement and some foreign filing

21   oversight work as well, but those functions were

22   transferred away as we reorganized.

23        In the rule-making side of this, I was

24   responsible for heading up a team that adopted what has

25   become known as the Integrated Disclosure Program.  This

 1    revised the periodic filings made by public companies, new

 2    10Ks, 10Qs.  10Ks are annual reports; 10Qs are quarterly

 3    reports.  And Form 8 reports, 8Ks are reports for material

 4    events, otherwise not required by the timing of the rules.

 5          At the same time we also put in draft new

 6    registration forms, S1, S2 and S3.  As part of this

 7    project, in order to coordinate the disclosure request of

 8    all filings, we wrote regulation SK.  Regulation SK

 9    contains all the common rules that are used in all these

10    filings.  If you are describing your executive officers,

11    the requirements are the same for a 10K or a 10Q, if it

12    happens to apply to that, or a registration statement, or

13    a proxy statement.  They all incorporate this same central

14    body of rules, which was sort of the key to the integrated

15    disclosure process.

16          I left the Commission in 1980 and at that time

17    the company filing rules were adopted.  The actual

18    registration forms had not been adopted at that time, and

19    it took almost two years to adopt them after I left,

20    although they were adopted almost without change of any

21    kind.  The reason was that there was a change of

22    administrations, and the new Commission wanted to go back

23    and look over the process from beginning to end.

24          When I left the Commission, I went back to the

25    law firm of Paul Hastings Janofsky & Walker.  And from

1      then on in my practice, I continued to do mergers and

2      acquisition activities and was a securities specialist as

3      well, based on my career with the commission, in part.

4              I left Paul Hastings Janofsky & Walker in, I

5      believe, 1989 approximately and went to the firm of

6      Morrison & Foerster.  I also was in the Los Angeles

7      office.  And I was in that office through -- well, through

8      2003, although in the year 2000, before this transaction,

9      I moved from a full-time partner in the firm, and I had at

10     one time been the managing partner of that office to a

11     part-time role and worked mostly out of my own office that

12     was located away from the Morrison Foerster office.

13             THE COURT:  When you were managing partner, how

14     many partners and associates did you have?

15             THE WITNESS:  In the Los Angeles office there

16     were 135, I believe, partners and associates;

17     approximately evenly split, about 60 partners, as I

18     recall, and the rest were associates.  The firm, as a

19     whole, had about 650 partners and associates, and the

20     firm's home base is in San Francisco.

21             THE COURT:  Thank you.

22     BY MR. NAKASHIMA:

23     Q    How are you currently employed?

24     A    I am employed on a part-time basis by Quateman LLP.

25     Quateman is a firm of ten lawyers of whom I think only

M. Connell - Direct

 1   about four or five are actually full-time lawyers.  Let me

 2   amend that.  They are all full-time lawyers other than

 3   myself, but they aren't necessarily full-time with the

 4   firm.  They do quite a bit of municipal bond work.  For

 5   example, one of their -- one of the people associated with

 6   the firm does tax work for that practice, but he also does

 7   it for other firms as well.

 8   Q    Now, can you explain to us the retention of you and

 9   your law firm in connection with the Grove Farm matter.

10   A    Yes.  Apparently an inquiry -- I didn't see the

11   inquiry directly -- was sent from the Case Bigelow firm to

12   our partner in the San Francisco office.  He in turn

13   contacted, I believe it was Henry Fields, who was the then

14   head of the business practice in Los Angeles.  Henry

15   recruited Michael Cohen and myself to work on the project,

16   based on what he thought our relevant experience was going

17   to be.

18   Q    What was Mr. Cohen's experience as contrasted to or

19   similar to yours?

20   A    He had less experience in what I would call the

21   public securities area, although he had engaged

22   extensively in private M & A transactions and general

23   corporate work along that line.  I had done much of what

24   he had done and also had the securities experience.

25   Q    Do you recall when you first got involved in the

1    Grove Farm matter?

2    A    I think it was right away, on the 16th, if I

3    remember.  I can't -- it could have been earlier, but I

4    believe it was on the 16th.

5    Q    Of what month?

6    A    Of November, I'm sorry, of 2000.

7    Q    Now, what was your understanding as to what function

8    you and your law firm would serve in the Grove Farm

9    matter?

10   A    We were to be independent advisors to the board of

11   directors to advise them as to the fairness of the

12   process, to the extent we're able; the fairness of the

13   price, to the extent it came out of the process; and in

14   particular to look at whether or not all bidders were

15   being -- and other interested parties -- were being

16   treated equally.

17          There had been some complaints that perhaps

18   ALPS, because it had a relationship through Mr. Case

19   Senior, was somehow being favored, and they wanted us to

20   look at that, and to assure the board that, at least as

21   far as we could determine, we didn't detect that

22   happening.

23   Q    So with those three principal areas, what did you do?

24   A    Well, we first reviewed documents that were available

25   to us, and we were sent the proxy statement, several of

1   the acquisition agreements.  I would be hard pressed to

2   tell you exactly which versions of which, but we certainly

3   saw the ALPS final agreement, and we saw several drafts of

4   what ultimately became the Wattson Breevast -- although

5   those had just gone out -- as I recall, went out on about

6   the same time we came on.

7           We saw -- the principal concern at the time was

8   a Del Mar proposal, which the company had some enthusiasm

9   for, but they thought that this looked like it could

10  become a superior offer, and that's a technical term under

11  the agreement.  And they were interested in pursuing that

12  to see if that could be the case.  So we saw the Del Mar

13  materials, certainly the ones that came in on

14  November 10th.  I am not sure we saw the earlier ones.  I

15  don't recall actually.  I think I might have, but I don't

16  recall.  And we saw some correspondence that had gone on

17  at that time as well.

18  Q    I believe you testified:  Did you review the proxy

19  statement?

20  A    Yes.  I reviewed it carefully.  Reviewed it for a

21  couple of things:  First of all, it was a very valuable

22  source of background information.  It showed the bidding

23  history, which was of importance to us in our assignment,

24  and it also gave a flavor of just how thorough these

25  people were going to be.  I'm very familiar with proxy

statements, and I actually recall doing a comparison with the public rules as to whether I thought this would come close to complying or comply with those rules, even though this was a private company and not subject to those rules. And I thought that turned out to be a very favorable comparison. I thought they had done a thorough job.

Q   So after review and comparison, what was your opinion as to the adequacy -- well, strike that. Had that proxy statement already been issued?

A   Yes, it had been. It was sent out somewhere around the first week of November; I think the 3rd or 4th.

Q   After your review and comparison, what was your judgment and opinion?

A   At this stage I think I withheld any judgment. I wanted to know more than just read the document. On its face I felt it was adequate and fair, but I wanted to test some of these things and see whether or not -- what other people had to say about it was consistent with what it said.

Q   So what did you do in that connection?

A   In that connection I had conversations with -- and almost all my conversations and the bulk of my conversations and information came from Mr. Klebahn, Mr. Cribley and Mr. Tanaka. I had the opportunity to talk to all of the other directors, except Mr. Combs, who was

M. Connell – Direct

1   only present by telephone.  I spoke, I believe, to the

2   chief financial officer very briefly, but again, didn't

3   have a long opportunity.

4           None of these were sit-down interview type

5   things; the time didn't permit that.  But at each

6   opportunity I tried to get each person's flavor of what

7   had gone on and tried to find out whether something they

8   were saying was inconsistent with my understanding from

9   the proxy or from the prior interviews.

10  Q    At some point did you come to an opinion as to the

11  adequacy of the proxy statement?

12  A    Yes.  By the time I reached the November 30 date, I

13  was of the opinion it was adequate, full and fair.

14  Q    Did you have any input or involvement in what has

15  been called the supplemental proxy statement?

16  A    Yes, I did.

17  Q    There is a black binder in front of you.

18  A    There was, but it seems to no longer be in front of

19  me.

20          MR. NAKASHIMA:  I think my partner, Mr. Alston,

21  took it from you.

22  BY MR. NAKASHIMA:

23  Q    Could you turn to tab 1369.

24  A    Yes.  This is the letter -- supplemental letter to

25  the shareholders that you were referring to.

M. Connell - Direct

1   Q    And did you review this letter in draft form?

2   A    Yes, I did.

3   Q    Did you and your partner make comments?

4   A    We did.  We made —— yes, we did.

5   Q    To your knowledge, who was the drafter or originator

6  of this document?

7   A    It is a good question.  It was jointly drafted.  The

8  originator of the first draft, I believe, was either

9  Mr. Cribley or Mr. Tanaka, or maybe the two of them

10  together.  But the final product, Mr. Cohen in particular

11  was very much involved, and I participated in that as

12  well.

13   Q    Do you recall any input or changes by any ALPS

14  representative or the Carlsmith law firm into the

15  supplemental proxy statement?

16   A    No.  I know that under the agreement they had the

17  right to see things before they went out, but I was not

18  aware specifically —— maybe I was —— but I certainly don't

19  remember being aware of any specific comments.

20   Q    What was the purpose of the supplemental proxy?

21   A    Let's start off what it wasn't.  It wasn't because

22  there was some big material change of events.  What it

23  was, was that information concerning the Del Mar letter

24  had leaked to the shareholders.  In fact, the leak was

25  found.  It was a Del Mar person who had delivered a copy

M. Connell – Direct

1    of the letter to at least one or maybe possibly more of

2    the shareholders.

3              So what we had was a situation where the

4    information was uneven.  Some shareholders knew about

5    Del Mar and others did not.  There was also indications

6    that were reported to us by Mr. Klebahn in particular and

7    Mr. Cribley that some shareholders thought it was a viable

8    transaction and why weren't the board of directors

9    pursuing a $175 offer, which is a pretty reasonable thing

10   to be concerned about.  In fact, it was never a real

11   offer.  And secondly, by the time of the 20th, actually on

12   the 17th, Del Mar had withdrawn.

13             So we now had shareholders who were out there

14   with information which, at best, was misleading, and it

15   was the consensus view that we should cure that; that we

16   should make sure that everybody had the same information

17   and that that information should be accurately portrayed

18   rather than inaccurately portrayed.

19   Q    And were you personally in favor of issuing a

20   supplemental proxy?

21   A    I was.  In fact, both Michael and I were encouraging

22   this, but I think everybody agreed that something had to

23   go out.  We were not in agreement as to necessarily what

24   it should say, but we were in agreement that something

25   should go out.

1    Q    Well -- when you say there was differences or

2    disagreement, who was that between?

3    A    That was really -- it was Mr. Klebahn, in particular,

4    and I think Mr. Cribley agreed with him, were reluctant to

5    include in the supplement the mention of the $175 or any

6    mention of Wattson Breevast.

7          We were of the view that, look, the letter that

8    was already out there had that number in it.  If you

9    didn't put the number in with reasonable explanation, it

10   continued to be confusing.

11         So both Michael Cohen and I -- we actually had

12   an internal exchange on this, but between the two of us,

13   we were very much of the view that this ought to happen.

14         Now, with respect to Wattson Breevast, it was

15   kind of a difficult situation, because in these situations

16   you would almost never disclose a letter of intent

17   exchange like the one that was going on with

18   Wattson Breevast.  The reason for that is that there is no

19   deal and everything you put out would be subject to change

20   and change without notice.  So you would end up -- once

21   you start coming up with more and more information

22   everyday, in theory at least, and the cases have long

23   recognized that you don't have to go out with that so long

24   as there is an indication that somebody is leaking the

25   information, like the Del Mar situation, and there was no

M. Connell - Direct

1    indication that people were -- had encountered the

2    Wattson Breevast information and were somehow relying on

3    it.

4            But we actually ended up on the other side of

5    that and encouraged that they disclose the existence of

6    this, because we thought by telling people that Del Mar

7    had gone away, and then being silent, that there was a

8    strong implication there were no other indications of

9    interest.

10           So we did encourage something to go in.  There

11   was a first draft that I think was undertaken by

12   Mr. Cribley on the subject.  We had comments that we

13   thought that he had perhaps gone too far with this.  All

14   we really wanted to do was show that there was an

15   indication of interest.  We didn't want to tell people --

16   we didn't want to encourage or discourage people about the

17   proposal.

18   Q    Let's go back to Del Mar.  Was the $175 per share

19   price included in the supplemental proxy?

20   A    Yes, it was.

21   Q    That was by agreement?

22   A    It was a consensus view in the end.  Actually, the

23   way that worked was that we took our positions to the

24   board.  Mr. Klebahn and Mr. Cribley made a presentation

25   and said:  We don't think we need to put this in, and we

M. Connell – Direct

1    think it might be misleading to suggest $175, when it

2    wasn't.  We said it ought to go in, for the reasons I just

3    explained, and that we thought we could qualify it in ways

4    to explain the weaknesses of the number.  Ultimately the

5    board voted unanimously, Mr. Klebahn included, to go out

6    with the number in the proxy, but the board ultimately

7    made this decision.

8    Q    I'm sorry.  What was Klebahn's, and I guess to some

9    extent Cribley's concern, about including the share price?

10   A    They thought it wasn't a real price.  They thought

11   that there were so many offsets and other adjustments that

12   the real price might have, in theory at least, been less

13   than the ALPS number, if you ever got to it.  So they were

14   very concerned about putting out a number of $175 and

15   raising people's expectations when they personally,

16   particularly Mr. Klebahn, did not believe that was an

17   honest number; that that was the number that would have

18   resulted had you proceeded.

19   Q    But I think you testified it was a unanimous vote?

20   A    It was.  He agreed.  He said we had a full and fair

21   debate, so to speak, and he went along with the rest of

22   the group.

23   Q    Let's go to the Wattson Breevast issue.  Was that

24   included in the supplemental proxy?

25   A    It was, yes.  But the proxy that the board saw was

M. Connell – Direct

```
 1   without these changes we then made right after the meeting
 2   to conform to what we agreed the board had agreed to.
 3   Wattson Breevast -- it wasn't a strong debate on that is
 4   what I would say.  I think ultimately everybody said yes.
 5   Once we sort of opened the door by describing Del Mar, we
 6   probably ought to at least indicate that there is this
 7   other possibility, and it was left for us to work out, the
 8   language, which we did.
 9   Q    Looking at Exhibit 1369, the second page, third
10   paragraph, is that the description of the per share price
11   for Del Mar?
12   A    1369, second page?
13   Q    Third paragraph.
14   A    That's the description for Del Mar.
15   Q    And it includes the share price?
16   A    It does, yes.
17   Q    If you could turn to the next page.
18   A    Yes.
19   Q    "Other proposals."  Do you see that?
20   A    Yes.
21   Q    Is that the --
22   A    Yes, it is.
23   Q    -- general disclosure, correct?
24   A    For Wattson Breevast, yes.
25   Q    Now, if you look at the last sentence on this letter
```

M. Connell – Direct

1    it says, "If the board does exercise a definitive

2    agreement regarding a superior acquisition offer, it will

3    seek shareholder approval of that transaction at the

4    appropriate time."

5            Do you see that?

6    A    Yes, I do.

7    Q    There has been some discussion in this trial about

8    definitive agreement.  What is your --

9    A    This is an area where people are being victimized by

10   the jargon of the trade, I think, a little bit.  There are

11   common references to letters of intent as opposed to

12   definitive agreements.  Letters of intent are outlines

13   that nobody is bound by them.  They tend to change quite

14   dramatically.  And definitive agreements are the

15   agreements that actually bind the parties.

16           So even though letters of intent are often

17   referred to as "offers," they are not really offers,

18   because the other side can't just say "I accept" and have

19   a binding contract.  So it is not in the contract sense an

20   offer-and-acceptance situation.  But a definitive

21   agreement, once signed by one party and delivered to the

22   other, is that kind of an offer.  It is an offer which, if

23   signed by the receiving party, is an acceptance and is a

24   binding agreement binding the parties.

25   Q    Now, were you present at the board meeting when there

M. Connell – Direct

1   was discussion over the supplemental proxy?

2   A    I was by telephone, yes.

3   Q    Did you later attend in person board meetings?

4   A    I did.  Whether you call it one or two, I think it

5   was technically one that was adjourned to the following

6   day.  That was on November 30th and December 1st.

7   Q    Can you turn to Exhibit 163.  I think it is the first

8   tab.

9        THE COURT:  Well, before you do, since you are

10  being so candid with Del Mar, when you get down to the

11  last paragraph of Klebahn's letter, it goes into vagaries

12  instead of specifics.  I thought, even though the letter

13  of intent was not binding, the purpose of this

14  supplemental communication was to advise the stockholders

15  what was effective and what was not.

16       You covered Del Mar, stating that they -- their

17  position.  But there is nothing at all said about the

18  Wattson Breevast letter of intent.  It says, "which

19  advised that the company has received a written proposal

20  from another interested party."

21       So that was Wattson Breevast?

22       THE WITNESS:  That's correct, Your Honor.

23       THE COURT:  And they had a specific number,

24  right?

25       THE WITNESS:  No, Your Honor, they did not.

1    They had a number, but it was a number that was subject to

2    negotiation.

3              THE COURT:  Didn't they make an offer of 170?

4              THE WITNESS:  It was not an offer.  Yes, their

5    letter referred to 170.  The key disclosure here is that

6    Del Mar went away, and we still have a live customer, if

7    you want to look at it.  That's all that we were talking

8    about.  The L.O.I. Wattson Breevast was a proposal

9    outline.  Now, if you compare --

10             THE COURT:  Just a minute.  You are going away.

11   Since you are trying to advise stockholders, and there is

12   confusion out there.  You said there was confusion on

13   Del Mar, and there was also confusion on the Wattson

14   matter, and all it would have taken is to say:  We

15   received a letter of intent from Wattson Breevast.  This

16   is not a binding offer and, therefore, should not be

17   counted on.

18             Wouldn't that have served a much better purpose

19   than saying, "We received an unwritten proposal, an

20   unknown quantity, which at this time is non-binding"?

21             THE WITNESS:  I think to mention the price that

22   they had put in would have led people to an unrealistic

23   expectation.

24             THE COURT:  Even if you told them it was

25   non-binding?

1        THE WITNESS:  Even if you told them it was

2    non-binding.

3        In this practice, I would testify that is almost

4    never done.  The only time it is done is when there has

5    been a leak of the letter, like the Del Mar leak, and then

6    you have to somehow deal with it because of the uneven

7    information situation.

8        This -- as it turned out, they made significant

9    changes in this letter over time, and there were very

10   significant loan arrangements that didn't materialize.

11   For example, there was the whole problem of the

12   practicability of the offer, concerning the year-end

13   concerns.  And at this stage you were early in their

14   process still.  So you weren't quite sure where any of

15   this would go.

16       So to throw out that kind of expectation would

17   have, I think, put the company in a very difficult

18   position.  They could have done it.  They could do

19   anything along that line, but then they would have to give

20   periodic updates, and the practicality of doing that makes

21   it very difficult.  You do run out of time to do it.

22       And so I think that the better decision was the

23   one they made, which was normally you wouldn't have said

24   anything about Wattson Breevast, but the reason they did

25   here is because the Del Mar going away thing led you to

 1   the conclusion that there were no proposals, and they

 2   didn't want to leave that out there.

 3            THE COURT:  Thank you.  Go ahead.

 4   BY MR. NAKASHIMA:

 5   Q    Let's turn to the November 30th/

 6   December 1st meetings.  Obviously you flew from

 7   Los Angeles?

 8   A    On the 29th to Kauai.

 9   Q    And leading up to the board meeting, what were you

10   doing?

11   A    Well, I got in late the night before because the

12   plane was delayed.  So I met with Mr. Park for about an

13   hour or so and then as I recall -- excuse me -- back up.

14   Wrong flight.  On the 29th, I came in.  The plane was on

15   time that time and then I got lost finding my hotel.  So I

16   got an unexpected tour of the properties.  But I did come

17   back and find the hotel and then we started with an early

18   morning -- I think it was a 9:00 a.m. meeting the next

19   day.  But I had no contact with any representative of

20   Grove Farm until just before the meeting.

21   Q    Let's talk about the November 30th meeting.  Looking

22   at Exhibit No. 163, it does show that you were present,

23   correct?

24   A    That's correct.

25   Q    And did you make any presentation at this

1    November 30th meeting?

2    A    Yes.  I made a presentation that had sort of two

3    technical aspects and then my conclusions concerning our

4    assignment.  The first was, I discussed with the board

5    what I thought their obligations would be, in a general

6    way, without -- I dealt with sort of the general

7    obligations that all companies face in these

8    circumstances, and I used, by analogy, Delaware standards,

9    even though very clearly the Hawaii statute differs from

10   Delaware's.

11            MR. SIMMONS:  Objection; move to strike.

12            THE COURT:  Go ahead.

13            MR. SIMMONS:  There has been no testimony to

14   establish that this witness is qualified to discuss

15   Hawaiian law.

16            THE COURT:  We have already discussed Delaware

17   practices and Hawaiian practices.  Did you discern that

18   there was some material differences?

19            THE WITNESS:  Yes.  And I also had Mr. Cribley

20   in the room to respond to those differences as well, who

21   is licensed in Hawaii.

22            MR. NAKASHIMA:  I think he is testifying as to

23   his understanding, Your Honor, which I think is clearly

24   material.

25            THE COURT:  I don't see where that is relevant

1    to what we are talking about here.

2            MR. NAKASHIMA:   Let me try to narrow the issue.

3    BY MR. NAKASHIMA:

4    Q    What were the topics of the presentation to the

5    board?

6    A    Generally what directors, as a general matter, should

7    consider in connection with acquisition proposals that

8    were similar of this sort, using by analogy the public

9    arena cases, mostly those from Delaware, which are often

10   discussed, but they aren't necessarily controlling.  And I

11   believe I told the directors that ultimately Hawaiian law

12   would govern this, and Mr. Cribley was there to discuss

13   that issue.

14           And secondly, the obligations under the business

15   judgment presumption, to be fully informed, which I

16   believe is law adopted across almost every jurisdiction at

17   this point.  And Mr. Cribley had confirmed that he felt it

18   had been adopted in Hawaii as well.  And then, finally, I

19   talked about our assignment to see whether we thought that

20   there had been fair dealing and that this fair dealing had

21   resulted in a fair price.

22   Q    Starting with the third, what did you tell the board

23   about your evaluation of fair dealing?

24   A    I thought that our investigation, which had out of

25   necessity been limited somewhat by time and scope, raised

M. Connell – Direct

1  no indications that there was any unfair dealing in the

2  process; that the bidding process that had gone back into

3  December of the prior year appeared to have been very

4  consistent with what you would hope you would see; that

5  the prices had risen from $125 through to 152 and still

6  possibly, based upon the then status of Wattson Breevast,

7  it might even go higher.

8        But of the process, there seemed to be no

9  unreasonable favoring of anybody in the process.  They had

10  entered into an agreement with ALPS, and that obviously

11  gave ALPS an advantage at that point in time.  But that is

12  what is consistently done.  Every process ends up with an

13  agreement with somebody who gets an advantage, and they

14  have preserved for themselves the ability to review

15  unsolicited offers, as long as they met the criteria of

16  the agreement.  I pointed out to them that they were

17  obligated by that agreement, and so they weren't just free

18  to do whatever they wished here, but they had to take into

19  consideration the terms of that agreement.

20        I also said that I thought it was perfectly

21  reasonable to consider matters other than just price alone

22  in evaluating offers and that case law in other

23  jurisdictions, again, not necessarily relevant to Hawaii,

24  had allowed this.  In particular, there is at least one

25  case in Delaware, I think many, that allowed -- considered

1    financing the feasibility of the transaction, the

2    background and capabilities of the bidder and also the

3    consequences if you don't do the deal.

4            And we turned to that element, and I was

5    convinced, based upon my review and discussions, that

6    there were legitimate concerns.  There was termite damage

7    that would cost between 4- and $5 million.  My review of

8    the financial information indicated that they didn't have

9    that money.

10           That there was debt coming due at the end of the

11   year, or first of the following year, of about

12   three-and-a-half-million dollars, and it didn't have that

13   money.

14           That there were infrastructure projects needed

15   to make entitled properties saleable.  And while I wasn't

16   convinced that I had extensive information about that, it

17   did appear that that was a significant amount of money as

18   well.  And the company was, in effect, up against some

19   very serious deadlines.

20           Mr. Klebahn had written a letter indicating

21   that, at least -- indicating that he thought that, if all

22   things went bad and no acquisition was consummated, that

23   the company would most probably face bankruptcy.

24   Q    Did you also discuss at either this meeting or the

25   following meeting Wattson Breevast?

1    A    Yes.  I think it was at the following -- you know my

2    recollection isn't actually clear about the two.  I know

3    at the first meeting Mr. Cribley laid out in detail the

4    discussions with Wattson Breevast.  In fact, I was

5    familiar with those because he kept us apprised as he went

6    along.  So that was laid out.

7         But whether we deferred that, as we did any

8    decision about delaying the meeting or the closing, I

9    don't really precisely remember.  I believe we did defer

10   any decisions, but whether we discussed in detail sort of

11   what Wattson Breevast was at the first or second meeting,

12   I'm not sure.

13        In any event, I did discuss that and concurred

14   with Mr. Cribley that there was no offer on the table;

15   that despite deadlines that had been established, at least

16   as early as November 7th and a continuous attempt to

17   contact people and to get their commitment, that there was

18   no commitment in whatever form, certainly not a definitive

19   agreement, and there was no assurance that there could be

20   financing.  No deposit, which I think, considering the

21   amounts of the loans involved, I think that would have

22   been enough, without further things.  I don't think they

23   would have walked away from four-and-a-half-million

24   dollars.  But that would probably have been enough, but it

25   still was no commitment.

1          I was also personally influenced, and I called

2     it to the attention of the directors by two things that I,

3     frankly, never experienced before.  These people had set

4     up due diligence meetings for November 13th and 14th and

5     never showed up.  I understand that they had seen the

6     properties, and they had made other tours.  But I have

7     never experienced somebody who didn't want to come and

8     kick the tires and see what people were doing, whether the

9     employees were going to stick around, what the properties

10    looked like and what the current developments were and

11    what people's current outlook was.

12         The second thing that surprised me is that they

13    set up a meeting to discuss the debt with the bank and

14    then never had that meeting.  I think it was a telephone

15    meeting they had set up, and I don't understand that in

16    the context of this.

17         Again, the bank had to consent to any

18    transaction.  It had a lien, as I understand, or at least

19    a negative covenant on everything.  And for a buyer not to

20    want to know they were going to have a good relationship

21    or to seek an extension or to even to think they were

22    going to make this loan, to get the bank's agreement to

23    get their money back in some form, with a priority or

24    something else, that quite amazed me that they were not

25    there.  And I did call that to the attention of the board

M. Connell – Direct

1   and said that I had not experienced anything of that sort

2   before.

3   Q    Can you turn to Exhibit 163, the second page.  Do you

4   see that side heading "Comparison of Wattson Breevast

5   Possibility with ALPS Agreement"?

6   A    Yes.

7   Q    Are these statements on this page consistent with

8   what you were telling the board?

9   A    Yes.  It is not the complete set of statements, but

10  yes.

11  Q    You did note that the strength of the

12  Wattson Breevast proposal was that it was talking about a

13  7.8 percent premium?

14  A    Yes.  And they later then clarified that it was even

15  more -- more like a 12 or 13 percent premium, as I recall.

16  And I believe that, based upon the reaction of the board,

17  that had they had the definitive agreement or had a

18  reasonable expectation within a few days of a definitive

19  agreement, that they would have pursued that because in

20  the case of all the directors, except only possibly one,

21  they expressed the view:  Do what you can to get -- we

22  would like to get the money.  I think they would have

23  taken it had they thought it was a viable offer.

24  Q    Do you recall which director was less enthusiastic?

25  A    Pam Dohrman was less enthusiastic about this.  She

1    specifically asked about the factors in the Hawaii law,

2    and Jim Cribley responded to that, yes, there are factors

3    in the Hawaii law that permit people to consider other

4    than shareholder interests in situations like this.

5            I, for one, said, as a factual matter, there was

6    no offer on the table, and it wasn't even appropriate to

7    consider whether those would apply at this point in time.

8    And there was really no real need.

9    Q    Can you turn to the third page of that exhibit?

10   A    Yes.

11   Q    Did you frame the issue to be the fact that the board

12   did not have before it a superior acquisition offer?

13   A    Yes.  That is a definition in the agreement itself.

14   It requires that there be an offer that can be accepted,

15   and while there isn't a direct reference to a definitive

16   agreement, that is really what a definitive agreement

17   means.  It is something that has been accepted actually or

18   is presented for acceptance, and it defines all of the

19   relevant terms of the transaction, and that the board then

20   reached the conclusion that it is a superior offer, which

21   in this case I think would have been fairly easy.  It was

22   at a price that was significantly above the ALPS number,

23   and they would be in breach of their fiduciary duties if

24   they did not present it to the shareholders.  But we never

25   got to that, because we never got to step one in this

M. Connell – Direct

1    process.

2    Q    Could you turn to the next exhibit, which is the ALPS

3    proxy, Exhibit 145.  Do you have that in front of you?

4    A    Yes.

5    Q    I want to go to the appendix with the ALPS merger

6    agreement, particularly Bates stamp page A001966.  It is

7    section 5.18.

8    A    Yes.

9    Q    First of all, as of 2000, were you familiar with this

10   type of provision?

11   A    Yes.  Well, there are some variations from agreement

12   to agreement.  If you do have no solicitation and

13   fiduciary-out type language, this one is pretty

14   representative of the kind of thing that is done.

15   Q    And can you explain what a fiduciary out is?

16   A    Yes.  It basically says that, even though I have

17   signed a binding agreement with a party -- and normally,

18   for example, I use the example, if you sell your house,

19   you normally sell it.  And if someone comes along with the

20   next day with a higher offer, tough luck.  It is not how

21   most things are sold.  But in the case of businesses --

22   and it isn't always case -- it is not a requirement.  The

23   boards often reserve the right, if they get to consider

24   superior bids, if they can be turned into an offer.

25          This particular agreement is quite typical.  It

M. Connell – Direct

1    says that they won't actively go out and solicit such

2    things, having reached an agreement with ALPS on that

3    subject.  But if they get unsolicited offers, they will

4    inform ALPS, which is entitled to know about them

5    contractually, and then they may negotiate.  If they make

6    the preliminary judgment that this is likely to result in

7    that superior final agreement, which is referred to as an

8    offer, which is confusing here, but it is an offer of a

9    definitive agreement, then they can negotiate with this

10   person.

11           And if they reach a final judgment that it is a

12   superior offer, then they can sign the agreement, which

13   must be subject to the rights of ALPS under this

14   agreement, and ALPS in this case was fairly typical.  It

15   had the right to either match the bid, the right of first

16   refusal, or to terminate the agreement and collect what's

17   commonly referred to as a break-up fee.  In this case,

18   that was a $1 million fee.

19   Q    If you turn to the next page, subparagraph G has the

20   definition of "superior acquisition offer."

21   A    Right.  The idea is that it has to first be an offer,

22   and then you have to reach the conclusion that it is, in

23   fact, superior.  So it had to be substantially the

24   company, in this case 75 percent, and it had to be on

25   terms that they think are more favorable in their good

1   faith and reasonable judgment.  And also after consulting

2   with legal authorities, they should determined it would be

3   a breach of their fiduciary duties not to proceed forward.

4   Q    Now, going back to the November 30th board meeting,

5   which is Exhibit 163, did you tell the board, even though

6   it was not a superior acquisition offer, they could defer

7   the vote at the shareholders' meeting the next day?

8   A    Yes.  That's really a different provision of the

9   agreement, but it was pointed out that Wattson Breevast

10  represented and requested a deferral; that ALPS had

11  indicated they would very much oppose a deferral.  Had

12  threatened, I think -- I don't know how serious the threat

13  was -- but had threatened to do more than complain,

14  although in the time frame it is hard to imagine what they

15  could have done.

16          And under the agreement it was possible to

17  extend the meeting.  That was pretty obviously, actually,

18  as far as December 11, which would be ten more days, and

19  it was possible to extend the closing before ALPS would

20  have an absolute right to walk away, to December 15th.

21  Q    It looks like you are looking at the direction -- do

22  you recall the board instructed Mr. Klebahn to approach

23  ALPS again and defer the decision about postponing until

24  the next day?

25  A    Yes.  There was quite a bit of discussion about the

1   issues, and then I think I was one of the people who

2   suggested that -- and I don't think I was the only one --

3   I think some directors suggested it as well -- that given

4   the circumstances we should go back to ALPS and see if

5   they were willing to raise their offer, or to perhaps even

6   match the $170, which I don't think realistically people

7   thought that was likely, I said:  Look, we ought to try.

8   You can't be hurt for trying.  You could benefit, and we

9   would get a much better idea about what ALPS' attitude

10  would be if we had a face-to-face meeting.

11  Q    So did you attend a face-to-face meeting?

12  A    Yes.  Mr. Klebahn and I traveled to Honolulu, and we

13  met with Mr. Agee, the representative of ALPS.  I was

14  there, Mr. Klebahn was there, and I know Mr. Case Senior

15  was there.  I know there were others at the meeting.  I

16  don't recollect who they were.  I apologize to them,

17  because I think they actually participated, but I cannot

18  remember who was there.

19  Q    Can you just summarize what Grove Farm's position was

20  at this meeting?

21  A    Yes.  There were actually two presentations.

22  Mr. Klebahn and I had slightly different ideas of what

23  might be more appealing to ALPS.  So he presented one, and

24  I presented the other.  He presented a concept that ALPS

25  should increase the price, perhaps all the way to $170,

1    but I'm afraid he backed off of that number fairly

2    quickly, in order to -- what he referred to as buy an

3    early closing; that Grove Farm would waive its rights to

4    extend in exchange for the increase in price.

5          I took a slightly different approach, although I

6    supported that approach.  He was the client in those

7    circumstances.  I suggested that -- I was the first to

8    raise the question of indemnity and say:  Look, I think

9    you are going to be responsible for whatever goes wrong

10   afterwards.  You are acquiring the company, and you will

11   end up with whatever its responsibilities are, and I think

12   it would be in your interests to raise the price and avoid

13   potentially some of those issues.  If, for example, you

14   raised it to $170, that would effectively eliminate any

15   other concerns about Wattson Breevast.

16         Now, Mr. Agee -- I'll say this was a very

17   friendly meeting and certainly no raised voices or

18   anything of that sort.  He found Mr. Klebahn's argument to

19   be -- he was not receptive in any way to his arguments.

20   And if he found -- if he wasn't receptive to Mr. Klebahn's

21   arguments, he was less receptive to my arguments with

22   respect to this.

23         He rejected, I think after consultation, but he

24   rejected both arguments, and he said he would go forward

25   on whatever the contract said and whatever their

1    obligations under the contract were; that they intended to

2    live up to them under the letter of the law.

3    Q    So that was the afternoon of the 30th?

4    A    It was afternoon of the 30th.  Yes, it was.

5    Q    Did you fly back to Kauai that night or the next

6    morning?

7    A    That night.

8    Q    Was there a board meeting before the shareholder

9    meeting?

10   A    There was.  I believe it started early in the morning

11   and the first issue was to report the outcome or the lack

12   of outcome from the meeting with ALPS.  I believe we

13   discussed more the Wattson Breevast situation.  Again, as

14   I said earlier, it could be that I confused the 30th and

15   1st in that regard.

16        Then we had an extensive discussion concerning

17   the possibility of extending the shareholders' meeting and

18   whether or not it would be in the interests to do that,

19   particularly whether there was enough of a chance that

20   Wattson Breevast would really materialize in that ten

21   days.  Would those ten days make a difference?  You know,

22   it was a judgment call to decide what to do at that point.

23   There were considerable downsides to extending, in that

24   you were just getting ever closer to these deadlines.

25   ALPS made it clear that they would be really upset if this

M. Connell – Direct

1   was done, and they were the bird, you know, that we had in

2   hand.

3          It was not -- it was not keep chasing these

4   other guys forever and ever and ever, and they had been

5   chasing them for a year.  I think they made the judgment

6   that let's take what we have got at this point.  The

7   downside doesn't justify the risk of continuing onward

8   here, and that was the decision.

9          First, on the meeting -- it was really two

10  decisions.  The first was, do we hold the shareholders

11  meeting and then delay the closing?  Well, in the meeting,

12  my recollection was that everybody voted in favor.  They

13  had the proxies in hand.

14  Q    Does that include director, Mr. Combs?

15  A    That's my recollection, although I could be wrong on

16  that.  He was on the phone, again, recording his vote.  I

17  could have easily misunderstood that.

18  Q    Can you look at Exhibit 163, the fourth page.

19  A    Yes.

20  Q    Under the subheading of "Determination to Proceed

21  with Shareholder Meeting."  Do you see that?  It says,

22  "The view of all directors was that the shareholders

23  should be asked to vote on the ALPS transaction at the

24  nine o'clock meeting."

25          Do you see that?

1    A    Yes.

2    Q    Is that consistent with your recollection?

3    A    That's my recollection.  Again, I would never argue

4    that my recollection is perfect.

5    Q    Next it does say, "All directors, except Director

6    Combs, favor closing as soon as possible, while

7    Director Combs favored delaying closing until December

8    15th."

9    A    That's correct.  I remember it that way.

10   Q    Is it your best recollection that all the directors

11   wanted to go forward with the shareholders' meeting and

12   vote?

13   A    Yes, that's correct.

14   Q    And Director Combs wanted to delay the closing until

15   sometime later?

16   A    That's my best recollection, yes.

17   Q    Did any other directors join in that view or

18   position?

19   A    No.  It was discussed, but I don't believe that

20   anybody else did.

21   Q    Now, as of the morning of December 1st, had

22   Wattson Breevast signed a definitive agreement?

23   A    No.

24   Q    Had Wattson-Breevast put in any deposit or loan?

25   A    No.

M. Connell - Direct

1    Q    Now, did you attend the shareholders' meeting?

2    A    I did.

3    Q    Can you look at Exhibit 2196.  Would you look down to

4    the report of other potential offerors.

5         Do you see that?

6    A    Yes.

7    Q    Do you recall that Mr. Klebahn did disclose by name

8    Wattson Breevast and their proposed share amount?

9    A    I do.  My recollection of exactly what he said is

10   imperfect.  I recall him describing it, and I think he did

11   describe the amount.  The minutes certainly reflect that.

12   I was not the preparer of the minutes.

13   Q    Following that description, there was also a note

14   that Mr. Klebahn had noticed a lawsuit had been filed by

15   Michael Sheehan.

16        Do you recall that fact?

17   A    Yes.  We were aware of that fact after the meeting or

18   the day before, and we called it to the attention of ALPS

19   when we met with them.  But they were already aware of it

20   at that time.

21   Q    I'm sorry.  So when you met with Mr. Agee in

22   Honolulu, that issue was already known?

23   A    Yes, it was.

24   Q    Was that part of your raising this indemnity issue?

25   A    Exactly.  Exactly.  It was one of the motivations for

1    raising that.

2    Q    Looking at the approval of the motion, it looks like

3    Ms. Sandra L. Day recorded that 98.9 percent had voted in

4    favor of the motion?

5    A    Yes.

6    Q    Do you recall that?

7    A    I do.

8    Q    That was essentially approving the ALPS merger?

9    A    It was.  That's exactly what it was.

10           MR. NAKASHIMA:  Thank you.  That's all the

11   questions I have.

12           THE COURT:  It's time for a recess.  Let's take

13   ten minutes.

14           (Recess.)

15           (Open court; proceedings resumed:)

16           THE COURT:  Go ahead, counsel.

17                    CROSS-EXAMINATION

18   BY MR. SIMMONS:

19   Q    Good morning, Mr. Connell.

20   A    Good morning.

21   Q    Nice to see you again.  Do you know whether Morrison

22   Foerster did work for America Online prior to November of

23   2000?

24   A    I don't know, but I don't believe it did.

25   Q    Do you know whether it did any work for any other

1   entity related to Stephen case?

2   A     I'm not aware, no.

3   Q     Do you know whether they did any work for Steve Case

4   directly?

5   A     Not that I know of.

6   Q     And why not?  How do you know that?

7   A     I say I don't know.  I believe that they did not,

8   mainly because a conflict check was done, and it came back

9   that we could undertake this representation.  Now, if

10  something was missed in the conflict check, I didn't know

11  about it.

12  Q     Okay.  Do you recall testifying that the conflict

13  check came back, found no conflicts, "And that definitely

14  would have been a conflict.  I'm pretty sure.  They did

15  not do any work for Steve Case."  Do you recall that

16  testimony?

17  A     Yes.

18  Q     Do you stand by that testimony?

19  A     I do.

20  Q     Thank you.  How would that have been a conflict?

21           THE COURT:  Wait a minute.  Do you have any

22  evidence that there was a conflict?

23           MR. SIMMONS:  Not for this witness, no.  Well,

24  no.

25           THE COURT:  Or for his law firm?

M. Connell - Cross

1          MR. SIMMONS:  But he was brought in, according

2     to some testimony, to look at this conflict issue on the

3     Case firm.

4          THE COURT:  He already said he didn't find one.

5          MR. SIMMONS:  But the testimony about his own

6     conflict check confirms that there was one.

7          THE COURT:  Did you say that?

8          THE WITNESS:  No, not that I know of, Your

9     Honor.

10          MR. SIMMONS:  He says he didn't find a conflict

11     with the Case firm being involved.

12          THE COURT:  Yeah.

13          MR. SIMMONS:  But his own conflicts check for

14     his own internal process shows there would have been a

15     conflict if Steve Case would have been involved because --

16          THE COURT:  That goes around in circles.

17     BY MR. SIMMONS:

18     Q    Well, you couldn't have represented Steve Case,

19     right?

20     A    That's correct.

21     Q    Because he was on the other side of the deal, right?

22     A    That's correct.

23          MR. SIMMONS:  That's all I needed to ask.

24          THE COURT:  Okay.

25     BY MR. SIMMONS:

M. Connell - Cross

1   Q    And the background information on the transaction,

2   you got primarily from the proxy statement, correct?

3   A    From the proxy statement, from Mr. Klebahn, from

4   Mr. Cribley, from Mr. Tanaka and from conversations with

5   directors, to the extent that I had them.

6   Q    Right.  And you never interviewed any director other

7   than Hugh Klebahn, outside the presence of the other

8   directors, correct?

9   A    I'm not absolutely sure, but I think that's correct,

10  yes.

11  Q    Did you ever pick up the phone and call any of the

12  directors outside the presence of the directors?

13  A    No.

14  Q    Do you recall having face-to-face meetings with any

15  of the directors one at a time other than Hugh Klebahn?

16  A    No.

17  Q    And your -- did you ever take steps to back-check,

18  other than talking to Hugh Klebahn, Tod Tanaka and

19  Jim Cribley -- let me ask you a slightly different

20  question.

21       The only time you talked to the other board

22  members, besides Hugh Klebahn, were at board meetings you

23  attended or by telephone or in person?

24  A    Or at breaks.

25  Q    Or at breaks.  And you don't recall interviewing

M. Connell - Cross

1   anyone at a break outside the presence of anyone else?

2   A    Well, I may have.  That's why I qualified the others,

3   but, no, I don't recall anything else.

4   Q    Outside of that context and the information that you

5   got at the board meetings or on breaks, did you -- what

6   steps did you take to back-check the procedural history

7   you saw on the proxy?

8   A    We also looked at the documents that we had received,

9   some of which were described in proxy material, for

10  example, and some were not, because they were subsequent

11  to that time.

12          We had some correspondence.  Mike Cohen talked

13  to people, other than the ones I talked to, to some

14  extent, but I think basically his contacts were the same

15  as mine.

16  Q    Do you recall when I asked you whether you actually

17  interviewed the directors external to the board meetings,

18  you gave me a slightly more definitive answer?  Read your

19  answer to that question.

20          "Did you actually interview the directors

21  external to the board meetings?"

22          Your answer?

23  A    You never sent me this transcript for corrections.

24  Q    It is the court reporter's job.

25  A    I never got it, but I did get the transcript in

1    electronic form a couple of days ago.

2    Q     Did you fill out an erratum sheet?

3    A     No, no one ever asked me to.

4    Q     You are aware that's part of the process, though,

5    correct?

6    A     When requested, yes.

7          THE COURT:  Would you answer the question now.

8    Just read it.

9          THE WITNESS:  I apologize, Your Honor.

10         "And you spoke with the directors at those

11   meetings?

12         "Yes."

13   BY MR. SIMMONS:

14   Q     "Did you actually interview the directors external to

15   the board meetings?"

16   A     "Other than Mr. Klebahn, no."

17         That's that I said, and that's what I just said

18   again.

19   Q     Go ahead and finish.

20   A     "But I did interview Mr. Klebahn externally to the

21   meeting, yes."

22   Q     And your testimony is you started work on this matter

23   in November, mid-November?

24   A     Correct.

25   Q     Do you recall that you weren't retained, though,

M. Connell - Cross

1    until November 27?

2    A    That's the date of our engagement letter, which

3    often, regrettably, follows behind the actual commencement

4    of the work and that was the case here.

5    Q    Okay.  Do you know whether Hugh Klebahn told the

6    other directors -- in the future tense -- that they were

7    going to hire you?

8    A    I don't know what he said.

9    Q    You testified that you were involved in the drafting

10   of the November 21 supplemental proxy statement?

11   A    Yes.

12   Q    And you discussed changes internally that were to be

13   made to that with Jim Cribley, correct?

14   A    The internal discussions were internal to my firm

15   with Michael Cohen, but I did discuss them also with

16   Mr. Cribley.

17   Q    And I believe I wrote this down, and correct me if

18   I'm wrong.  You testified these changes were made right

19   after the meeting that the board had agreed to.  The

20   changes the board had agreed to were made immediately

21   after the board meeting, correct?

22   A    Correct.

23   Q    Whatever changes you had involvement and input into

24   would have been those changes, correct?

25   A    Both -- there were some before and some after, as I

1    recall, but I believe the most important changes were

2    after, as directed by the board.

3    Q    So the most important changes were done immediately

4    after the board meeting?

5    A    Correct.

6    Q    By you and Jim Cribley?

7    A    Actually by Michael Cohen and myself, and I think

8    Mr. Cribley participated as well.

9    Q    Those changes were done in the afternoon or early

10   evening of the same day of the board meeting, correct?

11   A    Yes, because the material was sent out the following

12   day.

13   Q    What changes were made after that?

14   A    After it was sent out?

15   Q    Yes.

16   A    None were made.

17   Q    After it was sent -- are you aware it was sent in the

18   evening of November 20th, after the board's changes had

19   been made, to the buyer?

20   A    Yes.  The buyer had a right to see the material

21   before it went out.  I'm not sure of the timing.  I was

22   not the person who did that.

23   Q    So you weren't involved in the changes that occurred

24   after the boards changes were made, but before the buyer's

25   changes were incorporated, correct?

M. Connell - Cross

1    A    I'm not aware there were any.

2    Q    Nobody told you there were changes from the buyer?

3    A    I was not aware of any.

4    Q    Did I understand you correctly to testify that a

5    letter of intent is never binding?

6    A    Well, "never" is a strong word.  I guess there have

7    been some.  But, yes, if there is a letter of intent, it

8    is never binding.  Otherwise, it would be referred to as a

9    formal offer.

10   Q    Would you agree there is a spectrum between a letter

11   of intent and signed definitive merger agreement?

12   A    I'm not sure what you mean by "spectrum."

13   Q    They are not my words.  I'm asking you whether you

14   agree with them.

15   A    I'm not sure I understand them, but I guess I'll

16   agree with them.

17   Q    Your testimony that the Del Mar offer was not a real

18   offer, what was the basis for that?

19   A    It never matured into an offer.  It was an indication

20   of interest; not a binding commitment of any kind.  It was

21   subject to specific conditions, including the preparation

22   of the definitive agreement, and it was withdrawn in any

23   event before it got far enough along in the negotiations.

24            THE COURT:  That's why I asked you to tell us

25   all about Del Mar, because you don't have any definition

1     of the Breevast.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Neither one of them were enforceable

4     according to you?

5              THE WITNESS:  That's correct.

6              THE COURT:  Why is one and not the other?

7              THE WITNESS:  The first one, the shareholders

8     had learned about the first one.  A Del Mar representative

9     apparently had given them a copy, and they were

10    misinterpreting it to be a binding arrangement and thought

11    they had $175 price, and we knew that it had gone away.

12    We wanted to correct that misimpression.

13             THE COURT:  You had no idea what the

14    shareholders knew about the 170?

15             THE WITNESS:  Well, we were pretty sure they

16    didn't, because there was a confidentiality agreement

17    among the parties.  We had no indication that there had

18    been a breach of the confidentiality.  And if we had known

19    that, we might have changed our view.

20             THE COURT:  Go ahead.

21    BY MR. SIMMONS:

22    Q    Your testimony is that you shouldn't be sending

23    letters of intent to shareholders?

24    A    Yes.

25    Q    So you, I take it, had a real problem that they had

1    sent Scott Blum's letter of intent directly to

2    shareholders?

3    A    That was a special arrangement.  I'm not sure I would

4    have done that arrangement, but they were seeking

5    pre-approval of the deal.  That was a very unusual

6    arrangement.

7    Q    You are saying you shouldn't tell shareholders --

8    whether you send them the actual letter of intent, you

9    shouldn't tell them about the letter of intent until you

10   have a definitive merger agreement, because there is

11   nothing for them to understand, right?

12   A    If you don't have definite terms, it can be

13   misleading, that's correct.

14   Q    Do you know why the company told the shareholders it

15   had a letter of intent with Honu before there was a

16   definitive merger agreement?

17   A    No, I do not.

18   Q    Having disclosed all prior letters of intent, why

19   wouldn't it disclose to the shareholders new letters of

20   intent?

21   A    I don't believe that they did disclose all prior

22   letters of intent.  They got close to a definitive

23   agreement, but not actually there, with Honu.  Whether

24   they did with others, I don't know.  I'm sorry, I don't

25   recall.  I probably did know at the time, but I don't know

1    now.

2    Q    You recall at the time that shareholders were told

3    very soon after the letter of intent with Honu was in

4    place that that was the state of affairs?

5    A    I don't remember.

6    Q    You don't have a recollection one way or another

7    whether they waited until they were almost at the

8    definitive stage?

9    A    No, I don't.  I don't really have a recollection.

10   Q    Do you think if you are going to engage in a course

11   of conduct, vis-a-vis shareholders one way, it is fair to

12   shift ground on them and stop telling them information

13   without telling them:  We are not going to tell you any

14   more?

15             MR. NAKASHIMA:  Objection, argumentative.

16             THE COURT:  No.  He asked him if it was fair.

17             THE WITNESS:  I think you evaluate each

18   circumstance on its merit, but some consistency is what

19   you seek to find.  So you try to do that.

20   BY MR. SIMMONS:

21   Q    In terms of whatever documents you got, I just want

22   to confirm this, those all came from the Case Bigelow &

23   Lombardi -- any documentary material that was provided to

24   you to review came to you from Case Bigelow & Lombardi,

25   correct?

M. Connell - Cross

1    A    Not necessarily.  Certainly the documents like ALPS

2    and the proxy statement and those sorts of things did, but

3    as I recall I actually got the financial statements

4    directly from the company because I didn't want to lug

5    them around.  So I left exhibits off the proxy material.

6    We got e-mails copies, and they came from whoever they

7    came from.  So we were on the copy list for some of the

8    people.

9    Q    Let me come at it in a different way.  Did you talk

10   to any other bidders?

11   A    No?

12   Q    That was not part of your authorized mandate, was it?

13   A    Well, we talked to ALPS, but, no, not other than

14   ALPS.

15          THE COURT:  When you say you talked to ALPS, you

16   can't talk to ALPS.

17          THE WITNESS:  That's right.  We talked to

18   Mr. Agee in that one meeting that I already referred to.

19          THE COURT:  Well, I don't know whether you

20   talked to the partner of the law firm that hired your

21   firm, Dan Case?

22          THE WITNESS:  I didn't really have the -- I met

23   him, and I guess in that sense, Your Honor, yes, I did

24   talk to him.  But I didn't talk to him about any issue of

25   substance.  I said "hello."  And beyond that, he did not

M. Connell - Cross

1    participate in the meeting, the one meeting that I recall

2    him being at, other than to host it.

3            THE COURT:  And you did talk to Cribley?

4            THE WITNESS:  Yes.  I talked to Cribley and

5    Tanaka, yes --

6            THE COURT:  Who was the partner of Dan Case.

7            THE WITNESS:  Who was his partner, Dan Case.

8    Absolutely.

9            THE COURT:  You have the seller over here, and

10   the buyer over here, the agent for the buyer.  You didn't

11   ever stop and talk to Steve Case, did you?

12           THE WITNESS:  No, never.

13           THE COURT:  It is either Agee or Dan Case,

14   right?

15           THE WITNESS:  It was -- Agee had -- I don't

16   remember who was at the meeting, but I believe his lawyers

17   were there, so I did talk to his lawyers.  He was

18   represented at the meeting and not by Mr. Case.  It was

19   clear somebody else was representing him.

20           THE COURT:  All right.  Go ahead.

21   BY MR. SIMMONS:

22   Q    You are aware that Randy Moore was a director?

23   A    Yes.

24   Q    Did you have an understanding whether

25   Randall Moore -- Randolph Moore had a relationship, direct

M. Connell - Cross

1   or indirect, with Stephen case?

2   A     No, I knew of no relationship.

3   Q     Do you recall whether any of the directors worked for

4   a company controlled by Steve Case?

5   A     Not that I knew of.

6   Q     Is that something that would have stood out to you?

7   A     Yes.

8   Q     That would have been information you would have

9   wanted to know?

10  A     Yes.

11  Q     Do you know why Del Mar walked away?

12  A     No.

13  Q     Did anyone tell you that they withdrew their

14  confidentiality agreement after a phone call in which they

15  learned that Steve Case was the buyer and there was a

16  right of first refusal and huge termination fee?

17  A     They were told of the break-up fee and its amount and

18  of the whole process of right of first refusal, and they

19  withdrew their confidentiality agreement.  But, you know,

20  was that the reason?  I guess it might have been, but I

21  don't know.  You would have to ask them what their reason

22  was.

23  Q     Did you do that?

24  A     No.

25  Q     You are aware that as part -- shortly after

1  withdrawing -- or I should say the same day -- they faxed

2  over a letter stating they were very disturbed by events

3  that led them to that point?

4  A     Yes, yes.

5  Q     You were there to investigate the process in part,

6  correct?

7  A     Yes.

8  Q     You didn't call Del Mar and ask them why they were so

9  disturbed?

10  A     I did not.

11  Q     You recall the November 30 meeting?

12  A     I do.

13  Q     Are you saying that the request was made there for

14  $170 a share, or $3 a share more?

15  A     If the request -- as I recall it was, there were two

16  elements of that.  The request was $170 but rapidly

17  declined to something in the vicinity of $3 and actually

18  went below that, I believe, during the conversations.

19  Q     You were at the board meeting that preceded that

20  meeting?

21  A     Yes.

22  Q     Do you recall the board's authorization and agreement

23  as to how it was going to be conducted that a request for

24  $3 a share more was going to be made?

25  A     No.  What the board said was, as I understood it, was

M. Connell - Cross

1   that you are authorized to say:  Yes, make a deal for

2   anything that raises the price by $3 or more.  If it is

3   less than $3, you have to come back to us.

4   Q    That meeting was held in Dan Case's office, correct?

5   A    You know, I think so, but you could have taken me to

6   any office, and I wouldn't have known one from another.

7   So, yes, I think it was.

8   Q    And your recollection, when I spoke to you, at least,

9   was that Mr. Case Senior, yourself, Mr. Klebahn,

10  Mr. Agee -- you had specific recollections of them being

11  there, and you believed that Jim Cribley was there,

12  correct?

13  A    I no longer believe that, but I believe I said that.

14  Mr. Cribley, as I look back through the file of documents,

15  it was pretty clear he wasn't there, because he had other

16  things he was working on.  But the people that I -- I

17  remember other people in the room, and I believe they were

18  Mr. Agee's lawyers, but, you know, I couldn't tell you for

19  sure.  I just don't remember.

20  Q    You would agree with me that taking a client into a

21  negotiation of a multi-million deal is practicing law,

22  correct?

23  A    It is -- you know, I actually don't know the answer

24  to that question but to go -- it is frequently done in

25  negotiated deals; you go across boundaries.  Perhaps it

1    may technically be.  I don't know.  I would have to get

2    advice on that.

3    Q    Let me ask this a slightly different way.  I'm not

4    trying to attack you, sir.  You weren't there giving

5    business advice, were you?

6    A    No.

7    Q    And you didn't have co-counsel with you in that

8    meeting who were Hawaiian licensed, correct?

9    A    No, not in the meeting, no, but I did have them

10   available outside.

11   Q    As I recall, having had your transcript in front of

12   me, you testified that Dan Case was trying to convince

13   everybody in the room that he was neutral.

14   A    Could I see that?

15   Q    Absolutely.

16   A    Thank you.

17   Q    I asked you, "Who did you speak to at ALPS?"  Can you

18   read your answer.

19   A    I think he was trying to say that he was neutral or

20   not involved; sort of the gentleman host of the meeting.

21   Acting in any capacity, in a business capacity, but I

22   can't actually say what his capacity was while he was

23   there.

24   Q    So when I asked you, "What was your perception

25   contemporaneously why he was there?"  Can you read your

1    answer verbatim, the whole answer.

2    A    "It was his office that it was held in, or his

3    conference room, and he acted more or less as the host of

4    this thing.  I think he was trying to convince everybody

5    else he was neutral."

6    Q    And I asked you whether you bought the "neutral act."

7    Do you recall that?

8    A    Yeah.  I said that I thought, you know, as a matter

9    of filial relationships, or whatever, we didn't view him

10   as a neutral party.  He was his son's father.

11   Q    You are a sophisticated person.  So when Dan Case is

12   holding himself out as neutral, you are saying when,

13   enough to know that he is not, correct?

14   A    I wouldn't know what his capacity was there.  If

15   anything, he tried to encourage or at least acted like he

16   was trying to encourage an increase in price.  But was

17   that an act or substance, I can't tell you.

18        THE COURT:  In your entire career, have you ever

19   encountered a situation where your client, the Case firm,

20   a senior partner, is dealing with his own counsel, his own

21   partners as well as with, on the other side of the fence,

22   as his son's agent, where he is a buyer and connected with

23   the lawyers by partnership on the other side?

24        THE WITNESS:  There are lots of things about

25   this transaction that are a little unusual, Your Honor.

 1          THE COURT:  I would say so.  I wanted to know if

 2    you have ever encountered it.

 3          THE WITNESS:  I can't recall a very similar

 4    situation to this.  I think I would characterize it a

 5    little differently than you have, but that's the only

 6    experience.

 7          THE COURT:  How would you characterize it?

 8          THE WITNESS:  Okay.  Well, first of all, I think

 9    that he was not -- this is very distracting, this hand

10    that is on the screen.

11          MR. SIMMONS:  I'm sorry.  That was not my

12    intention.  I was trying to get ready to go fast.

13          THE WITNESS:  I think that the way things went

14    here, Your Honor, and this was before we became involved.

15    When the Honu deal died, they were -- I guess using the

16    word "desperate" would be a strong term, but they were --

17          THE COURT:  "They" being.

18          THE WITNESS:  The directors of the company.  And

19    the company was our client, not the law firm is our

20    client.

21          And when an opportunity arose to get another

22    bidder into the picture, particularly one that looked like

23    a bidder that could actually perform and who had sort of a

24    sponsorship of his father in this case, but he'll come in.

25    They will have that thing.  They thought that was a good

M. Connell - Cross

1    thing for shareholders to do.

2          I don't think they were thinking that was a

3    conflict -- if there was a conflict, they obviously knew.

4    He disclosed it.  He came forward and told everybody about

5    it.  And they just thought, yes, okay, there is a conflict

6    here, but this is good for the shareholders.  We ought to

7    get another bidder into the picture.

8          Then when it turned out that there were bidders

9    that might pay more later on, the directors became

10   concerned.  And that's why they hired us.  They tried --

11   in a sense, they tried to cure something by having us come

12   in and see whether we thought -- that this relationship or

13   something else --

14         THE COURT:  After a binding merger agreement had

15   already been reached --

16         THE WITNESS:  Yes.

17         THE COURT:  -- without outside counsel.

18         THE WITNESS:  That's correct.

19         THE COURT:  I don't want to beat that to death.

20   I just wanted to get your experience and answer my

21   question.

22         Go ahead, Counsel.

23   BY MR. SIMMONS:

24   Q    Mr. Connell, you were under the impression that

25   Dan Case was to essentially recuse himself from

1   representing other side, correct?

2   A    That's correct.  From a legal point.  It was unclear

3   to me whether that commitment extended to a business

4   relationship, whether -- Mr. Case is of the generation

5   where business and law were much more merged than they

6   would be today.

7   Q    Is there a different set of rules for people from

8   that generation?

9   A    Absolutely not.

10  Q    In fact, that was the generation that spear-headed

11  the adoption of the Rules of Professional Conduct over the

12  Canons?

13  A    I don't know.

14  Q    When I asked you how you know he recused himself, you

15  gave a slightly different answer.  Read your answer here,

16  starting with "A."

17  A    Yes.  You want me to read it again?

18  Q    Read that out loud.

19  A    "Well, that he -- he had asked for a waiver from the

20  board, and we reviewed the waiver.  We saw the waiver that

21  he had requested -- and part of the waiver, as I recall

22  it, I -- I did not have the waiver in front of me at the

23  time -- was that he would not represent either party in

24  the transaction as far as legal representation was

25  concerned."

1          Which is what I think I just said.  That was my

2    understanding.

3          "His firm would continue the representation of

4    Grove Farm but without his participation in the matter."

5    Q    And your understanding was that he was to be

6    sidelined, essentially, as far as any involvement in the

7    legal representation, correct?

8    A    Correct.

9    Q    So he wasn't going to be doing legal work directly

10   for his son himself, correct?

11   A    Correct.  Not on this matter anyway.  I don't know

12   about other matters.

13   Q    Did you know that he was giving direction to the

14   Carlsmith Ball legal team?

15   A    No, I did not know.

16   Q    Did you ever ask Dan Case that question?

17   A    No, I did not.

18   Q    Did you ever ask the Carlsmith team that question?

19   A    No, I did not.

20   Q    Did you ask Dan Case whether he was giving direction

21   to Tod Tanaka?

22   A    Yes.  Oh, did I ask Dan Case?  No.  I asked Tod

23   Tanaka.  I am sorry.

24   Q    Did you ask Dan Case if he was giving direction to

25   James Cribley?

M. Connell - Cross

1    A    No.

2    Q    You saw no one -- you saw Dan Case.  You were there a

3    couple of days in person, correct?

4    A    Yes.  I saw him twice, I believe, in person.  I only,

5    frankly, remember the one occasion.

6    Q    And you didn't see him acting on behalf of -- you saw

7    Dan Case acting on behalf of no one, correct?

8    A    I was uncertain.  I can't say.  He might have been

9    acting on behalf of someone; it is just not clear.

10   Q    I asked you:  "You did not see -- you saw Dan Case

11   acting on behalf of no one, right?"

12         You answered?

13   A    "That's right, previously."

14   Q    In your deposition I asked that question?

15   A    That's right.  It is consistent.  He wasn't acting on

16   behalf of any particular person that I could identify.

17   Q    And is there a clear line between when a lawyer is

18   giving legal advice or business advice?

19   A    No.

20         THE COURT:  He has already been asked that and

21   answered that, as well as the previous question.

22   BY MR. SIMMONS:

23   Q    Did you have an understanding how Morrison Foerster

24   was to be paid?

25   A    We submitted billings based upon the hours worked.

M. Connell - Cross

1   Q    You knew that Grove Farm -- or you were under the

2   impression, I should say, that Grove Farm was in severe

3   financial distress, correct?

4   A    That's correct.

5   Q    And you were told they had a shopping center they had

6   to put millions of dollars into in the first quarter of

7   2001?

8   A    That's correct.

9   Q    You were told they had three-and-a-half-million or

10  three-point-something payment due to First Hawaiian Bank

11  at the end of year, correct?

12  A    Yes.

13  Q    And you were under the impression that they did not

14  have the cash on hand or available resources to meet those

15  obligations, correct?

16  A    That's correct.

17  Q    So were you worried about getting paid?

18  A    I was not personally worried.

19  Q    You did not -- you know your firm got paid

20  eventually, correct?

21  A    I don't know.  I honestly never saw a bill.

22  Q    To your knowledge, they weren't paid prior to the

23  vote, correct?

24  A    No, I don't -- they couldn't have been, because the

25  time wasn't even submitted by then.

1    Q    Prior to this engagement, there had been instances

2    that you were involved in or familiar with where your

3    offices -- where Morrison Foerster didn't get paid when a

4    transaction didn't go through, correct?

5    A    It didn't get paid even when they did go through,

6    yes.

7              THE COURT:  We are on a collateral matter.

8              MR. SIMMONS:  I'm done with it.

9    BY MR. SIMMONS:

10   Q    Your mandate did not include negotiating with or

11   discussing anything with any bidder, right?

12   A    That's correct.

13   Q    So even though you were in California and Wattson

14   Breevast were in California, you weren't permitted to talk

15   to them, correct?

16   A    I wouldn't use the word "permitted."  We didn't talk

17   to them, and we didn't ask to.

18   Q    You never asked permission?

19   A    Never asked permission.

20   Q    And that's not what you were engaged to do, correct?

21   A    That's correct.

22   Q    So even though, according to you, you were brought in

23   because there was some other bidder involved --

24             THE COURT:  You are going in high-gear again.

25             MR. SIMMONS:  Sorry.

M. Connell – Cross

BY MR. SIMMONS:

Q    The reason, as I took your understanding why the --
what the board's motive was in hiring you, they were
concerned that the law firm having to deal with what
appeared to be a real bidder, who could close, might be
impaired, correct?

A    Correct.

Q    Why didn't you ask or advise that your firm be
empowered to take over those negotiations rather than
monitor them based on discussions with Jim Cribley and
Hugh Klebahn?

A    Well, I won't say that that was impossible, but that
would have been extremely difficult and disruptive --

Q    Why didn't you ask to --

        THE COURT:  Wait a minute.  Let him finish.

        MR. SIMMONS:  I apologize.  I didn't realize.

        THE WITNESS:  You know, I think that what we
are -- this was an assignment to do an independent
investigation, and we took it at that.  It took a while to
get up to speed.  The negotiations were already -- Del Mar
was over before I would say we were really up to speed and
Wattson Breevast was well along.  The first draft of the
agreement had already been sent out.  So I question the
practicality of that, but I'll have to say:  Did we really
think about it or ask, which I think was your question, we

M. Connell - Cross

1    did not ask to do that.

2    BY MR. SIMMONS:

3    Q    And you did not ask or recommend that you participate

4    in every telephonic or written communication with Wattson

5    Breevast during the window that you were counsel?

6    A    That's correct.

7    Q    That could have been done or somebody other than you

8    as investigating counsel could have been brought in to do

9    that?

10   A    That's correct.

11   Q    Since we just touched on Del Mar just briefly, do you

12   know why they waited until Del Mar had gone away to make

13   disclosure?

14   A    That was the issue they were disclosing.  Because if

15   they had been continuing to do the negotiations with

16   Del Mar, I think the disclosure would have been

17   substantially different than the one that you saw, and I'm

18   not quite sure what would have been done.  That's a

19   hypothetical situation we didn't address.

20   Q    And they did not disclose the reasons why Del Mar

21   went away?

22   A    To this day I'm not sure I know the reasons.  They

23   withdrew.  They were upset about the break-up fee, but who

24   knows what the reason was.

25   Q    Why didn't you include in the Del Mar letter, the

M. Connell - Cross

1    November 21 letter, or the draft approved on

2    November 20th, a statement that when Del Mar's

3    representatives withdrew their confidentiality agreement,

4    they had stated they were disturbed by the process that

5    had led up to that point?

6              MR. NAKASHIMA:  Objection; lacks foundation.

7              THE COURT:  There is no foundation that needs be

8    laid.

9              THE WITNESS:  You know, people are disturbed for

10   all kinds of reasons.  I don't think that "disturbed" is

11   the issue.  The issue is they have gone away.  What

12   difference does it make if they have gone away; that they

13   were disturbed?

14   BY MR. SIMMONS:

15   Q    You were there investigating the process?

16   A    Right.  But the fact that they were disturbed did not

17   lead us to conclude that the process had been unfair.

18   Q    But it was information you considered in reaching

19   that conclusion, correct?

20   A    That's correct.  We saw it.

21   Q    Why wouldn't a shareholder want to have access to

22   that same information and way?

23   A    You could have disclosed every single comment that

24   everybody made in all the meetings, but all we were trying

25   to do was to tell them that Del Mar, which had an offer,

M. Connell - Cross

1   which could have been characterized -- or an indication of

2   interest -- it could have been characterized as $175 was

3   not a real offer.  It had gone.  They had withdrawn.

4   Q    Was not or was no longer?

5   A    Well, it was not a real offer, and it was no longer

6   even an indication of intent.

7   Q    And it was not a real offer using the definition --

8   A    -- of offer and acceptance.  An offer that we could

9   accept and have a binding agreement.

10  Q    Did anybody go back to him and say:  Change these

11  three sentences in here, we will countersign, and we will

12  have a binding letter of intent?

13  A    I don't know.

14  Q    Do you know that Jim Cribley did that for Scott Blum?

15  A    I don't know.

16  Q    From the perspective of the company, this process was

17  a zero sum game, correct?

18  A    I don't understand your question.

19  Q    It didn't matter to the company who owned the stock,

20  right?

21  A    That's correct.

22  Q    And the company had no dog in this hunt?

23  A    That's correct.

24  Q    Can you take a look at Exhibit 1345.

25  A    I have it.

M. Connell – Cross

```
 1              THE COURT:  What number?

 2              MR. SIMMONS:  1345.

 3              THE COURT:  I have that; but within the

 4   document.

 5   BY MR. SIMMONS:

 6   Q    I want to ask about the recommendation on the first

 7   page.

 8              THE COURT:  Read it.

 9   BY MR. SIMMONS:

10   Q    Excuse me.  It is on the second page of the proxy

11   statement.

12   A    Of the letter or the proxy?

13   Q    On the actual proxy statement.

14   A    Second page of the proxy statement.

15   Q    This is the copy.  It says on the bottom, "The board

16   of directors believes" --

17   A    "And recommends that you vote for approval of the

18   merger agreement," yes.

19   Q    "The board of directors believes that the merger

20   agreement is fair and in the best interests of the

21   stockholders and recommends that you vote for approval of

22   the merger agreement."

23              Do you see that?

24   A    Correct, I see that.

25   Q    So the basis for the recommendation, since the
```

 1    company had no dog in the hunt, was that it was in the

 2    stockholders' best interest, correct?

 3    A     Yes.

 4    Q     And the Hawaii statute that you mentioned, did you

 5    read that statute at the time?

 6    A     I did.

 7    Q     That is the authorizing statute that permits a board,

 8    in certain circumstances, to weigh other factors, correct?

 9    A     That's correct.  It also has a standard of care in

10    it.

11    Q     I placed in front of the witness a copy of 414-221,

12    general standard for directors.  I would ask that we focus

13    on Subsection B.

14          Is that the provision that recommends --

15    authorizes directors in certain circumstances to consider

16    other constituencies?

17    A     Yes, it is.

18    Q     The qualifying language at the beginning of that,

19    does it not, states that "It applies when the board of

20    directors is determining the best interests of the

21    corporation," correct?

22    A     That's correct.  That's what it says.

23    Q     Those decisions are the decisions that are made in

24    day-to-day situations for the company, not what's at stake

25    when the entire company is being sold, correct?

1   A    No, that's not correct.  And it is very clear with

2   these statutes that have been adopted across a number of

3   different jurisdictions, that that's not correct.

4   Q    You just conceded to me that the corporation had no

5   interest in this sale?

6   A    As referred to here, "corporation" is the corporation

7   and its shareholder.

8   Q    No, sir.  Look a the next clause.  They use

9   "constituency shareholders."  It says, "In determining the

10  best interests of the corporation, a director, in addition

11  to considering the best" --

12              THE COURT:  You are going way too fast.

13  Q    "In determining the best interests of the

14  corporation, a director, in addition to considering the

15  interests of the corporation's shareholders," correct?  It

16  says that?

17  A    That's correct.

18  Q    So the legislature knew, when drafting this, knew

19  that the shareholders of the company and the corporation

20  itself might have diverging interests and treated them as

21  separate constituencies, correct?

22  A    No, I don't believe that was their intent at all.

23  Q    How is this different than Delaware law?

24  A    Delaware just has a general provision that the

25  directors will manage the affairs of the corporation.

1  Q    I didn't ask you how it was different from Delaware

2  statute; I asked how is it was different from Delaware

3  law.

4  A    Are we going to do a treatise on Delaware law here?

5  Q    You opened this door.  I didn't want it opened.

6  A    Okay.  Delaware law -- are you talking about in

7  circumstances like this or in general?

8         THE COURT:  Well, just a minute.  You objected

9  earlier about getting into this area.  We are dealing with

10 Hawaii law.  You have an interpretation of this.  The

11 witness has an interpretation of this.  And I'll make an

12 interpretation of this.

13        So we are going to leave it there.  I'm very

14 concerned about our timing.  It is ten minutes after

15 11:00.

16        MR. SIMMONS:  I understand, Your Honor.

17        THE COURT:  There was one thing, Mr. Simmons,

18 that you raised that left me with a question mark.  You

19 asked if there were any changes made by the buyer after

20 the input of the witness, I think.

21        MR. SIMMONS:  Yes, I did.

22        THE COURT:  Were you inferring that there were

23 changes?

24        MR. SIMMONS:  Yes.

25        THE COURT:  By the buyer?

M. Connell - Cross

1          MR. SIMMONS:  From the fax we have from

2     James Cribley to Steve Egesdal at 5:38 p.m. on the day of

3     the November 20 shareholders' meetings.  It states, "Here

4     is the letter approved by the board."  So we know that

5     this witness's changes were all made before that fax went

6     out, and the chain of documents that we looked at

7     yesterday all occurred after that and after this witness's

8     involvement.  It involved, as Mr. Egesdal testified to,

9     things that were highlighted in by them.  I was just going

10    to argue that since he didn't know --

11         THE COURT:  You don't know anything about it?

12         THE WITNESS:  I don't know of any changes that

13    were made after we were done.  I may have known at the

14    time, but I certainly don't remember.

15         THE COURT:  Or who made them?

16         THE WITNESS:  No, I don't.

17         MR. SIMMONS:  That's why I was trying to pin

18    down the chronology of when --

19         THE COURT:  That's fine.  He answered by other

20    evidence.

21         Any other areas?

22         MR. SIMMONS:  I have a couple of areas I have to

23    cover with him.  I have three tabs left and two or three

24    notes.

25         THE COURT:  Okay.

BY MR. SIMMONS:

Q    Did you tell directors they owed duties to
shareholders?

A    Yes, I did.

Q    Was your intention to imply that shareholders had two
choices:  To continue talking with Wattson Breevast and
run the risk that ALPS walks away, or just take the deal
that's on the table?  I'm sorry, the corporation.

A    Essentially yes.  Yes, essentially.

Q    You were concerned, although nobody raised their
voice, they seemed to take a hard line -- I'm
characterizing -- not using your words -- at the
November 30 meeting.

A    Well, I believe that they had given Wattson Breevast
sufficient time between their October 30 letter and the
November 30 meeting to get to a definitive agreement and
some sort of deposit or loan arrangement commitment.

        They had laid this deadline out in advance.  The
question was:  You laid out a deadline, the people agreed
to the deadline, which apparently they did both on the 7th
and 10th of November --

Q    Let me stop you there.  What's your basis for saying
that?

A    Those were the communications given to me by
Mr. Cribley and Mr. Tanaka, who were on phone calls, and

M. Connell – Cross

1    Mr. Klebahn, also, who, I believe, was on both of the

2    phone calls with the Wattson Breevast principals and

3    lawyers.

4    Q    So you saw no written communication.  This was

5    information they relayed to you orally?

6    A    It was; that's correct.

7    Q    I'm sorry to interrupt.  I needed to know that.

8    A    They had laid this out.  They had reported on several

9    prior occasions that there were repeated commitments that

10   they would make the deadline.  There were also the issues,

11   as I said, of the missed due diligence sessions and the

12   failure to contact the bank.  And the question was, is

13   there realistically something that is going to happen here

14   and should we take any risks given the circumstance.  They

15   knew pretty much where the vote was.  They had the proxies

16   in hand at that point in time, and they made the judgment,

17   and I guess we are all here to see whether or not we are

18   going to second guess it, that they didn't extend it.

19           MR. SIMMONS:  Objection.  Move to strike the

20   last part of the answer, Your Honor, with respect to

21   second guessing.

22           THE COURT:  Objection is overruled.

23   BY MR. SIMMONS:

24   Q    What I was trying to ask you, and maybe I didn't do

25   it artfully, was:  Was there a risk that if they continued

M. Connell - Cross

1    to postpone the meeting and continued to talk to Wattson

2    Breevast, postpone the shareholder vote, that ALPS would

3    walk away?

4    A    I told them that ALPS had indicated that there would

5    be such a risk; that I, frankly, discounted that risk.

6              THE COURT:  You discounted that ALPS had made a

7    binding offer?

8              THE WITNESS:  Well -- and I thought they really

9    wanted to buy the property.  Why would they walk away for

10   ten days?  It is essential.

11             THE COURT:  Well, they would walk away before

12   they would put up another --

13             THE WITNESS:  They made that perfectly clear.

14   For more money, they weren't going to do it.  Mr. Agee

15   said at the meeting on November 30, as I recall, in his

16   personal judgment that they had already gone too high.

17             THE COURT:  My question was:  You said if they

18   continued with the Wattson Breevast matter, it would raise

19   a risk that ALPS would walk away from their already

20   binding offer.

21             THE WITNESS:  They had an argument that I did

22   not think had a great deal of merit to that effect, and I

23   reported that they had made that argument.  But that was

24   the case.  Was it realistic that they were going to go

25   away?

1          THE COURT:  That's a different matter.  That's a

2     subjective thing.  I want to know the answer.  You could

3     or could not -- if we are negotiating, and I give you an

4     offer and you say, well, that's interesting, I'll accept

5     it, but then you come back and say, no, I really want $3

6     more --

7          THE WITNESS:  Yes.

8          THE COURT:  -- then at that point I can say, you

9     made a counteroffer; I withdraw my first offer.  That's

10    contracts basics 101.

11         THE WITNESS:  Right.  I am sorry, Your Honor.  I

12    didn't understand your question.  Both parties said we

13    have got an existing agreement.  The question is:  Would

14    they be willing to amend the agreement for us to give us

15    rights or avoid problems under that agreement?  I think

16    that was the context in which those discussions occurred.

17    Insofar as this question is concerned, the rights under

18    the agreement were not absolutely clear in their favor

19    that they could have a right to terminate, particularly if

20    the only thing that the directors did was extend the vote.

21         THE COURT:  Thank you.

22    BY MR. SIMMONS:

23    Q    Do you recall testifying that ALPS had threatened at

24    one point or another to declare a breach?

25    A    Yes.  They did on a couple of occasions.  I think

M. Connell – Cross

1   they were sort of mild threats, but yes.

2   Q    In fact, you said there would be a risk that ALPS

3   would allege they breached the agreement in some fashion

4   by not going forward with the meeting or other things, all

5   of which, by the way, ALPS threatened at one point or

6   another; whether they would have done is not known,

7   correct?

8   A    That's correct.

9   Q    And the next page you told me they never threatened.

10  Do you see that?  I asked you, "Were they threatening to

11  sue you and enforce?"

12  A    No, they did not ever threaten to sue and enforce.

13  Q    You said, "No, they never gave threats."

14  A    I apologize for that.  I should have been more

15  specific to the question.  No, they never threatened to

16  sue and enforce.

17  Q    Okay.  Did you have any knowledge as to whether ALPS

18  had assets on November 30th?

19  A    ALPS was a shell company, but in its behalf there had

20  been $500,000 in deposits put up, and I think that

21  Mr. Case Junior's reputation was well known.

22          THE COURT:  Do you know if the $26 million was

23  deposited in ALPS at the time of the merger?

24          THE WITNESS:  Yes.  It was actually deposited

25  before the merger.  It was deposited on the 30th, I

M. Connell - Cross

```
 1   believe.  They announced that they were putting the money
 2   in, and they expected the company to close.  They were
 3   taking the position:  We have fulfilled every condition,
 4   including putting up the money.  Therefore, we expect you
 5   to close once your conditions are fulfilled.
 6   Q    Did they put that money in after your meeting?
 7   A    I don't know when it was.  It was reported to me it
 8   was put in.  I think it was before actually.
 9   Q    Not when did it occur, but when did you know?
10   A    I don't remember whether it was then or the day of
11   the meeting that I learned about the deposit.  The deposit
12   will speak for itself when it actually happened.
13   Q    I'm trying to get your state of knowledge as you sat
14   in the November 30 meeting.
15   A    I don't believe I knew that when I was talking to
16   Mr. Agee during that meeting.
17   Q    Thank you.  Did you ask Mr. Cribley what factors had
18   been considered by the board when the board voted to
19   accept the merger agreement?
20           THE COURT:  Wait; slow it down.
21   BY MR. SIMMONS:
22   Q    Did you ask Mr. Cribley what factors had been
23   considered when the board voted to accept the merger
24   agreement?
25   A    I think I did.  I don't have a specific recollection
```

M. Connell - Cross

1    today.

2    Q    Did he tell you they considered any social factors or

3    things like that?

4    A    I'm pretty sure -- again, I don't have a specific

5    recollection -- but I believe that he told me that he did

6    not.

7    Q    And did he tell you they thought they had got

8    everyone the best price?

9    A    Yes.

10   Q    And were stockholders ever told that the board had

11   voted on bases other than best price?

12   A    Not that I know of.

13   Q    Do you recall your answer in that question in your

14   depo. was, "I don't recall anything in there that they

15   considered anything other than price," referring to the

16   stock proxy statement?

17   A    That's correct.  I don't and I would stand by that.

18   Q    You were at the December 1 meeting, correct?

19   A    Which one?

20   Q    The shareholders' meeting?

21   A    Yes.

22   Q    And the stockholders weren't told there that other

23   factors were considered besides price, correct?

24   A    Not that I recall.

25   Q    In terms of the --

1          MR. SIMMONS:  I'll try to speed this up,

2     Your Honor.

3     BY MR. SIMMONS:

4     Q     You thought it was very important that this piece of

5     information -- first, let me step back.  You keep talking

6     about a deadline you were told had been relayed to

7     Wattson Breevast on November 7th, right?

8     A     Correct.

9     Q     That deadline, as I take it -- I don't remember who

10    said it or not, but I know other people said that's what

11    happened -- Wattson Breevast was told it was December 1,

12    correct?

13    A     I think it was November 30 is my recollection, but

14    the one day difference, how big a difference would that

15    make, but yes.

16    Q     Do you recall the only deadline mentioned to

17    Wattson Breevast, according to even Mr. Hugh Klebahn, was

18    that there was a shareholder vote on December 1 --

19    A     But that meant they had to get it done before then,

20    and that deadline -- we're just quibbling.  It was what it

21    was.  I remember it was November 30.

22    Q     So you inferred from "We are having a vote on

23    December 1," that the deadline was November 30?

24    A     We had numerous conversations.  So I don't think it

25    was just inferring from the one deal.  We were constantly

1    talking about deadlines.

2           THE COURT:  Let's not talk about deadlines.

3    We're out of time.

4           MR. SIMMONS:  Your Honor, I have got about three

5    or four more crucial areas I've got to cover with this

6    witness.  I am trying to go quick, but then I go too fast.

7           THE COURT:  I'll just deduct it from your

8    closing argument time.

9           MR. SIMMONS:  At this point, if I have to do

10   that, Your Honor, I will.  It is just that important.

11          THE COURT:  I said go ahead, but we have got to

12   get through the testimony.  We have several more witnesses

13   today.

14          MR. SIMMONS:  They have taken as long as I have

15   doing their direct or cross-examine on a lot of my

16   witnesses.  I'm going fast and tight today.  I am doing

17   the best I can.

18          THE COURT:  I didn't ask for a speech.  Ask your

19   next question.

20   BY MR. SIMMONS:

21   Q    The failure to show up at a due diligence meeting was

22   important to you, correct --

23   A    Yes.

24   Q    -- by Wattson Breevast?

25   A    Yes.

M. Connell - Cross

1   Q    You never called them and asked them why they hadn't

2   or if they, in fact, had not?

3   A    I was told by the company they had not, and I did not

4   call them.

5   Q    And you also testified that part of why that was

6   significant to you was because the banks had to approve

7   the transaction, correct?

8   A    No.

9   Q    You didn't say that?

10  A    I did say that, but not because they failed to come

11  to the due diligence meetings.

12  Q    You said it was surprising to you that they missed a

13  meeting with the bank because they were going to need bank

14  approval.

15  A    Right.  That was a separate meeting.  That was that

16  telephone meeting they were trying to set up.

17  Q    And I take it that the bank and Jim Cribley would

18  know better than you about whether there was any consent

19  required, correct?

20  A    I did review the loan documents at the time.  So at

21  the time I believe I knew that, but, yes, you are right.

22  Q    I'm showing the witness Exhibit 434.  It is a joint

23  exhibit.  It is an internal memo from First Hawaiian Bank.

24       Mr. Connell, do you recall seeing there was no

25  change of control covenant in the loan documents that you

M. Connell - Cross

1    saw?

2    A    Yes.

3    Q    Did Jim Cribley tell that you that his opinion that

4    neither bank's consent was required for the transaction?

5    A    No, I don't recall that.  He may have, and I may have

6    a faulty recollection.  I just don't know.

7    Q    That's fine.  Was it significant -- I'm sorry.

8         With respect to this deadline, you had letters

9    coming in from Wattson Breevast, which they say over and

10   over again:  We can meet the December 15th time frame,

11   correct?

12   A    I would have to look at those letters again.

13        MR. SIMMONS:  This is my last issue, Your Honor.

14   Sorry.

15        THE WITNESS:  Let me cut this short.  They were

16   certainly taking that position.  Whether it was in

17   letters, or whatever, they said that they would meet --

18   they were aware that the outside deadline for termination

19   of the agreement was December 15, and they were insisting

20   that they could -- "Just give us more time," they said.

21   Q    But they were evincing in October and November that

22   December 15 was the deadline, correct?

23   A    No -- well, yes.  Late November, yes.

24   Q    Did you ever pick up the phone or write them or

25   suggest that Jim Cribley do that, to tell them:  Hey, you

M. Connell - Cross

1  have got the number wrong; we told you earlier it was

2  December 1?

3  A    I may have suggested it to Jim Cribley.  I did not

4  call them.

5           MR. SIMMONS:  Nothing further.  I am sorry.

6           THE COURT:  In all fairness now, did you get

7  through your key points?

8           MR. SIMMONS:  Yes, I did.  I have to take time

9  for my closing argument.

10           THE COURT:  Thank you for your cooperation.

11           All right, sir.

12           MR. NAKASHIMA:  I'll be very brief, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. NAKASHIMA:

15  Q    Mr. Connell, could you look at Exhibit 1370.

16  A    Yes.

17  Q    Is this the black-lined version of the supplemental

18  proxy that you and Mr. Cribley worked on?

19  A    Yes.  It appears to be the one that Mr. Cohen and I

20  worked on, and I think Mr. Cribley was involved as well.

21  Q    Can you compare 1370 with 1369 -- I think you will

22  have to take it out to compare just the first page.  1369

23  is the final supplemental proxy.  I am not going to run

24  through the whole document.  Can you see the changes that

25  you and Mr. Cohen had made on 1370 were incorporated into

M. Connell – ReDirect

```
 1   13 --
 2   A    Yes.  I would have to go through this obviously and
 3   make a detailed comparison.  But looking at it briefly, it
 4   looks like they all were.
 5   Q    All your changes?
 6   A    Yes.
 7   Q    All your changes were incorporated into the final?
 8   A    I believe they were, yes.
 9            MR. NAKASHIMA:  Thank you.
10            THE COURT:  All right.  Thank you, sir.
11            THE WITNESS:  Thank you, Your Honor.
12            MR. NAKASHIMA:  The next witness will be Michael
13   Klausner.
14            Your Honor, we're not calling Stanford Carr.  We
15   will be making an offer of proof.  But because of time, we
16   are going to start cutting down some of our witnesses.
17            THE COURT:  Thank you.
18            (The witness was duly sworn.)
19            THE WITNESS:  My name is Michael Klausner.
20   M-I-C-H-A-E-L, K-L-A-U-S-N-E-R.
21                      DIRECT EXAMINATION
22   BY MR. KIM:
23   Q    Good morning, Professor Klausner.  Thank you for
24   coming from China to visit with us.  Can you state what
25   you do for a living?
```

M. Klausner – Direct

1    A    I am a professor at Stanford Law School.

2    Q    What is your official title there at the law school.

3    A    I am the Nancy and Charles Munger Professor of

4    Business and Professor of Law at Stanford Law School.

5    Q    Where did you attend law school?

6    A    I went to Yale Law School.

7    Q    What did you do immediately after law school?

8    A    I was a law clerk.

9    Q    For who?

10   A    I was a law clerk two years.  One year was for Judge

11   David Bazelon; the other year was Justice Brennan in the

12   Supreme Court.

13   Q    And currently, as a professor of law, what courses do

14   you teach?

15   A    I teach -- currently it varies somewhat by year.  If

16   we take a period of a few years, it would include the

17   basic corporate law course.  It would include a corporate

18   governance seminar.  It would include a course, Deals:

19   The Economic Structure of Business Transactions.

20        I teach a seminar that is slightly from the

21   corporate law seminars called Economics of Corporate Law.

22   Q    And beyond teaching classes, do you also pursue any

23   academic research?

24   A    Yes, I do.

25   Q    What are the areas you research currently?

M. Klausner - Direct

1  A    My current research is an empirical study of

2  shareholder lawsuits.  In the past I have done research on

3  takeovers and a variety of topics.

4  Q    Do any of your classes deal with merger and

5  acquisitions and similar substantial corporate

6  transactions?

7  A    Yes, they do.

8  Q    Which classes would those be?

9  A    Well, all of them would.  The course that goes by the

10  full title Deals:  The Economic Structure of Business

11  Transactions, which I'll refer to as "Deals."  That's the

12  general term for it around the law school.  Deals is a

13  course about transactions, and M & A transactions figure

14  fairly prominently in that course.  The basic law course,

15  of course, has a segment on mergers and hostile takeovers,

16  and the seminar would include that as well.

17  Q    And are you affiliated with the Stanford Directors

18  Forum?

19  A    Yes.  I am the co-director of that.

20  Q    Can you explain what the Stanford Directors Forum is.

21  A    The Stanford Directors Forum is a program that

22  Stanford Law School has with Stanford Business School in

23  which we put on a three-day program for corporate

24  directors, teaching them a range of topics running from

25  their legal duties to accounting to finance and strategy.

M. Klausner - Direct

1  Q    And does any portion of that course deal specifically

2  with mergers, acquisitions and other significant corporate

3  transactions?

4  A    Yes, it does.

5  Q    In addition to teaching the course to the directors,

6  do you also hear from the directors and learn yourself

7  information?

8  A    Yes, I do.  We spend -- in that particular program --

9  I'm involved in a number of programs like that, but in

10 that particular program, I would typically spend the full

11 three days with the directors on campus.

12 Q    Are you currently involved in any research relating

13 to merger and acquisition agreements?

14 A    Currently -- literally, currently, I'm pretty much

15 focused entirely on this empirical study of shareholder

16 lawsuits.  Now, some of those lawsuits -- a fair number of

17 them are merger related.  So in that sense this particular

18 project does touch on mergers, but the general topic is

19 the nature of these lawsuits in a variety of -- collecting

20 50 to 100 variables on 800 lawsuits, so it is a fairly

21 overwhelming task.

22 Q    Let me ask a slightly broader question.  Are you

23 involved in supervising any research relating to merger

24 and acquisition agreements?

25 A    Well, I have a research -- I work with a research

1    fellow; I am his advisor.  He is finished and is now

2    currently working on another topic involving mergers.

3    That project involves deal protection measures.  It

4    includes provisions like the one that is involved here.

5    The fiduciary-out -- the no solicitation/fiduciary-out

6    combination.  He is looking at a related provision called

7    a go-shop clause.  So in advising him, I have been looking

8    at those sorts of clauses as well.

9    Q    Professor Klausner, can you look at the second of the

10   two documents that are clipped in front of you.  That's

11   Exhibit 2303.

12   A    Yes.

13   Q    Professor Klausner, were you retained by the

14   defendants in this matter to prepare a report?

15   A    Yes, I was.

16   Q    Is there a true and correct copy of your report?

17   A    Yes, it is.

18   Q    Does it contain a complete statement of your opinions

19   and the facts and bases of that opinion?

20   A    I believe it does; it was my intent.

21   Q    Thank you.  Professor Klausner, in the interest of

22   time, we are not going through most of the part of the

23   agreement, but there are one or two things I want to

24   highlight.

25        Professor Klausner, in connection with the study

M. Klausner – Direct

1    undertaken by the defendants, did you have the opportunity

2    to review the agreement and planned merger between

3    Grove Farm Company and ALPS Investment, LLC?

4    A    Yes, I did.

5    Q    If you look at the first of the documents,

6    Exhibit 670, does that appear to be a copy of that

7    agreement?

8    A    Yes, it does.

9    Q    Looking at the cover page, ALPS Acquisition Sub is a

10   party to this agreement.  Is that correct?

11   A    That's correct.

12   Q    Is it common to use a similar sort of acquisition sub

13   in mergers of this type?

14          MR. SIMMONS:  Your Honor, we will stipulate, if

15   necessary, for a reverse triangular merger on ALPS

16   Acquisition Sub, Inc., if it will speed it up.

17          THE COURT:  That's fine.

18          MR. KIM:  That's was the only question on that.

19   Thanks, Matt.

20   BY MR. KIM:

21   Q    Professor Klausner, can you turn to page 30 of this

22   agreement; specifically section 5.12, information

23   delivered to shareholders.

24   A    Yes.

25   Q    Professor Klausner, before you got here today, had

1  you had an opportunity to review that provision?

2  A    Yes, I did.

3  Q    Is this provision a common provision in merger and

4  acquisition agreements?

5  A    Yes, it is.

6  Q    Now, I want you to turn to the next page, 31,

7  specifically section 5.17, indemnification of directors

8  and officers.

9        Do you see that, Professor Klausner?

10  A    Yes, I do.

11  Q    Prior to coming on the stand today, have you had an

12  opportunity to review that provision in detail?

13  A    Yes.

14  Q    Let me ask, of course, a general question.  Is it

15  typical, in a merger, for the surviving corporation to

16  indemnify the former -- the directors of the acquired

17  corporation?

18  A    Yes, it is.

19  Q    And does this particular provision appear to be a

20  typical example of that kind of phenomena?

21  A    Yes.  In general, it is typical.

22  Q    Beyond the agreement, do you know if there are legal

23  obligations for the surviving corporation to indemnify the

24  former directors of the acquired corporation?

25  A    There is a -- yes.  Now, I'm not expert in Hawaiian

1    law, but as a general concept the corporation has an

2    obligation to identify to a certain extent, and then

3    permission to indemnify to a greater extent, if it

4    chooses.

5    Q    That's talking about indemnity generally.  I'm

6    talking about the specific scenario of liabilities that,

7    in some sense, were carried by the old corporation as

8    opposed to the new corporation.

9    A    That's correct.  When two corporations merge, their

10   liabilities and contingent liabilities merge as well, and

11   this would be part of that, so, that's correct.

12   Q    Going to page 33 and following, there is a section

13   5.18 and what I believe to be a related to section 5.19 of

14   33 to 34.  Before testifying today, had you had an

15   opportunity to review these provisions in detail?

16   A    Yes, I did.

17   Q    Did you hear Mr. Connell testify about the nature of

18   these provisions?

19   A    I did.

20   Q    Would you also refer to them as fiduciary-out

21   provisions?

22   A    The fiduciary out is part of the provision.  It is a

23   no solicitation provision with a fiduciary out included in

24   it, that's correct.

25   Q    Did you generally agree with Mr. Connell's testimony

M. Klausner – Direct

1    about the nature of these provisions?

2    A    I did agree with his testimony.  I think the only

3    reaction I had is that these are present in the vast

4    majority of cases, something approaching 100 percent of

5    cases -- of transactions I have seen.

6    Q    Can you give the Court some information about the

7    genesis or purpose of this kind of suite of provisions

8    relating to -- we will refer to them as fiduciary-out

9    provisions?

10   A    Sure.  Actually, Mr. Connell, I liked the way he

11   framed it.  He contrasted it with the sale of one's house.

12   If I am going to sell my house, I signed an agreement.  It

13   is sold and nothing else can happen.  In the case of a

14   corporation, there is this extra complication, which is

15   the shareholders have to approve the agreement after the

16   directors of the company and the directors have approved

17   it.  So there is this period in between.  The question

18   therefore arises is:  What happens if events change,

19   particularly another offer comes along in that period

20   between signing and closing?

21        Now, what buyers would like and pay quite a lot

22   for, if they could get it, would be an absolute locked up

23   deal.  Sellers would like to do that in many cases as

24   well, if they are paid for it.  Now, the law somewhere

25   along the way disallowed that and imposed on boards an

1    obligations during this period to continually adjust in

2    relation to facts that evolve to moment by moment, day by

3    day, act in the interests of shareholders.

4            So in other words, it could well have been in

5    the interests of shareholders to approve a deal, lock it

6    up at the outset, at the time of signing, subject to a

7    vote of yes or no, but that wasn't permitted.  So what the

8    courts have done is put the boards in a position of having

9    to make this an ongoing determination.

10           In response to that, this sort of provision has

11   a contractual provision, has evolved such that that

12   fiduciary duty is defined more particularly and additional

13   provisions are added to it.  So, for instance, the courts

14   now allow, and typically parties agree, that there will be

15   no ongoing solicitations.  So in other words, fiduciary

16   duty doesn't have to extend that far.  But if an

17   alternative offer lands in the lap of directors, they need

18   to contemplate it.

19           What these agreements now do is they work out

20   the dance in advance.  What counts as an offer they need

21   to contemplate, what they need to do in response to that

22   offer, the extent to which that offer needs to be

23   communicated to the incumbent buyer, what needs -- what is

24   permitted to be communicated to the would-be third-party

25   buyer.  So these agreements now implement that initial

M. Klausner - Direct

1    court ruling or set of court rulings about how fiduciary

2    duty is going to be carried out during the period between

3    signing and closing.  That's the history of it.

4    Q    Thank you very much, Professor.  One more area to

5    cover.  If you could turn to paragraph 28 of your report.

6    Page 7.

7    A    Yes.

8    Q    And in paragraph 28, to summarize your explaining

9    what's commonly referred to as the due diligence process

10   section with mergers and accusations.  Is that correct?

11   A    That's correct.

12   Q    Can you describe generally the type of information

13   that is provided to a potential -- to a company that has

14   shown interest, serious interest, in acquiring the

15   corporation?

16   A    Yeah.  Some people divide this into business due

17   diligence and legal due diligence.  But what a would-be

18   buyer would want to know is pretty much anything there is

19   to know about the business of the company.  That would

20   include the nature of its assets, the nature of its

21   liabilities, the nature of operations, the attitudes of

22   its employees.  Anything there is to know about the

23   company that would relate to its value.

24           Getting toward the legal side, it would include

25   the nature of its contracts, the nature of its -- well,

M. Klausner – Direct

1   you might want to look at its history, so minutes you

2   typically look at.  If real estate is involved, you want

3   to look at title.  You would want to look at environmental

4   issues.

5          The concept is that a seller wants to know, and

6   importantly the buyer wants the seller to know everything

7   there is know in order to get the highest price

8   possible -- if I had it backwards, let me correct myself.

9   The buyer wants to know and the seller wants the buyer to

10  know.  Thank you.

11  Q    Is the information provided in the due diligence

12  process limited to publicly available information?

13  A    No, it is not.

14  Q    How is confidentiality protected?

15  A    Before the due diligence process starts, the buyer

16  would sign a confidentiality agreement.

17  Q    Would it be typical to provide all of the information

18  that comes out in the due diligence process to the

19  shareholders of the target corporation to enable them to

20  decide whether to vote in favor or against the

21  transaction?

22  A    No, that would not be typical.  In a typical case,

23  that would be unworkable, and it is not the practice.

24          MR. KIM:  Thank you very much, Professor.

25  That's all the questions I have.

M. Klausner – Direct

```
 1              MR. SIMMONS:  I have very few.
 2                      CROSS-EXAMINATION
 3   BY MR. SIMMONS:
 4   Q    Mr. Connell, you have never served as lead counsel in
 5   a complex corporate transaction, change of control,
 6   correct?
 7   A    Actually, I'm Klausner.  That was Connell before.
 8              MR. SIMMONS:  I'm sorry. I am tired.
 9   BY MR. SIMMONS:
10   Q    Professor Klausner, you have never served as lead
11   counsel in a complex corporate transaction or change of
12   control, correct?
13   A    That's correct.
14   Q    Did I understand you correctly, you said the law at
15   some point, as much as maybe a seller or buyer would want
16   to do it in a corporate context, prohibited an absolute
17   agreement without room for boards to adjust day to day
18   their fiduciary duties.  Is that right?
19   A    It imposed an ongoing fiduciary duty between the
20   period of signing and closing.
21   Q    So it wouldn't be proper, after you sign an
22   agreement, to go in and tell the buyer to "pay me $3 more,
23   I'll lock the whole thing up and you get a quick closing"?
24   A    I don't think I would agree with that.  I'm not
25   exactly sure what you mean.
```

M. Klausner – Direct

1          THE COURT:  He meant what he said.

2          THE WITNESS:  Well, if a quick closing, as you

3   say, is consistent with fiduciary duty, coupled with that

4   additional price, then that would be fine.

5          Now, let me just make clear -- I think I

6   understand where you are going.  If, still, between the

7   time of signing -- between that agreement and closing of

8   that agreement an offer came in and fiduciary duty

9   required the board to consider it, it would have to

10  consider it.

11         Let me make this clear.  There are deals that

12  have simultaneous signings and closings, if you can do it.

13  You often can't do it, because you need to wait for the

14  shareholder vote.

15         THE COURT:  Let's be very specific.

16  Mr. Simmons, give him the scenario we are dealing with;

17  then we don't have to talk about a lot of these other

18  things.

19  BY MR. SIMMONS:

20  Q    Is it proper --

21         THE COURT:  Ask him to assume as a fact.

22  BY MR. SIMMONS:

23  Q    Assume that there is a definitive merger agreement

24  signed.  Further assume that after that is signed, the

25  seller approaches the buyer and says, "I will effectively

1   give you a quick closing and break off negotiations with

2   another bidder if you give me $3 a share more."

3           Is that proper.

4   A    Yes, it would be proper.

5   Q    Then why couldn't you do it on the day you sign the

6   merger agreement?

7   A    You do could do it on the day you sign the merger

8   agreement if you can get that shareholder vote to be

9   essentially simultaneous.  I think we are talking about

10  two different things.  In your scenario, can you tell me

11  when the vote will occur?

12  Q    I am sorry.  The vote will occur two days out or 48

13  hours out, or 24 hours out, but it is not right then, and

14  it is required.  Can I tell the buyer:  I will give you a

15  quick closing and not talk to this other person for three

16  bucks a share?

17  A    During that two days, you would still be obligated to

18  exercise your fiduciary duty.  If that third party came in

19  during those two days and made an offer that you needed to

20  take, consistent with your fiduciary duty, the same

21  obligation would continue.  You could still promise a

22  quick closing.  There is no problem with promising a

23  faster closing.  But if there were an intervening event

24  during that period, fiduciary duties would still have to

25  be exercised.

1    Q    The purpose -- you were asked generally about the

2    purposes of a suite of provisions.  I disagree with your

3    testimony, but I wanted to ask about 512 specifically.

4    Isn't it true -- tell me when you get there.  It is page

5    30.

6    A    Okay.  I got it.

7    Q    Isn't the purpose of that provision to give the

8    buyer -- isn't the purpose of that provision to give the

9    buyer some control or control over communications to

10   shareholders?

11   A    The purpose is to allow some coordination between the

12   buyer and the seller; to minimize the possibility that

13   there is something incorrect in that proxy statement.

14   Q    And this provision doesn't say you have an obligation

15   to notify us and consult with us or coordinate with us,

16   does it?  It says:  You have to have our approval,

17   correct?

18   A    Does it not say "not be unreasonably withheld."

19   Q    "And which approval shall not be unreasonably

20   withheld."  It does say that.  Do you think Grove Farm was

21   in a position to get in litigation over whether or not

22   approval had been unreasonably withheld?

23   A    I think if approval was unreasonably withheld, they

24   would have no choice.

25   Q    Okay.  If they have the time and luxury to do that,

M. Klausner – Direct

1   then why didn't they talk to Wattson Breevast?

2   A    You have got to explain a little more about your

3   question.

4   Q    You are saying, yes, they would have gone into

5   litigation over unreasonably withheld consent on

6   shareholder communication.  I am saying if they had time

7   and money to do that, why then wouldn't they continue to

8   negotiate with other buyers?

9          MR. KIM:  Objection.  Argumentative.

10         THE COURT:  I don't know if you can answer that

11  or not.

12         THE WITNESS:  I'm not really sure what you mean

13  by that.  You mean they had the resources to litigate this

14  if this came up?  Is there a particular approval or

15  disapproval you are referring to?

16  BY MR. SIMMONS:

17  Q    No.  You are trying to say, I guess, it is something

18  less than control because your consent is subject to a

19  reasonable withholding provision?

20  A    Right.

21  Q    I am asking -- your report -- this just isn't about

22  what this agreement says, right.  Your report says you

23  reviewed a slew of documents and depositions, right?

24  A    Right.

25  Q    So you know what happened in this process?

1   A      Yeah.

2   Q      So my question to you is:  Was Grove Farm in a

3   position, if consent had been unreasonably withheld, to

4   litigate about and fight about it, or not?  I am asking

5   the distinction between factual and legal control.

6   A      I believe that if they were about to do this

7   transaction and consent were unreasonably withheld, and

8   they therefore could not do this transaction, I believe

9   they would have litigated, yes.  I can't tell you how

10  expensive that litigation would be but --

11  Q      I understand.  And if they had the time and money to

12  do that, why couldn't they have taken ten more days to

13  talk to Wattson Breevast?

14            MR. KIM:  Same objection.

15            THE COURT:  Overruled.

16            THE WITNESS:  Okay.  So now the question is why

17  they didn't take ten -- I don't see a connection between

18  the two scenarios.

19  BY MR. SIMMONS:

20  Q      Sure.  If you have the time and money to litigate

21  before you go bankrupt, why don't you have money and time

22  to talk to a buyer that is going to potentially increase

23  what your shareholders are going to get, or even better

24  yet, trigger a counter from the existing buyer?

25  A      Uh-huh.  My understanding why they did not want to

1   take ten days to continue talking to Wattson Breevast was

2   not a concern about money or time.  My understanding, and,

3   again, I'm only reading the record.  My understanding is

4   that they did not want to do that because they were

5   concerned that they were going to lose the bird in the

6   hand, and Wattson Breevast was not a sufficiently serious

7   or certain offer.  So the reason that you and I are

8   talking by each other, I didn't see that as a money issue.

9   That is a litigation cost issue.

10  Q    Did you happen to notice if they had Stephen Case's

11  signature on any document?

12  A    I don't recall seeing.

13  Q    You don't recall?

14  A    As I recall, I don't recall seeing.

15  Q    Do you recall if they had Dr. Henry Samueli's

16  signature on a Wattson Breevast document, as an

17  individual?

18  A    I recall there was a confidentiality agreement, I

19  believe.  I recall seeing his signature on a document,

20  yes.

21  Q    That document was their September 29 initial offer?

22  A    Okay, yeah.

23       MR. SIMMONS:  I'm trying to cut this down to one

24  or two questions --

25       THE COURT:  Please keep going.

1      MR. SIMMONS:  -- with the Court's indulgence.

2  BY MR. SIMMONS:

3  Q    Did you see any communication to shareholders that

4  told shareholders that the board was considering anything

5  other than maximizing price?

6  A    As I recall the proxy statement, there was a list of

7  factors and that factor -- those factors listed other

8  things.  On the other hand, as I recall the cover page of

9  the proxy statement, it emphasized price -- I am sorry --

10  benefit to the shareholders on price.

11  Q    When I asked you, did you see anything in the

12  communications to shareholders, the ones that you did see,

13  that told shareholders anything other than were out there

14  trying to maximize price, your answer was.  Please read it

15  out loud.

16  A    "As I sit here today, I recall that that was the

17  thrust of the communications.  I don't know that it was

18  stated that way in each communication, but I believe that

19  management described to shareholders their judgment that

20  this transaction was in their interest."

21  Q    Once you inform shareholders that this is what we are

22  trying to do; we are trying to maximum value.  You tell

23  them that over and over again for a year.  Do you think

24  management is still free to choose a non-value maximizing

25  path without telling shareholders that that's what they

1   are doing or why?

2           THE COURT:  You are going too fast again.  I

3   know you are trying to hurry up.  You are in the position

4   like a mother is:  You take the kids into a fast food

5   store and tell them to eat slowly.  (Laughter) I told you

6   to hurry up, but don't speak so fast.

7   BY MR. SIMMONS:

8   Q    Let me ask you to assume that the shareholders have

9   been informed by a company over the course of a year that

10  what we're trying to do is maximum value to return to you,

11  okay.  Based on that assumption, do you think that

12  management is free to then choose a non-value maximizing

13  path without telling shareholders what they are doing and

14  why, if they choose criteria other than price, to be the

15  reason for the decision?  That's my question.

16  A    We say a reasoned decision.  Let's talk about a

17  reason for a merger agreement is what we are talking about

18  here.  So if that were the case, and they had said that

19  was their goal all along, and they changed their goal,

20  they would need in the proxy statement to explain their

21  decision.  In any case, they need to explain their

22  decision in the proxy statement.

23  Q    You indicated that if there was a material

24  misstatement or material omission in the description of

25  what management was doing, that would be potentially

Case 1:05-cv-00741-REJ-KSC   Document 674   Filed 11/28/08   Page 112 of 205
PageID.17407
3349
M. Klausner - Direct

1    problematic.  Is that correct?

2    A    Well, a material misstatement in a proxy statement

3    would violate the disclosure rules.

4    Q    Including with respect to management's rationale,

5    correct?

6    A    Any material misstatement would be a violation of the

7    rules governing the proxy.

8    Q    You didn't see anything in the proxy that said, "We

9    chose to maximize value because of other factors," did

10   you?

11   A    It is my understanding of the proxy is they explained

12   all the factors they considered, and there was a list that

13   went on for a page or a page and a half, but they also

14   said that they believed they were maximizing value.

15   Q    Your answer in your deposition, when I asked you

16   that, "I did not see any statement that would fit that

17   exact description," you stand by it, correct?

18   A    I stand by the statement that my understanding is

19   that they were maximizing value when they said that.

20   Q    And, therefore, they wouldn't need to say:  We chose

21   not to maximize value and ignored a higher offer, because

22   we thought it would be better for the community?  Or the

23   company?  Or the employees?  Correct?

24   A    If they agreed, explicitly decided not to take the

25   maximizing value, yes.

M. Klausner - Direct

1   Q   Do you think it is adequate disclosure to say

2   something at a stockholders' meeting, where the actual

3   shareholder vote occurs when you already have 98.6 or

4   .9 percent of the proxies in hand?

5   A   Do I think it's adequate?

6   Q   Do you think that's enough to tell the shareholders:

7   Oh, by the way, before we drop all the proxies in the

8   ballot box, we got an offer from Wattson Breevast for

9   $176?

10   A   If there were -- I mean, what the board needs to do

11   is inform all of the shareholders of the material facts.

12   If there is a material omission from the proxy, and it is

13   only communicated to some shareholders, that material

14   omission would still be a material omission.

15   Q   Okay.  Where you have shareholders on the mainland

16   and Australia and Asia, and those people aren't at the

17   meeting, as to them, it would be a material omission?

18   A   You are assuming that what is being described at the

19   shareholders' meeting is material?

20   Q   I am.  I am asking to you assume that that's correct.

21   A   Plenty of things at shareholders' meetings are not

22   material.

23   Q   If disclosure of material information occurs at the

24   actual shareholder meeting, is that not a material

25   omission effectively?

M. Klausner – Direct

1  A    You know -- let me step back.  You are asking me a

2  legal question that says:  If information arises at the

3  moment of a shareholder meeting, or the day before a

4  shareholder meeting --

5  Q    I'm asking if it is disclosed.  Let's assume it

6  existed previously.

7  A    Okay.  If it existed at the time the proxy statement

8  was sent out --

9  Q    Or at the time the supplement was sent.

10  A    Any material information that exists when the proxy

11  is sent out should be included in the proxy.

12  Q    Would you agree that, regardless what a company's

13  bylaws say, with respect to the time periods for

14  shareholder communications, where you have an

15  extraordinary transaction, you need to send out

16  communications in sufficient time for shareholders to get

17  them before they are being asked to vote?

18  A    Again, in an extraordinary transaction -- if there is

19  something that requires a shareholder vote, you need to

20  send out a proxy, and the law requires that a proxy

21  contain material information.

22  Q    So do you think a ten-day period is sufficient to

23  permit the company to transmit information that needs to

24  be received by shareholders all over the world where the

25  company will also be getting or will be expecting

M. Klausner – Direct

1    potentially to get feedback and changes in votes from the

2    shareholders?

3              MR. KIM:  Objection.  It calls for speculation.

4              THE COURT:  He can answer it yes or no.

5              THE WITNESS:  I don't know what's involved in

6    communicating, but in this era I would expect that

7    information can be communicated fairly quickly, within ten

8    days.

9    BY MR. SIMMONS:

10   Q    How about using the U.S. Mail, regular service?

11             THE COURT:  Now, you are getting into

12   speculation.

13             MR. SIMMONS:  That's what the company did do

14   here.

15             THE WITNESS:  In the normal course it would

16   arrive within ten days.

17   BY MR. SIMMONS:

18   Q    And how about a response?

19   A    A response by whom?

20   Q    By a shareholder who may or may not have been home

21   the day it arrived?

22   A    You mean a vote?

23             MR. KIM:  Objection.

24             THE COURT:  You can save that for argument.

25             That's it?

M. Klausner - Direct

1                    MR. SIMMONS:  That's it.  Thank you.

2                    THE COURT:  Anything further?

3                    MR. ALSTON:  Nothing further.

4                    THE COURT:  All right.  Sir, you came from

5      China?

6                    THE WITNESS:  This semester I am teaching in

7      China.

8                    THE COURT:  Did you come all the way back for

9      this?

10                    THE WITNESS:  I did.  I guess it was bad timing.

11                    THE COURT:  Well, anyway, thanks for the long

12     trip.

13                    THE WITNESS:  Thank you.

14                    THE COURT:  By the way, the fast food story is

15     not my own creation.  It is from adjunct speech

16     professor/lawyer Jim Wagstaff of Stanford.  What are you

17     called now?  You are not Indians; you are Stanford --

18                    MR. ALSTON:  Cardinals.

19                    THE WITNESS:  Yes.  They changed it.

20                    THE COURT:  Have an uneventful trip back.  Thank

21     you.

22                    (Recess.)

23

24

25

D. Wong - Direct

1          (Afternoon session; open court:)

2          (The witness was duly sworn.)

3          THE WITNESS:  Danton Wong.  D-A-N-T-O-N,

4    W-O-N-G.

5                   DIRECT EXAMINATION

6    BY MR. NAKASHIMA:

7    Q    Good afternoon, Mr. Wong.

8    A    Hi.

9    Q    Could you just briefly summarize where you were born

10   and raised and education and employment.

11   A    Sure.  I born 1957, Lihu`e-Puhi, Kauai.  Matriculated

12   from Punahou High School '75.  Graduated from Stanford,

13   '79.  Hastings Law School, '82.  I was with the firm Case

14   Kay & Lynch at the time from '82 to '92.  Since '92, I

15   have been with the present firm of Chunn Kerr Dodd Beaman

16   & Wong.

17   Q    I have been waiting -- this is the last day of

18   testimony, so I have to ask you.  Isn't Punahou the second

19   best private school in Hawaii?  (Laughter)

20   A    It is probably the first best on the West Coast.

21   Q    Since graduating from law school, what is your

22   specialty and practice or emphasis?

23   A    Real estate transactions; buying, selling and

24   developing.

25   Q    Now, Mr. Wong, did you represent the Honu Group with

1    the possible acquisition of Grove Farm?

2    A    Yes.

3    Q    And what responsibilities or duties did you have?

4    A    It was the normal scope of representation; assist

5    them in negotiating the purchase and doing the due

6    diligence on the process -- on the project.

7    Q    In the second volume, can you turn to tab --

8    Exhibit 2260, volume 2.

9    A    Okay.

10   Q    Is Exhibit 2260 a true and accurate copy of your law

11   firm's invoices in connection with the representation of

12   the Honu Group on the Grove Farm acquisition?

13   A    It certainly looks like our bill.  I would have to

14   look through the whole thing, but it certainly looks like

15   it.

16   Q    Can you focus on the first page.

17   A    Uh-huh.

18              MR. SIMMONS:  I will stipulate that it is.

19              MR. NAKASHIMA:  I think it is stipulated in

20   evidence.  I want to get the witness's testimony.

21   BY MR. NAKASHIMA:

22   Q    Looking at the first page, were you retained, it

23   looks like, in the second week of May of 2000?

24   A    Yeah.  That's where this bill starts from.  May 11,

25   2000.  May 11.  That's the first entry.

D. Wong - Direct

1   Q    And your initials are DFW?

2   A    Correct.

3   Q    Who is JSN?

4   A    John Nitao.  He was one of the associates at that

5   time.

6   Q    How about and CYH?

7   A    Carolyn Hayashi.  She was a paralegal.

8   Q    ARB?

9   A    Andy Bunn.  He was an associate at that time, yeah.

10  He might have been a partner, but another attorney.

11  Q    MN?

12  A    Marilyn Ng.  She is another paralegal.

13  Q    GWK?

14  A    Georgina Kwan, another attorney.

15  Q    TDT?

16  A    That was Tracy Tanaka.  She was another attorney.

17  Q    And I thought I saw LEC, which is Leroy Calone

18  (phonetic)?

19  A    Correct, another attorney.

20  Q    What I want you to do is speed this up.  Correct me

21  if I am wrong, but as part of the due diligence, did you

22  and your associates have a number of meetings with

23  Grove Farm management?

24  A    Yes.

25  Q    Did you and your team tour the Grove Farm property as

D. Wong – Direct

1   part of the due diligence?

2   A    Yes.

3   Q    Going through the time records, I note, do you recall

4   that you and your team met with Hugh Klebahn?

5   A    Yes.  I'm sorry -- Hugh Klebahn is with --

6   Q    Grove Farm.

7   A    Yeah.  Okay.

8   Q    Allan Smith?

9   A    Yes.

10  Q    Mike Furukawa?

11  A    Yes.

12  Q    Sandy Day?

13  A    I don't recall that name in particular.

14  Q    Could you look at Bates stamp page 314, the last

15  entry of June 30th, FY was --

16  A    Francis Yee.  She is a paralegal.

17  Q    Do you have any reason to doubt that she had a

18  conference with Sandy Day regarding financials?

19  A    No, no reason.

20  Q    Did you and/or your team meet with representatives of

21  Belt Collins regarding possible development of Maha`ulepu?

22  A    Yes.

23  Q    Do you recall you and your team either meeting or

24  having telephone conferences with representatives of

25  First Hawaiian Bank and Bank of Hawaii?

1    A    Yes.

2    Q    Actually there is an entry I want to clear up.  Can

3    you turn to page 317.  Do you see the second entry as

4    July 6th, with your initials?

5    A    Uh-huh.

6    Q    It says, "Analysis re:  Bank loans.  Meeting with

7    Allyn."  That's Mark Allyn, who is a consultant for Honu?

8    A    Correct.

9    Q    "Moore."  Do you know who that was?

10   A    I think that was probably Randy Moore.

11   Q    From?

12   A    From Grove Farm.

13   Q    Then it says, "First Hawaiian Bank and Bank of

14   Hawaii."  Did you meet with representatives at that time

15   or is that some other designation?

16   A    I'm not really sure what exactly that meant except

17   whether we met directly with them or they came over or

18   exactly what happened at that time.

19   Q    Do you recall calling anyone at the banks, Bank of

20   Hawaii or First Hawaiian Bank?

21   A    I don't have any specific recollection of any

22   particular time.

23   Q    Could you turn to Bates stamp page 313.  Look at the

24   second to last entry, 6-29, with your initials.

25   A    Uh-huh.

1   Q    Do you see there was a telephone conference with

2   Alton Kuioka at Bank of Hawaii?

3   A    Yes.

4   Q    That is Mr. Alton Kuioka, who is a bank president?

5   A    Executive VP at that time.  He is pretty high up.

6   Q    You also had a telephone conference with Fred Shine

7   at First Hawaiian Bank?

8   A    Right.

9   Q    Was this all in connection with your due diligence

10  for Honu?

11  A    Yes.

12  Q    Do you recall talking to Deloitte & Touche, which is

13  Grove Farm's auditors?

14  A    I don't remember anything specific about talking to

15  them directly.

16  Q    Could you turn to page 311.

17  A    Uh-huh.

18  Q    You see your entry for 6-22.

19  A    Yes.

20  Q    And there is an entry about a telephone conference

21  with Lloyd Fujie --

22  A    Yes.

23  Q    -- about work papers?  Do you see that?

24  A    Right.

25  Q    Do you recall reviewing the Deloitte work papers as

1   part of your due diligence?

2   A    I don't remember specifically reviewing his work

3   versus other people in my team reviewing the work.

4   Q    Fair enough.  Do you recall you or your team --

5   actually I think it was Leroy Calone talking to

6   Ke-Ching Ning about the status of the Wallace Theaters

7   lawsuit?

8   A    I do recall that, yes.

9   Q    Did you or anyone on your team meet with

10  representatives of Chaney Brooks?

11  A    Would you remind me who at Chaney Brooks that might

12  have been?

13  Q    Hold on.

14       Could you turn to Bates stamp page 332.  If you

15  look at the entry of August 15th for Ms. Yee, it is the

16  fourth entry.

17  A    Sure.

18  Q    You see that she had a telephone conference with

19  Clori Digney (phonetic) at Chaney Brooks regarding

20  updating rent rolls.

21  A    Yeah, my team definitely talked with them about rent

22  rolls.

23  Q    Did you or anyone on your team meet or have telephone

24  conversations with representatives of the Kauai Planning

25  Department?

1    A    Again, I don't remember specifically that.

2    Q    Turn to page 314.

3    A    Uh-huh.

4    Q    Look at 6-29, TDT.

5    A    Right.

6    Q    That was?

7    A    Tracy Tanaka.

8    Q    And it appears she traveled to Kauai to attend the

9    meeting with -- I believe Michael Furukawa from Grove

10   Farm, but with Dale Cua from the planning department?

11   A    I do recall that, yes.

12   Q    Now, in that second binder, could you turn to

13   Exhibit 2259, which is a document before your invoices?

14   A    Okay.

15   Q    Do you see that, Mr. Wong?

16   A    Yes.  Table of contents.

17   Q    Was this the table of contents for the due diligence

18   materials held by Grove Farm?

19   A    I believe so.

20   Q    And this would include financial information.  It

21   looks like it had an asset listing, the Jason Glover

22   agreement, rent rolls.  Looking at No. 31, E & Y Levanthal

23   brochure on Puakea Development.  Does that look right?

24   A    Yes.

25   Q    Going to the third page, do you recall that

1   Grove Farm provided tax map keys?

2   A    Yes.

3   Q    Do you recall a valuation by Aspen Venture Group

4   being provided?

5   A    Yes.

6   Q    And it looks like, No. 46, several shareholder

7   letters from the chairman, correct?

8   A    Yes.  Uh-huh.

9   Q    In addition to the Grove Farm due diligence

10  materials, did you also obtain additional information from

11  Grove Farm?

12  A    Yes, I believe we did.

13  Q    There was some testimony that Mr. Mark Allyn was over

14  on Kauai for a number of weeks, I think it was.  Do you

15  recall that?

16  A    Yeah.  He was over there for a period of time.  I

17  forget exactly how long ago.

18  Q    Was he doing due diligence on behalf of Honu?

19  A    Due diligence, some investigations, yes.

20  Negotiations.

21  Q    And did you personally ever travel to Kauai to look

22  at Grove Farm materials or properties?

23  A    Yes.

24  Q    How many occasions?

25  A    I don't recall how many.  At least once, if not a few

D. Wong - Direct

1    times.

2    Q    I'm sorry.  Going back to 2259, look at No. 5.  Do

3    you recall being provided the Bank of Hawaii loan

4    agreements?

5    A    Yes.

6    Q    And same with No. 11, First Hawaiian Bank loan

7    agreement?

8    A    Yes.

9    Q    Now, could you turn to volume 1, and it is

10   Exhibit 2013.

11   A    It is a letter dated November 14, 2000?

12   Q    Correct.

13   A    Yes.

14   Q    Do you recall that after Honu dropped out of the

15   Grove Farm picture, that it sold its due diligence

16   materials to Wattson Breevast?

17   A    Yes.

18   Q    Could you turn to schedule A of 2013?

19   A    Yes.

20   Q    First of all, looking at schedule A, do you have that

21   in front of you?

22   A    Yes.

23   Q    I guess up to page 22, was this a list or inventory

24   of the due diligence materials maintained at your law

25   firm?

D. Wong - Direct

1  A    Let me take a minute and take a look at the letter.

2  Q    Sure.

3  A    It is quite a few pages here.  What was the question

4  again?

5  Q    Was schedule A the due diligence materials on

6  Grove Farm maintained at your office?

7  A    Yes.

8  Q    Now, there is a schedule B.  Do you see that?

9  A    Yes.

10 Q    That was separated out because that was Belt Collins'

11 consulting work done on behalf of Honu.  Is that correct?

12 A    Yes, it appears so.  The letter recites that it was

13 environmental studies that had been prepared by Honu.

14 Q    For purposes of my questioning, I want to exclude

15 schedule B and just talk about schedule A.  First of all,

16 can you give an estimate to the Court on what amount or

17 size of due diligence materials did you compile and

18 maintain in connection with the Honu deal.

19 A    You know, I don't really recall.  Once we stopped the

20 project and put all the docs. away, I kind of put it in

21 the back of my mind.  But the document boxes for this

22 transaction and the materials we got were numerous.

23 Definitely more than three; probably more than four or

24 five.  But I don't recall.

25 Q    Four or five long bankers' boxes?

D. Wong - Direct

1    A    Regular banker boxes.

2    Q    Can you turn back to volume 2, and I will try to run

3    through these quickly.  You can use schedule A to verify,

4    but we pulled certain specific documents from your due

5    diligence files.

6    A    Uh-huh.

7    Q    Can you look at 2262.

8    A    Okay.  April 28, 2000 letter.

9    Q    Right.  Do you recall as part of the due diligence

10   materials you received was the subdivisional approval for

11   the 16.9-acre lot by the Po`ipu Golf Course?

12   A    I don't exactly remember.  If this is referenced in

13   our file, then we got it.

14   Q    I'll represent to you that I quoted from your --

15   A    We got it.

16   Q    2263?

17   A    Uh-huh.

18   Q    And let me do it in the negative.  Do you have any

19   reason to doubt that you received a copy of the Hastings

20   appraisal on the Kukui Grove Commercial Village as part of

21   your due diligence?

22   A    No, we got this.  I recall this.

23   Q    Same question on 2264, which is the Hastings

24   appraisal on the shopping center?

25   A    Right.

D. Wong – Direct

1    Q    2265.  Do you recall receiving the May 31, 2000

2    balance sheets and income statements?

3    A    I don't have any -- I don't have any specific

4    recollection, but if it was in our files, then we got it,

5    yes.

6    Q    Looking at 2264.  First of all, do you know who

7    prepared this memo about a meeting with Belt Collins?

8    A    22 -- what number?

9    Q    I'm sorry.  2266.

10   A    I don't recall who prepared it.

11   Q    Would it be someone from your office?

12   A    I believe it was, yes.

13   Q    This is about a meeting with Belt Collins, correct?

14   A    Correct.

15   Q    Can you turn to the next exhibit, 2267.

16   A    Uh-huh.

17   Q    Now, this is a letter from you to Mr. Cribley?

18   A    Yes.  June 22, 2000.

19   Q    And this is confirmation of certain information that

20   was given to -- given to you or Mr. Allyn, I believe,

21   correct?  Let me try that again.  This letter confirms

22   your discussions with Grove Farm about providing certain

23   information?

24   A    Right.

25   Q    Would you turn to 2268.

D. Wong - Direct

1    A    Yes.

2    Q    Who is ARJ?

3    A    Alex Jampel.  He is an attorney with my office.

4    Q    And did he do a summary of the First Hawaiian Bank

5    and Bank of Hawaii loans?

6    A    Yes.

7    Q    Could you turn to the next exhibit, which I believe

8    is 2269?

9    A    Yes.

10   Q    This is a memo from Tracy Tanaka from your office?

11   A    Yes.

12   Q    Going to the third page, she identifies pending

13   sales, including the Regency, Coastal Rim, Schuler and

14   Schuler Homes, correct?

15   A    Yes.

16   Q    If you go to the next exhibit, 2272, it's another

17   memo from Tracy Tanaka to Andrew Smith and cc'd to you and

18   others relating to kuleana relocation?

19   A    Right.

20   Q    And the first sentence says that Grove Farm provided

21   you with a copy of Max Graham's June 14th, 2000 memo,

22   correct?

23   A    Correct.  Uh-huh.

24   Q    And it looks like Ms. Tanaka was comparing

25   Mr. Graham's memo with her analysis of the property map

D. Wong – Direct

1  regarding kuleana?

2  A    Yes.

3  Q    Would you look at 2273.  Were you aware that

4  Chaney Brooks was a managing agent for Grove Farm on -- at

5  the shopping center?

6  A    Yes, I recall that.

7  Q    Do you recall you or your team receiving a statement

8  of cash flows regarding the shopping center?

9  A    Yes.

10 Q    2274 is another memo from Tracy Tanaka.  I guess it

11 looks like it is updating the sales by Grove Farm.

12 A    Right.

13 Q    Now, do you know if Ms. Tanaka was getting this from

14 Grove Farm or the Bureau of Conveyances?

15 A    I believe it was through Grove Farm, because these

16 transactions had already occurred.

17 Q    And 2275, I think this is an invoice from Ernst &

18 Young.  Did Honu, or you, retain them to analyze the

19 Deloitte work papers?

20 A    That's my recollection, yes.

21 Q    2276, do you recall receiving a statement of cash

22 flows for the land company, Grove Farm Land Company?

23 A    Yes.

24 Q    2277.  It looks like is another memo from Ms. Tanaka

25 relating to an undated partially executed agreement for

1    purchase of real property by Schuler.  Is that correct?

2    A    Yes.

3    Q    2278, this is a memo to you from Leroy Calone, and I

4    am sorry --

5    A    LEW is one of our litigation paralegals whose name

6    escapes me.

7    Q    Go to the third page, II, there is discussion about

8    the license agreement between Grove Farm and Glover?

9    A    Yes.

10   Q    2280.  Do you recall receiving corporate tax returns

11   for Grove Farm Company and its subsidiaries for year end

12   1999?

13   A    I don't recall specifically receiving it.  But if it

14   was in our files, then obviously we did get it.

15   Q    2281, the memo from you and Marilyn Ng summarizing

16   the Sears expansion lease?

17   A    Yes.  Uh-huh.

18   Q    Can you go back to in volume 1, 2013.  This is your

19   list of due diligence materials?

20   A    Yes.

21   Q    Could you turn to 8023410.  It is page 6.

22   A    Yes.

23   Q    No. 40.  Do you recall receiving the Kenneth

24   Leventhal Real Estate Group memoranda regarding the

25   Lihu`e-Puhi development?

D. Wong - Direct

1   A    Yes.

2   Q    Turn to the next page, No. 54.  Do you recall

3   receiving the Regency purchase agreement as part of the

4   due diligence.

5   A    Yes.

6   Q    Page 10, Item 117.

7   A    The Schuler agreement?

8   Q    Yes.

9   A    Yes.

10  Q    Turn back to your time sheets, which is 2260 in

11  volume 2.  I'm sorry.

12  A    Okay.

13  Q    Look at the second page, your entry on May 23rd.  Do

14  you see that?

15  A    Yes.

16  Q    You had a telephone conference with Guy Combs Re:

17  Proposals?

18  A    Yes.

19  Q    I went through the time sheets, and I found nine

20  separate conversations with Guy Combs.  Does that comport

21  with your recollection?

22  A    Yeah.  I had a number of conversations with

23  Mr. Combs.  Nine.  If that's what it says, that's what it

24  says.

25  Q    Could you turn to Bates stamp page No. 306.

D. Wong – Direct

1    A    Yes.

2    Q    Do you see your June 4th entry?

3    A    Yes.

4    Q    And it looks like you had a meeting with Mr. Combs,

5    Mr. Allen, Mark Allyn.  Do you know who is the second

6    Allen is -- A-L-L-E-N?

7    A    I don't recall.

8    Q    How about Katherine?

9    A    I don't recall who they were.

10   Q    Applegate is Tom?

11   A    Tom Applegate.

12   Q    He is a representative of Honu?

13   A    Yes.

14   Q    Abadir is Mona?

15   A    Mona Abadir is with Honu as well.

16   Q    Smith?

17   A    Smith is Andy Smith.

18         Travis, I think that was a guy working with Andy

19   on Kauai at that time.

20   Q    And this meeting was about Grove Farm and strategy?

21   A    Yes.

22   Q    Do you recall what was being discussed at the --

23   first of all, where was this meeting, if you recall?

24   A    My recollection is the meeting was on Kauai.

25   Q    And what do you recall about the substance of that

1   meeting?

2   A    Not all together that much, I'm sorry.  I don't mean

3   to be glib, but I don't recall what we discussed at that

4   meeting particularly.

5   Q    Well, was there a discussion about the strategy to

6   approach Grove Farm in attempting to acquire all the

7   shares?

8   A    I guess I'm trying to look at my time sheets and put

9   that meeting in context.  I don't know whether that's the

10  first meeting or what.  So -- to the best of my

11  recollection, it would be discussing the purchase of

12  Grove Farm.

13  Q    Now, can you go to -- do you recall that Mr. Combs

14  provided Honu or you information on Grove Farm?

15  A    Yes.

16  Q    Can you turn to 2070 in volume 1.

17  A    Okay.

18  Q    On the first page, do you see the Pau (phonetic) file

19  number, 292?

20  A    Yes.

21  Q    And your initials?

22  A    Yes.

23  Q    Is this part of Pau files on Honu matter?

24  A    Yes.

25  Q    This particular page is entitled materials received

D. Wong - Direct

1    from Guy St. Clair Combs on May 16, 2000?

2    A     Yes.

3    Q     Turn to the next page.   There is a two-page index?

4    A     Yes.

5    Q     Other than the cover, Pau page and the index, was

6    everything else in here provided by Mr. Combs?

7              MR. SIMMONS:  Objection; foundation.

8              THE COURT:  Do you know if this all came from

9    Guy Combs?

10             THE WITNESS:  My recollection would be that it

11   all came from Mr. Combs.

12             THE COURT:  Do you want to ask a question in aid

13   of objection?

14             MR. SIMMONS:  I guess, how?  Was it provided by

15   Mr. Combs to him, or did somebody else tell him that?

16   That was the basis of my foundation objection.

17             THE COURT:  Ask him.

18   BY MR. SIMMONS:

19   Q     Did Mr. Combs provide you personally with these

20   documents?

21   A     I don't recall whether -- when we got these

22   documents.  May 16th, is that the day -- does that

23   coincide with the day we met?

24             MR. NAKASHIMA:  No, it doesn't.

25             THE WITNESS:  I don't have any specific

D. Wong – Direct

1   recollection about how --

2          THE COURT:  Maybe we can shortcut this.

3          Mr. Combs, you need to stand up and stretch.

4   Would you mind coming around and taking a peek at these.

5   Look at Mr. Simmons collection there.  These are

6   attributed to you, sir.

7          MR. COMBS:  Yes, sir.

8          THE COURT:  Can you tell me --

9          MR. COMBS:  It has been a long time, and there

10  are some pages in here that do not belong to me at all.

11  Matt has already uncovered this in the Honu deposition of

12  Andy Smith.  Most of them are, but there are a number of

13  exceptions, about 10 or 20 percent.

14         THE COURT:  Anyway, did you give them -- who did

15  you give them to?

16         MR. COMBS:  I can't remember.  I think it is

17  Mark Allyn.  I think I gave them to Mark Allyn.  He was

18  from Texas; I was from Texas.  I think that's who I gave

19  it to.  He was the negotiator and overall --

20         THE COURT:  You know we are under tight time

21  restraint.  Is there anything in there particularly that

22  you feel would be inappropriate?

23         MR. COMBS:  I don't think so, but that's my

24  opinion.  They were getting the confidentiality agreement

25  together and -- Grove Farm and they were talking about

 1     that.  It was actually signed on May 23rd, and it was

 2     executed by Andy Smith and ARP (phonetic), somebody like

 3     that, on May 29th.

 4              So the ones in June, they were under the shadow

 5     or umbrella of the confidentiality.  I don't even know

 6     that May 16th is correct.  It might be.  If that's what it

 7     says, that's what it says.

 8              THE COURT:  It is an insolvable problem.

 9              MR. COMBS:  I accept whatever.

10              THE COURT:  I appreciate your help.

11              MR. COMBS:  A lot of these papers go way back,

12     like they were in the dark on how Grove Farm operated.  I

13     had materials from '96, '97 and '98 that I gave that were

14     stale.

15              THE COURT:  Thank you very much.

16              MR. SIMMONS:  Can I ask him two questions?

17              THE COURT:  Sure.

18              MR. SIMMONS:  First of all, you know that there

19     are documents in here that you did and could not have

20     provided?

21              MR. COMBS:  Oh, yes, there is about 10,

22     20 percent.

23              MR. SIMMONS:  7821.  If you could turn to that.

24     Did you give him special committee meeting minutes?

25              MR. COMBS:  Oh, no.  No, I wasn't on the special

1    committee.  I was not on the special committee.  I had

2    asked to be, and when they refused that, I asked to have

3    the minutes.  So I had no access to those --

4              THE COURT:  We are getting a little out of

5    sequence here.

6              MR. COMBS:  But definitely not --

7              THE COURT:  Thank you.  You say lack of

8    foundation.  The foundation is that the vast majority of

9    this came from Mr. Combs; some did not that he has

10   mentioned on the record.  Go ahead.

11             MR. NAKASHIMA:  I wanted to make an offer of

12   proof, because Mr. Combs testified, under oath, that he

13   was unaware the date that Honu signed a confidentiality

14   agreement.

15             THE COURT:  That's fine.  Do you have any

16   questions of this witness?

17             MR. NAKASHIMA:  I want to have it authenticated.

18   BY MR. NAKASHIMA:

19   Q    The next exhibit, 2077 --

20   A    Yes.  Documents received on June 2nd, 2000 from

21   Guy St. Clair Combs.

22   Q    And, again, the second and third and fourth page are

23   table of contents from your office?

24   A    Yes.  We compiled that table of contents.

25   Q    Look at the fourth page, Bates stamped page 07516.

1   Do you see that?

2   A    Yes.

3   Q    It says, "More documents for files of Andy Smith.

4   Thanks, Guy."

5   A    Yes.

6   Q    And Andy Smith was a principal of Honu?

7   A    Yes.

8   Q    Now, I think you said that Mark Allyn was from

9   Texas -- I'm sorry.

10           MR. SIMMONS:  He didn't.

11           MR. NAKASHIMA:  I am sorry.  Mr. Combs said

12   that.

13   BY MR. NAKASHIMA:

14   Q    You didn't?

15   A    Yeah.

16   Q    In volume 1, can you turn to Exhibit 416.

17   A    416.  Yes.

18   Q    Now, were you aware that Mr. Allyn used the Office of

19   Anterra?  You see the fax header?

20   A    416 is a fax to Jim from Randy Moore.

21   Q    Right.  The fax at the top, it has Anterra.

22   A    I see it, yes.  At the very top.  Anterra.

23   Q    Mark Allyn has testified that that is his fax number.

24   Do you have any personal knowledge of that?

25   A    I recall him being in that office and sending things

1   from that office.

2   Q    In looking at Exhibit 416, were you aware that

3   Mr. Allyn had faxed these materials to, I think it was,

4   Howard Hamamoto?

5   A    What page?

6   Q    Looking at these documents, were you aware that

7   Mr. Allyn had faxed materials about Grove Farm to

8   Howard Hamamoto?

9           MR. SIMMONS:  Objection; foundation.

10           THE COURT:  He is asking if he knew.

11           THE WITNESS:  I don't recall.

12   BY MR. NAKASHIMA:

13   Q    Can you turn to the second page of 416.  Did

14   Mr. Allyn ever tell you how he received Grove Farm board

15   of directors -- a memo from Randy Moore to the other

16   directors, including Guy Combs?

17   A    I don't recall.

18   Q    By September 17th, Lehman Brothers had dropped out,

19   correct?

20   A    I don't know exactly the date.  Let's assume that's

21   the case.

22   Q    Did you ever see a memo from Randy Moore to the board

23   of directors at Grove Farm talking about what response

24   they would have to that event?

25   A    I don't recall.

D. Wong - Direct

1    Q    Would you turn to Exhibit 150?

2    A    Yes.  This is the deal from Kobayashi?

3    Q    Correct.  Were you aware that Mr. Allyn had suggested

4    to Mr. Combs to retain Bert Kobayashi?

5    A    I do recall something of that nature, but the extent

6    of the relationship and what it was about, I don't have a

7    specific recollection.

8    Q    Do you have any recollection that Honu paid

9    Mr. Kobayashi's fees on behalf of Mr. Combs?

10   A    I don't remember.

11        MR. NAKASHIMA:  Thank you, Mr. Wong.  That's all

12   the questions I have.

13                    CROSS-EXAMINATION

14   BY MR. SIMMONS:

15   Q    Good afternoon, Mr. Wong.

16   A    Good afternoon.

17   Q    Can you look at binder 203 in tab 2259.

18   A    The second?

19   Q    Yeah, the second tab.

20   A    Volume --

21   Q    2259.

22   A    Sure.

23   Q    That's the table of contents?

24   A    Yes.

25   Q    Did you get any kind of due diligence checklist from

D. Wong - Cross

1   Grove Farm that included strategy advice on how to deal

2   with members of the board?

3   A    No.

4   Q    Did you get any information from Grove Farm or any of

5   its agents about exactly what other bidders were bidding?

6   A    No.

7   Q    Do you know -- are you positive that you got -- there

8   are some bank appraisals in here.  Do you see those?  Are

9   they in the small binder?

10  A    Is that like 2263, the appraisal for Grove Farm

11  Commercial Village?

12  Q    Yes.  Are you positive you got those as part of this

13  due diligence?

14  A    I'm pretty sure we did.

15  Q    Did any representative or attorney for Grove Farm

16  provide to you a legal opinion that the Wallace Theaters

17  litigation would not affect the Sears lease?

18  A    I don't recall anything about that.

19  Q    So you don't remember getting an opinion saying:  You

20  don't have to worry about this lawsuit; the Sears lease is

21  golden?

22  A    I don't remember hardly anything about the Wallace

23  claim, frankly.

24  Q    If you had gotten information to that effect, would

25  it have been recorded in your file in one of the papers

D. Wong - Cross

1  dealing with the Sears lease?

2  A    Yes.

3  Q    Did anyone tell you that you could get a discount

4  from First Hawaiian Bank on the loan?

5  A    Did anyone tell us?  No.

6  Q    No one told you that.  I am going to parse the

7  question.  Exclusive of what your own work product was,

8  did anyone tell you that you can get the loan for less

9  than face value?

10 A    I don't recall anything specific on that.

11 Q    Would an eight-and-a-half-million dollar discount

12 opportunity have been something that stood out in your

13 mind if somebody had told you?

14 A    Probably it would have.

15      THE COURT:  Well, did anybody already tell you

16 it had been written off as a bad debt?

17      THE WITNESS:  Judge, I recall hearing something

18 like that, where the bank was contemplating possible

19 write-offs, but I don't recall any amounts particularly.

20 And I don't recall the discussion about that.

21 BY MR. SIMMONS:

22 Q    Did your firm do your own internal analysis of those

23 loan documents to understand the loans?

24 A    Yes.

25 Q    Did that cost money and take time?

D. Wong – Cross

1   A    Yes.

2   Q    Can we turn to Exhibit 2260.  That's a bill, your

3   bill.  Can you turn to page 313.

4   A    Sure.

5   Q    If you had learned on this call that there was -- I'm

6   looking at the 6-29 entry for you.

7   A    Yes.

8   Q    If you had learned on that call from Fred Shine or

9   anybody else on the call that there was a substantial

10  discount available, would you have recorded it there?

11  A    Not necessarily.

12  Q    If you had any discussions about potential discounts

13  on the loan, would they have been recorded in your bill

14  somewhere?

15  A    No, not necessarily.

16  Q    Do you have any specific recollection of anybody at

17  Case Bigelow & Lombardi telling you that you could get a

18  discount?  I'm referring to you personally.

19  A    No.

20  Q    Did Dan Case ever tell you that negotiating with

21  First Hawaiian Bank was "doable"?

22  A    No.

23  Q    Can we assume that the individual matters that you

24  chose or your client and you together chose to analyze

25  further and do memoranda on were things that were material

1    to the decision process?  For example, there is a memo

2    analyzing the Sears expansion lease.  Was the reason that

3    was done is because it was something significant?

4    A     Yes, yes.

5    Q     When is the last time you talked to Guy Combs?  I

6    tried to find the last one.  I found a lot of references

7    to his name, but the early ones seem to all be talking

8    about him.  Do you recall the last time you talked to him?

9    A     No, I don't.

10   Q     If you had a discussion, it would have been recorded

11   on your bill; the fact that it occurred, not the

12   substance?

13   A     Yes.

14   Q     When Guy Combs came in -- first of all, did you meet

15   with him face-to-face or was this phone call here on the

16   first page of the bill the first time, when you talked to

17   him on May 17th?

18   A     This is on the first page of my bill?

19   Q     It is "Re:  Combs."

20   A     I don't think we spoke to him.

21   Q     Here we go.  May 23rd.

22   A     May 23rd.  If that's the first entry that I had with

23   respect to a telephone call with Mr. Combs, yeah, that

24   would be the first time I spoke him.

25   Q     Did Mr. Combs complain to you that he thought that

D. Wong - Cross

1    there was an effort to give the company to Scott Blum in a

2    no bid context?

3    A    I don't recall that it was said in those terms.

4    Q    Do you recall what you said about it?

5    A    My recollection was that he was concerned that Scott

6    Blum was trying to get some special deal or something of

7    that nature.  I don't recall exactly what else.

8    Q    Do you have a recollection as to whether the

9    retention of Kobayashi or the referral over to

10   Mr. Kobayashi entailed an effort to open up the process?

11   A    Open up the process with respect to Scott?

12   Q    With respect to bidding generally with respect to the

13   company.

14   A    I don't recall how that came about exactly.

15   Q    Did Mr. Combs express to you that he had been

16   excluded from a committee that he wanted to be on to be

17   able to get information?

18   A    Yes.

19   Q    Did Mr. Combs, to your knowledge, ever ask to

20   participate in the purchase side of the transaction with

21   Honu?  Was he an investor, in other words?

22   A    My recollection was he was not.

23   Q    In your discussions with him, did he appear to be

24   touting Grove Farm and trying to get a higher price, as

25   least the ones you were present with?

D. Wong - Cross

1   A    I wouldn't characterize it in that context -- in that

2   way.

3            THE COURT:  How would you?

4            MR. SIMMONS:  Yeah.

5            THE WITNESS:  My recollection is that he was

6   seeking what I would call a fair price for Grove Farm.

7   BY MR. SIMMONS:

8   Q    Okay.

9   A    That's all.  I say that in context with what he

10  thought Scott Blum was trying to do.

11  Q    He would do that through his own affair?

12  A    Yes.

13  Q    Did he tell you that he provided his overview of the

14  Grove Farm memo to other potential buyers?

15  A    I don't recall that.

16  Q    On page 313, who is Mr. Park, or Ms. Park?  There is

17  a reference to "Park."

18  A    My entry or someone else's entry?

19  Q    DSW, the 6-29 entry.

20  A    That might have been -- I can't say for sure but that

21  probably was Russell Park.

22  Q    Can you turn to your entry for July 6th.  It is on

23  page 317.

24  A    Sure.

25  Q    Do you recall anything about that meeting with

D. Wong - Cross

1   First Hawaiian Bank?

2   A    I recalled meeting with the bank.  I don't know

3   whether that was the only meeting we had with them.  I

4   can't say my recollection is of that meeting itself, but I

5   do recall meeting with the bank, yes.

6   Q    Do you have any recollection there was an offer or a

7   discussion that the loan had been written down at that

8   meeting?

9   A    No.

10  Q    With respect to your July 6th entry a little further

11  down --

12  A    Yes.

13  Q    -- who is Lombardi?

14  A    That would be Dennis Lombardi with Case Bigelow.

15  They are called Case Bigelow now.  Well, I don't know what

16  they are called.  Case Lombardi Pettit.

17  Q    Do you have a recollection -- excuse me -- that's not

18  your entry.  Do you know why it would be significant to

19  get information to quiet title actions?

20  A    Why it was significant?

21  Q    Yeah.

22  A    We were checking on status of title and, you know,

23  where the company stood on their quiet title actions; how

24  much more they had to go and that kind of stuff.

25  Q    In the next entry it says here that you are seeking

D. Wong - Cross

1   status -- it talks about status of Schuler agreements not

2   received.

3   A    I'm sorry?  That's all the way on the bottom.

4   Q    TDT.  It is Tracy's entry.  I'm sorry.  Do you know

5   whether you guys had received -- your firm had received

6   those agreements and whether you had been trying to get

7   them?

8   A    Well, based on just what we saw in my questions from

9   defendants' counsel, I believe we did get the Schuler

10  agreements.

11  Q    You ultimately did?

12  A    Uh-huh.

13  Q    Do you recall that there was a question or still

14  uncertainty at the time Honu ceased to be involved -- at

15  the time of expiration in the letter of intent, whether

16  there were still questions outstanding as to whether those

17  agreements were going to go forward, the Schuler

18  agreements specifically?

19  A    I believe that there was still a question in our mind

20  whether they would go forward.

21  Q    Wasn't there still a question in your mind as to

22  whether or not Sears was going to proceed with the

23  expansion lease?

24  A    That, I don't remember.

25  Q    Did you care about the -- I'll withdraw the question.

1    I can make the argument.  Can you turn to 2262.

2    A    The April 8th, 2000 letter?

3    Q    Yes.  This relates to, among other things, a 16.9

4    parcel by the beach, correct?

5    A    I would have to check, but it does relate to a final

6    subdivision.

7    Q    The final subdivision lots are the ones recorded on

8    the map on the second page.  I will come to that.  Is that

9    correct?

10   A    Yes.

11   Q    The lots are the ones on the next page?

12   A    Yes, I think so.

13   Q    The S99-8 refers to the county file on that?

14   A    Yes.

15   Q    So if there was a subsequent action in this matter,

16   it would be indicated with that same number from the

17   County, correct?

18   A    I believe that's correct.

19   Q    Have I accurately filled -- I am not sure whether I

20   have read this correctly or not -- in these boundaries of

21   the particular parcel I was attempting to highlight here,

22   have I accurately highlighted that parcel?

23   A    I have to read this.

24   Q    Okay.

25   A    I don't remember that's what it was.

D. Wong - Cross

1    Q    It was a subdivision, which among other things,

2    created this parcel, I believe.

3    A    From the letter it indicates that lot 2D was created,

4    so let me just check from that.  This is small.

5    Q    That's why I blew it up.

6    A    That -- I think that's correct.

7    Q    If I pull back, I want to ask a quick question.

8    What's on the other side of this line here?  What's here?

9    A    That is ultimately the shoreline.

10   Q    Is this ocean frontage on that 16.9-acre lot?

11   A    No.

12   Q    No, it is not?

13   A    I don't believe it is.

14   Q    Where does the lot end?  That's what I was trying to

15   ask.

16   A    The lot ends where you have it.

17   Q    You think there is another real estate parcel here?

18   A    Possibly.  I can't say for sure, but yes.

19   Q    Is this the ocean?

20   A    Outside of that is the ocean.

21   Q    Thank you.  If there had been a final, final entry

22   approving the actual subdivision maps that that letter

23   says you have to record, would that have been something

24   your client would have wanted to know?

25   A    Say again?

D. Wong - Cross

1    Q    The County says that you have to record your actual

2    map and get final, final approval before it is real.  Do

3    you see that?  It says that if you don't do that, all your

4    approvals become null and void.  Would the entry of that

5    final approval, of the final maps, be something your

6    client would want to ultimately know?

7    A    Ultimately, yes.

8    Q    Can you turn to 2267.  This is the letter confirming

9    the discussion with Mr. Cribley?

10   A    Yes.

11   Q    As I understand it, on page 4 --

12   A    Yes.

13   Q    -- they told you that there were no outstanding sales

14   or offers to purchase the leased fee parcels.  Do you see

15   that?

16   A    Yes.

17   Q    Did they tell you that Dixie Daniel had been trying

18   to buy her leased fee parcel for about six years?

19   A    That name, Dixie Daniel, sounds familiar, but I can't

20   tell you why.

21   Q    Did they tell you about any outstanding offers for

22   any other ones?

23   A    I don't recall.

24   Q    Did they tell you the theater owner was trying to buy

25   their parcel?  Not Wallace Theater, the other one.

D. Wong – Cross

1    A    Who is the other one?

2    Q    Madeline Blair?

3    A    I don't recall that name.

4    Q    Can you turn to 2272.  This is an internal memo about

5    kuleana.

6    A    Yes.

7    Q    Were these ones in the Wiata area under water?

8    A    The Wiata?  I don't recall the location -- I recall

9    the location.  I recall Wiata, but nothing particular

10   about that.

11   Q    If they were relocatable, that would matter?

12   A    Yes.

13   Q    So that would be important to know if they are

14   relocatable?

15   A    Yes.

16   Q    Was that the purpose of this memo, to inventory the

17   kuleana?

18   A    Yeah, it was related to inventory.  To take a look at

19   this and compare it to Max Graham's memo.

20   Q    On 2275, the last assignment listed on the first page

21   for Ernst & Young, was to determine the tax basis and

22   assets.  Do you see that?

23   A    Yes.

24   Q    Why was that significant?  If you know.

25   A    I don't know if it is particular.  Obviously from a

D. Wong - Cross

1    tax-basis matter, it is important for a company.

2    Q    Did you ever actually finalize a merger agreement

3    with the company by generating the definitive merger

4    agreement?

5    A    No, we did not.

6    Q    When did you learn that Stephen Case was the buyer?

7    A    After we got out of the transaction with Grove Farm.

8    Q    How soon after?

9    A    I don't recall.

10   Q    What was your reaction?

11   A    A little surprised.

12   Q    Did you provide your due diligence that you had done

13   to the company, or do you know if it updated its binders

14   based on your work?

15   A    I don't know what they were doing; if they were doing

16   anything about it.

17   Q    Did anyone at Case Bigelow or Grove Farm tell you

18   there was a room full of documents at Case Bigelow for due

19   diligence?

20   A    I don't recall that.

21           MR. SIMMONS:  Nothing further.

22                     REDIRECT EXAMINATION

23   BY MR. NAKASHIMA:

24   Q    Mr. Wong, getting back to your discussions, telephone

25   calls and meetings with Guy Combs --

1    A    Yes.

2    Q    -- did he ever tell you that he preferred land for

3    his shares rather than money?

4    A    I don't recall that.

5    Q    Part of the proposed letter of intent included a land

6    for shares component.  Is that correct?

7    A    If you could point me to that.  But I don't have any

8    independent recollection right now.

9    Q    If you don't recall, that's fine.  You don't recall

10   there was a component where shareholders could get land

11   instead of money?

12   A    I hesitate because I'm trying to think whether it is

13   this transaction we are talking about or another

14   transaction that we are talking about.

15   Q    Did you did you ever retain any real estate

16   appraisers to do appraisals of the entire Grove Farm

17   property?

18   A    I don't think we did.

19   Q    Why not?

20        MR. SIMMONS:  Him personally or his client?

21   BY MR. NAKASHIMA:

22   Q    I am sorry.  Your client or you.

23   A    Like I said, I don't think we did.  If you asked me

24   why we did not, I don't recall.

25        MR. NAKASHIMA:  Thank you, Mr. Wong.  No further

D. Wong - ReDirect

1  questions.

2        THE COURT:  Anything further?

3        MR. SIMMONS:  No, Your Honor.  Thank you.

4        THE COURT:  Let's take a ten-minute break.

5        (Recess.)

6        (Open court; proceedings resumed:)

7        (The witness was duly sworn.)

8        THE WITNESS:  My name is Robert C. Hastings,

9  Junior.  R-O-B-E-R-T, H-A-S-T-I-N-G-S.

10                    DIRECT EXAMINATION

11 BY MR. KIM:

12 Q    Good afternoon, Mr. Hastings.

13       Mr. Hastings, what do you do?

14 A    I am a real estate appraiser.

15 Q    How long have you been doing that?

16 A    I have been doing that since way back into the '50s

17 when I worked for my father.

18 Q    And has most of your work, between the '50s and now,

19 been in Hawaii?

20 A    Since 1969, most of my work has been here in Hawaii.

21 Q    Do you have any experience appraising properties on

22 Kauai?

23 A    I do.

24 Q    Can you briefly describe the nature of that

25 experience?

R. Hastings – Direct

1    A    Yes.  I have appraised all of the Princeville

2    properties; all of the Marriott properties.  I was

3    involved as one of the co-developers of a 311-room hotel

4    at Kapa`a.  And I have been -- first of all, my first

5    involvement with Kauai was when I was brought here by

6    Seagrower & Company, a sugar company.  They had

7    plantations on that island, including Kilauea Plantation,

8    and I also had involvement with properties all around the

9    island, as an employee of Seagrower & Company, and later

10   on with the appraisal firm that I'm with now.

11   Q    Did you have any personal knowledge with Grove Farm

12   Properties?

13   A    Yes, I do.

14   Q    In what capacity?

15   A    When I came here, within the first week I was here in

16   Hawaii, I met with some members of the family, and I did

17   quite a number of tours around this part of the island,

18   the Grove Farm area.

19             THE COURT:  When you say "the family"?

20             THE WITNESS:  Jeffrey Wilcox Michaels was a

21   personal friend; somebody I met at that time.  He was from

22   San Francisco, but he had been a member of the Wilcox

23   family.

24             THE COURT:  Thank you.

25   BY MR. KIM:

1   Q     Mr. Hastings, do you have experience appraising

2   shopping centers?

3   A     Yes, I do.

4   Q     Can you explain at a very high summary level the

5   process by which, in Hawaii, shopping centers are

6   typically appraised?

7   A     In Hawaii and throughout the United States at this

8   point in time, the income approach carried out through the

9   discounted cash-flow analysis is the primary approach to

10  evaluation of shopping centers.

11  Q     And in terms of the income approach, is one of the

12  inputs into that analysis the rents generated by the

13  tenants in the shopping center?

14  A     Yes.

15  Q     And can you explain in a little more detail how you

16  go from the flow of rents into a set value at a certain

17  point in time?

18  A     Well, it is a combination of the rents, the Common

19  Area Maintenance fees that are collected, other service

20  charges that are collected, then less all operating costs,

21  whether they have been provided through the CAM fees,

22  Common Area Maintenance fees, or whether they are covered

23  by the owner of the shopping center out of the income

24  stream.

25          So after you have eliminated the operating

R. Hastings - Direct

1    expenses, you get down to a net income or net cash flow,

2    which is projected over a ten-year period of time and

3    discounted back to the present date.  This is so

4    standardized throughout the United States that we follow

5    pretty rigid standards.

6    Q    Can you turn your attention to Exhibit 2264, which

7    would be the first document in the stack in front of you?

8    A    Yes.

9    Q    This is a limited summary appraisal relating to

10   Grove Farm Shopping Center and dated May 2000.

11   A    Yes.

12   Q    In May 2000, did you do an appraisal -- in or about

13   May 2000, did you do an appraisal for Kukui Grove Shopping

14   Center for the Bank of Hawaii?

15   A    Yes.

16   Q    I want you to keep that out and also look at

17   Exhibit 2304.

18   A    Yes.

19   Q    Do you have that in front of you?

20   A    I do.

21   Q    Is that a summary appraisal with respect to the Kukui

22   Grove Shopping Center with an effective date of

23   December 2000?

24   A    Yes.

25   Q    And did you conduct that second appraisal in

R. Hastings – Direct

1    connection with this litigation as opposed to for the

2    bank?

3    A    We actually conducted both appraisals for the Bank of

4    Hawaii and then later on we were asked if we would update

5    and provide the Exhibit 2304 appraisal for litigation

6    purposes.

7    Q    And comparing these two documents, that is

8    Exhibit 2264 and Exhibit 2304, did you basically conduct

9    the appraisal the same way, without regard to whether it

10   was for a bank as opposed to litigation?

11   A    Let me explain.  The first document is called the

12   limited summary appraisal.  The bank had asked us to just

13   concentrate on the discounted cash-flow analysis in

14   processing the capitalized income.

15           In the second analysis, we provided that

16   discounted cash-flow analysis, and we also capitalized

17   stabilized net income, and in addition, we performed an

18   independent analysis called the sales comparison analysis.

19   Q    So with respect to the cash-flow analysis, which you

20   testified was the commonly accepted way of doing shopping

21   centers, as to that particular analysis it was

22   methodologically the same as between the bank appraisal

23   and litigation appraisal?

24   A    Exactly.

25   Q    And I should have gone over this earlier, but

1    approximately what percentage of your appraisal work is

2    for litigation as opposed to the business world?

3    A    I would say probably only about 10 percent for

4    litigation purposes -- 10, 15 percent, something like

5    that -- and then there is a lot of arbitration work that

6    is done, too.

7    Q    Generally speaking, is the way you do appraisals for

8    a bank, for example, the same as the way you do for

9    litigation?

10   A    Yes.  There are some small differences which are

11   brought about by bank regulations.

12   Q    So turning again to these two documents, that is 2264

13   and 2304, can you turn to table III (1).

14   A    Yes.

15   Q    I specifically want you to focus on the property that

16   is been labeled as G-0 on the second page of that table.

17   A    Yes.

18   Q    You have that designated as K-Mart.

19   A    In the May 2000 appraisal, that space is occupied by

20   K-Mart.  It is 42,150 square feet under a month-to-month

21   rent, and it is then paying $9,000, or 21 cents per square

22   foot per month.

23   Q    Turning to that same table, the analogous table, in

24   the December 2000 appraisal of Grove Farm, and is that

25   same area, the Kukui Grove Shopping Mall, now occupied by

R. Hastings – Direct

1    a different tenant?

2    A    G-0, with 42,150, is now occupied by Sears, and it is

3    effective with a lease beginning August 14, 2000.  And at

4    that time, or as of December 2000, the rent being paid

5    was -- the minimum rent or base rent of $10,537.50 or 25

6    cents per square foot.

7    Q    Turning back to that table for May.  What is the rent

8    being paid by K-Mart?

9    A    $9,000.

10   Q    Mr. Hastings, if you go to the very first page of

11   Exhibit 2264.

12   A    Yes.

13   Q    Beside the cover page, what's the total of appraised

14   value of Grove Farm Shopping Center with the effective

15   date of 2000?

16   A    $12,778,000.

17   Q    And turning to Exhibit 2304, with an effective date

18   of December 2000, what is the total appraised value of the

19   shopping center?

20   A    $13 million.

21   Q    So comparing those two figures, and based on your

22   review of the other data in the report, did the financial

23   condition of the shopping center materially change between

24   May 2000, before the Sears lease, and December 2000, after

25   the expansion lease?

1          MR. MALLONEE:  Objection.  It is outside the

2     scope, and he has not been offered as an expert on

3     materiality.

4          THE COURT:  Outside the scope of?

5          MR. MALLONEE:  Of his initial report.

6          THE COURT:  Well, I want to know what the figure

7     is.  Whether it is or not, I'll need the information.

8          MR. MALLONEE:  As to materiality.

9          MR. KIM:  Your Honor, I meant that in a common

10    sense way, not a legal sense.  I can use a different word

11    if it makes you feel more comfortable.

12         THE COURT:  It didn't bother me.  It is relevant

13    information that I want to have.  So that's all I am going

14    to say.  The objection is overruled.

15    BY MR. KIM:

16    Q   Mr. Hastings, do you still have that question in

17    mind?

18         THE COURT:  What was the appraised value?

19         THE WITNESS:  The answer was $13 million.

20         THE COURT:  Yeah, I heard that.

21    BY MR. KIM:

22    Q   Mr. Hastings, now looking at those total figures,

23    comparing the financial condition of the Kukui Grove

24    Shopping Center in May 2000, prior to the Sears expansion

25    lease, to its appraised value of the same shopping center

R. Hastings – Direct

1   in December 2000, after the Sears expansion lease, was

2   there any significant difference in the financial

3   condition between those two dates?

4   A    There was not.  There was very minor changes between

5   the two dates.

6            MR. KIM:  Thank you very much, Mr. Hastings.

7   That's all the questions I had.

8            THE COURT:  Well, now -- go ahead.

9            MR. MALLONEE:  Can we have copy of Sears' lease,

10  Plaintiffs' 1270?

11           THE COURT:  Go ahead, sir.

12                    CROSS-EXAMINATION

13  BY MR. MALLONEE:

14  Q    Good afternoon, Mr. Hastings.

15  A    Good afternoon.

16  Q    You said that the standard approach to evaluating

17  shopping centers was using a discounted cash-flow method.

18  Is that correct?

19  A    It is the generally accepted approach that has

20  been -- that appears to have been made the standard by

21  buyers, sellers, REITs --

22           THE COURT:  He asked you if you used that

23  approach.

24           THE WITNESS:  That's what I used, yes.

25  BY MR. MALLONEE:

R. Hastings – Cross

1   Q    What discount rate did you use in this report in the

2   summary appraisal of the market value for Kukui Grove in

3   December 2000?

4   A    I'll have to look.

5            THE COURT:  Do you know, Counsel?

6            MR. MALLONEE:  I started looking as soon as he

7   did.  I think it was 9 or 10 percent.

8            THE WITNESS:  We used a 12 percent internal rate

9   return, or discount rate, and an internal capitalization

10  rate of 9 percent.

11  BY MR. MALLONEE:

12  Q    Have you ever had your opinion excluded from a court

13  before?

14           THE COURT:  That's not relevant.  The only way

15  it would be relevant is if it was included before.

16  BY MR. MALLONEE:

17  Q    Have you ever changed your opinion regarding discount

18  rates during the course of court proceedings?

19  A    Not that I know of.

20  Q    Did you provide an opinion in a case regarding

21  Queen's Beach?

22           MR. KIM:  Objection; relevance.

23           THE COURT:  Sustained.

24           THE WITNESS:  Which Queen's Beach?

25           THE COURT:  You don't have to answer it.  I am

1  interested in this case.

2  BY MR. MALLONEE:

3  Q    Did you review the Sears lease before you included it

4  in your report in this case?

5  A    Yes.  I believe I have read that lease.

6  Q    Did you intentionally leave out the 4 percent

7  overage?

8  A    The 4 percent over what?

9  Q    The 4 percent overage, which is part of the lease,

10 did you intentionally omit that from your report?

11 A    No.  We did not omit it from the report.  As it

12 happens, there was not enough sales revenue to kick the

13 overage into play.

14 Q    Isn't this a retrospective report?

15 A    Yes, it is retrospective.  However, it is prospective

16 in the sense that it projects income into the future.

17 Q    How would anyone have known the income at the time,

18 December 1, 2000 for a lease that was just beginning

19 December 1 2000?

20 A    One has to make an analysis of the economy, and the

21 likelihood of there being an overage rent being paid in

22 the future.

23 Q    Did you perform that analysis?

24 A    Yes.

25 Q    Did you put it anywhere in your report?

1    A    Where it was required, we have projected overage

2    rents.

3    Q    Can you flip in your report to III (1) that we looked

4    at earlier.

5    A    Yes.  For which date?

6    Q    The December 2000 report.

7    A    All right.

8    Q    On the far right-hand side there is a column marked

9    "Overage Rent."

10   A    No.

11   Q    I do have on the screen table 31 from your report.

12   Is that the same one you are looking at?

13   A    Yes.

14   Q    I just zoomed on the far right-hand column named

15   "Overage Rent."

16   A    Yes.

17   Q    In that column, are there percentages for overage

18   rent for businesses which are leasing in the center?

19   A    Yes.

20   Q    Do those percentages come from the leases for those

21   particular businesses?

22   A    Yes.

23   Q    Is there a percentage for Sears?

24   A    There is no percentage shown.  However, in the ArcGIS

25   tables that back this up, they are shown.

1   Q    Are there tables that back this up included in any of

2   the materials that Mr. Kim handed you a moment ago?

3   A    I don't know.

4   Q    The tables aren't included in there, are they?

5        THE COURT:  He said he didn't know.  Can you

6   report that there aren't?

7        MR. MALLONEE:  I haven't seen them.

8        THE COURT:  You've looked for them?

9        MR. MALLONEE:  I looked for any percentage of

10  the Sears in there.  I couldn't find it.  He is saying,

11  now, he meant to leave it out.

12  BY MR. MALLONEE:

13  Q    Do you have the Sears lease in your hand?

14  A    Yes.

15  Q    Can you flip to page 7.  Look at section 4.02, which

16  describes minimum rent.

17  A    Yes.

18  Q    Does that correspond with the amount that you put in

19  your report?

20  A    Yes.

21  Q    Can you flip to page 8 and look at section 4.03.

22  A    Yes.

23  Q    Does that describe a percentage rent that is to be

24  paid by Sears to Grove Farm?

25  A    Yes.

R. Hastings – Cross

1   Q    That percentage is 4 percent of sales over the

2   minimum rent, correct?

3   A    Yes.

4   Q    And that's not included anywhere in your report,

5   right?

6   A    It is actually not over the minimum rent.  It is a

7   percentage rent calculated against the minimum rent.  In

8   the event there are sales in an amount great enough to

9   create percentage rents in excess of minimum rents, then

10  an overage rent will be projected.

11  Q    Can you flip in your report -- I'm sorry.  Did you

12  project revenues for companies that were required to pay a

13  percentage rent in your report?

14  A    Yes.

15  Q    Did you include a projection for the portion of the

16  Sears lease -- for the expansion of the Sears lease area?

17  A    As I understand it, we did, yes.

18  Q    Could you turn to table V-3 in your report.

19        Does table V-3 in your report show historical

20  gross sales data?

21  A    It does.

22  Q    Could you read the line for "J.O." near the bottom

23  that says, "Sears, Roebuck & Company."  It is

24  approximately 34,000 square feet and what are the annual

25  sales?

R. Hastings – Cross

1    A    Yes.  The annual sales is 7,831,000 in the year 1997.

2    In the year 2000, it is at $11,349,500.

3    Q    What's approximately 4 percent of $11 million?

4              MR. KIM:  Objection; foundation.  This is an

5    entirely different lease than what he was testifying about

6    earlier.

7              MR. MALLONEE:  That's my point.

8              THE COURT:  Go ahead.

9              THE WITNESS:  4 percent of that would be

10   something in the neighborhood of $400,000.

11   BY MR. MALLONEE:

12   Q    Now, that's not the Sears expansion lease area, is

13   it?

14   A    That would be all of Sears actually.

15   Q    Actually could you flip to the previous page, table

16   V-2.  Do you see the section "Similar" to go on the next

17   page, "Anchors, major tenants, J-2," the line you just

18   read, indicating the same 33,000 square feet.  Do you see

19   that?

20   A    Yes.

21   Q    If you move up and you see "G-0, Sears," it shows the

22   expansion lease of 42,000 square feet.  It shows the

23   minimum rent you read off.  Isn't that what this table

24   shows?

25   A    Yes.

1   Q    If you go back to the other table, Sears is missing?

2   A    Yes --

3            THE COURT:  Let me finish.

4            THE WITNESS:  As I understand it.  The

5   percentage income was not generated in that space.

6   BY MR. MALLONEE:

7   Q    Your projections for 33,000 square feet were for the

8   Sears space was in excess of $10 million.  That would have

9   generated $400,000 of percentage rent?

10  A    Your reasoning from one Sears space to another.  I

11  think they are all different client types, all different

12  product types.  There is no reason the sales are going to

13  be the same on a square-foot basis.

14  Q    Did you use the retroactive history for any other of

15  the businesses included in this report?

16  A    I believe we did.

17  Q    You have projections for these sales, don't you?

18  A    We have -- yes.  In the ArcGIS software, which is

19  very hard to read, there is additional information.

20  Q    Sorry.  I just don't know what you just said.

21  A    Are you familiar with ArcGIS software?

22  Q    Did you include ArcGIS software or anything like that

23  in your report?

24  A    Yes, we do use ArcGIS software.

25  Q    Is that in your report?  Is it referred to in your

R. Hastings - Cross

1    report?

2    A    I believe we did.  I believe we had mentioned ArcGIS.

3    Q    Is that where you made the projections?  I will step

4    back a second, and I think I can leave it alone with this.

5         Did Sears, "G-0," generate any revenues that

6    this ArcGIS software would have picked up in table V-3?

7    A    I don't know.

8    Q    So is it your testimony that the ArcGIS software

9    tells you that there is zero revenue generated in that

10   42,000 square foot Sears space in 2000, 2001?

11        MR. KIM:  Objection.  Misstates the testimony.

12        MR. MALLONEE:  I'm asking if that's his

13   testimony.

14        THE COURT:  No --

15        THE WITNESS:  I have an idea that there may have

16   been sales revenue there, but there weren't sales revenue

17   great enough for the overage rents to be paid over and

18   above the minimum rent required.

19   BY MR. MALLONEE:

20   Q    You know that for every year?

21   A    We know that as of December 2000.

22   Q    As in December of 2000.  They moved in on December 3,

23   2000 -- we are going forward.  I'll leave it at that.  You

24   didn't attribute any revenues to this 42,000 square foot

25   space, did you?

 1  A    I believe that is included in the ArcGIS program.

 2  Q    But it is not included on table V-3?

 3  A    That's correct.

 4  Q    Do you know what they actually collected?

 5  A    I don't know.

 6  Q    Can you flip to -- we were talking about the Kukui

 7  Grove Shopping Center.  Can you refer to your other

 8  report, page 16.

 9  A    Yes.

10  Q    Do you list on that page, page 16, your opinion of

11  the market value analysis of unimproved fee simple

12  properties, the total retail value prior to discounting,

13  for the properties that you discussed in this report?

14  A    You are in the May 2000 report?

15  Q    December 2000 report.

16          MR. KIM:  For which property?

17          MR. MALLONEE:  The non-Kukui Grove one;

18  everything else.

19          MR. KIM:  We object to scope.  We are not

20  offering the appraisals per se.  We were offering it on a

21  narrow issue, Sears.  The appraisals we can deal with at

22  another time.

23          THE COURT:  That's true.  It was restricted to a

24  very tight window.

25          MR. MALLONEE:  It goes to materiality.  I will

1    go quickly.  There is a difference between payments over

2    the lease or whether or not the entire Kukui Grove needed

3    to be liquidated.

4               THE COURT:  Let's hear what you have to say.

5               MR. MALLONEE:  Okay.

6    BY MR. MALLONEE:

7    Q     You list your total retail value prior to discount on

8    this page, correct?

9    A     You are on page 16 on the December 2000 report?  Is

10   that correct?

11   Q     The one for Kukui Commercial Village, Kukui Grove

12   West and the K-Mart properties.

13              THE COURT:  What is your question?

14   BY MR. MALLONEE:

15   Q     Are you on that page?

16   A     I am.

17   Q     Have you listed values for these properties, the

18   total retail value of unimproved fee simple properties,

19   prior to discounting, as 24,690,000?

20   A     Yes.

21   Q     Have you listed the total retail value of TMK-330612

22   and the 16 leased fee properties as 20,660,000?

23   A     Yes.

24   Q     Have you listed the value for the Kukui Grove

25   Shopping Center as 13 million?

1    A    Not on this page.

2    Q    I'm sorry.  I jumped back to your previous report.

3    A    Yes.

4    Q    And then you discounted these properties, didn't you,

5    because of the liquidation value that was being attributed

6    to Grove Farm, correct?

7    A    It is true for two line items there.  It is not true

8    for your third line item.

9         MR. KIM:  Your Honor, I think we are still

10   outside of scope.  I haven't seen this tied up yet.

11        MR. MALLONEE:  It will be.  Give me a second.

12   This was discounted.

13   BY MR. MALLONEE:

14   Q    Is that your rough opinion?

15   A    You are wrong.  You labeled that discounted.  That's

16   before the discount.  24,690,000 then gets discounted by a

17   factor.

18   Q    I was trying to point out it does get discounted

19   later on.  But my question is --

20   A    But you are aggregating it in the undiscounted

21   condition, and then I don't know what you are going to do

22   with the new total of eggs and oranges.

23   Q    That's an approximate total.  68 million is an

24   approximate total?

25   A    What have you just written?  I can't read it.

R. Hastings - Cross

1   Q    I had to write, "Not discounted" at the top.  My

2   point is, if you are going to discount those two by 50

3   percent for liquidation of value -- my question is, if you

4   don't know the value of the Sears lease, how can you

5   provide discounted values if you don't know that Grove

6   Farm actually needs to sell them at a discount?

7   A    We haven't said that I don't know the value of the

8   Sears lease.  The ArcGIS program gave us a result,

9   including Sears.

10  Q    We have talked about the Sears lease.  I want to say

11  that's your non-discounted total opinion, correct,

12  ballpark?  If you add back in the termites, it is

13  37 million -- I mean, 73 million?

14  A    As is made perfectly clear on page 16 of

15  Exhibit 2204, it is the second page.  16 related only to

16  Commercial Village.  The 24,690,000 is later discounted by

17  50 percent.  The TMK-33612 and 16 leased-fee properties,

18  before discounting have a $20,660,000 value, and they are

19  discounted at 85 percent to 17,560,000.  The shopping

20  center, $13 million value, does not become further

21  discounted.  That's why I say you have got apples, eggs,

22  oranges, turkeys, cats, whatever.

23            THE COURT:  Do you have any further questions?

24            MR. MALLONEE:  No further questions.

25            THE COURT:  Anything further?

1          MR. KIM:  Nothing further.

2          THE COURT:  Thank you.  Thank you, Mr. Hastings.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  Your next witness.

5          MR. KIM:  At this time the defense calls Mary

6    O'Connor, who is out of the room right now.

7          (The witness was duly sworn.)

8          THE WITNESS:  Mary A. O'Connor.  O'C-O-N-N-O-R.

9                    DIRECT EXAMINATION

10   BY MR. KIM:

11   Q    Good afternoon, Ms. O'Connor.

12   A    Hello.

13   Q    Ms. O'Connor, what do you do for a living?

14   A    I am an appraiser qualified to value businesses.

15   Q    And is appraising a business different than

16   appraising real property?

17   A    In some ways it is the same and in some ways it is

18   different.

19   Q    Is it considered a separate discipline within your

20   general field?

21   A    Yes, it is.

22   Q    In that field do you have any certifications?

23   A    Yes, I do.  I am a senior member of the American

24   Society of Appraisers.

25   Q    How long have you been engaged in business

1    evaluation?

2    A    Sometimes longer than I care to admit.  Let's say

3    over 25 years.

4    Q    And as part of providing opinions regarding business

5    valuations, do you also provide fairness opinions in the

6    context of corporate transactions?

7    A    Yes, I have done that.

8    Q    How extensive is your experience in that regard?

9    A    I would consider it extensive; during many different

10   decades and different economic conditions.

11   Q    Can you explain at a fairly high level of generality

12   the ways in which you can value -- put a dollar value on

13   100 percent of stock of a corporation?

14   A    Yes.  Appraisal theory in capitalism always endeavors

15   to apply three approaches to value.  Generally the most

16   reliable, because it is so based on the specific situation

17   of the company, is what's known as the income approach.

18   Then there is an attempt to use a market approach where

19   comparable transactions are analyzed in relation to the

20   subject company.  We know the price that a comparable

21   company was traded at, therefore, we can draw some

22   conclusions as to where we think the subject company would

23   trade.

24         And, finally, there is what is known as the

25   asset approach.  It used to be known as a cost approach,

M. O'Connor – Direct

```
 1   but it is where the value of the enterprise is really the
 2   sum of its assets or the fair market value of its assets.
 3   Q    And with respect to Grove Farm Company, which
 4   approach did you ultimately use?
 5   A    I began with a look at an income approach, and since
 6   we are valuing shares of the corporation, we are looking
 7   for how much cash flow did this particular corporate
 8   entity throw off to its shareholders.
 9            On that analysis, typically that cash flow is a
10   positive number for several years prior to a transaction.
11   Based on my analysis, it was a negative cash flow.
12   Sometimes many millions; sometimes a few hundred thousand,
13   but never positive.
14   Q    Let me stop you there.  If the cash flow is not
15   positive, is it possible to do an income analysis of a
16   corporation?
17   A    No.  You can regard it something as a decision tree.
18   If you cannot reach a positive number employing an income
19   approach -- and remember, and I think it is worthwhile to
20   go back to the definition of fair market value.  It is a
21   willing seller and a willing buyer with a reasonable grasp
22   of the facts of the situation.  It is my job to fully
23   analyze the seller and to model who the potential buyer
24   would be of the corporation.
25            The potential buyer in this case would be really
```

M. O'Connor – Direct

1    under an orderly liquidation premise.  Grove Farm at the

2    time of this valuation, given its negative cash flow, as

3    an entity, didn't have enough value to economically hold

4    the assets that it did.

5              Therefore, a prudent buyer and seller situation

6    would be one where I want to get cash for those assets, so

7    how would I go about doing that?  I could either sell

8    shares, but probably I would go into some sort of

9    liquidation analysis and ultimately draw cash that could

10   be distributed to the shareholders that they could go

11   employ in a much more economic fashion.

12   Q    Let me ask you briefly then about the comparable

13   transactions approach.  Were you able to use that approach

14   with respect to Grove Farm?

15   A    No, I did not.  I did not find transactions that were

16   specific enough to the specific situation of Grove Farm.

17   I would have to make too many assumptions in my belief to

18   make a good comparison, a valid comparison.

19   Q    Turning to the asset approach or liquidation

20   approach, does your use of that approach necessarily mean

21   that Grove Farm is insolvent or bankrupt?

22   A    No.  It just means that the value of the cash flow,

23   into the foreseeable future, does not warrant retention of

24   the assets under its current ownership.

25   Q    Okay.  And now I just want to focus on the asset or

M. O'Connor – Direct

1    orderly liquidation scenario.  Under that scenario, would

2    it be appropriate to simply add the retail value of all

3    the individual assets owned by the corporation?

4    A    No, it would not, because, again, we're going back to

5    the decision tree.  Our corporation doesn't warrant

6    retention of the assets.  Therefore, assuming that

7    management would then turn to liquidate in a reasonably

8    finite period of time, you know, turn all of those assets

9    into cash, pay off their taxes, pay off their liabilities,

10   have some cash left to distribute to shareholders over a

11   reasonable period of time, that is inherently the

12   definition of a orderly liquidation, not a fire sale, just

13   an orderly liquidation.

14   Q    Because of that, you look at factors other than the

15   retail value of the retail assets?

16   A    Absolutely.  "Retail," by definition, particularly

17   for real estate, are for assets that have been fully

18   developed, full infrastructure, Grove Farm, operating as a

19   truly functional real estate development company.  You

20   would look at that value; as to how many years would it

21   take to get to that kind of a retail value.  What kind of

22   investment would you have to make?  How many years would

23   it take to get there and reduce it back to present value?

24        That wasn't the situation that Grove Farm was

25   in.  They were limping along, at best, kind of slowly

M. O'Connor – Direct

1    cutting off pieces of themselves.  So an orderly

2    liquidation scenario, again, because an income approach is

3    impossible to apply, to me, is the appropriate way to

4    evaluate the asset.

5    Q    Okay.  I want to turn your attention to schedule 3 of

6    your report, which is Exhibit 2306 in front of you.

7    A    Which schedule would you like me to look at?

8    Q    Schedule 3.

9    A    Yes.

10   Q    And, Ms. O'Connor, I don't want to focus on the

11   numbers for now.  I want to focus on the theory behind

12   what you are doing.  So in the assets column, can you

13   describe generally what you are putting in the assets

14   column.

15   A    First of all, I'm using financial information, the

16   same financial information that the willing buyer would be

17   looking at; namely, September 30th, 2000.  We know on that

18   date cash and other assets -- I'm sorry -- we are not

19   going into numbers.  We know that there was cash.  We know

20   that the corporation had machinery and equipment.

21        We estimated what a cash value would be for that

22   equipment.  I relied on the appraisals produced by the

23   Hastings & Medusky firm.  That was subtotaled.  This is

24   the estimated proceeds from the bulk sale of the real

25   estate over a period of time, 12 months to 18 months,

M. O'Connor – Direct

1    again, per the estimate of the real estate appraisers.

2           There are costs of sales, broker fees, lawyer

3    fees, finder's fees.  So there would be some net proceeds

4    before capital gains tax.  You have to pay your taxes.  So

5    we take the capital gains tax out.

6           We then derive net proceeds from the bulk sale

7    of the real estate, which we believe would be 12 months to

8    18 months out.  So we brought that back to present value,

9    and I also added in the substantial tax loss carry forward

10   as a dollar-for-dollar asset and arrived at a total asset

11   value under this scenario, subtracted its liabilities.

12          Over that 18 months the company would have to

13   continue to function to make this sale happen.  So the

14   wind-down costs would also come out of cash proceeds.  We

15   arrive at a net asset value, which would then be assumed

16   to be distributed to the shareholders.

17   Q    Turning to the inputs, into that, specifically with

18   respect to the Jan Medusky and Bob Hastings' appraisals,

19   do you recall that those appraisals included a bulk

20   discount?

21   A    Some of them did.

22   Q    Is it your judgment that the use of a bulk discount

23   in this scenario is appropriate?

24   A    It is the only way you could sell this much property

25   in this time frame.

1      MR. KIM:  Thank you very much, Ms. O'Connor.

2  That's all the questions I have.

3                      CROSS-EXAMINATION

4  BY MR. MALLONEE:

5  Q    Good afternoon, Ms. O'Connor.

6  A    Hello.

7  Q    Did you use your business expertise to determine that

8  a bulk discount should be used or is that part of their

9  assignment?

10  A    I would say I used my business expertise.

11  Q    So was -- in your opinion -- was it your choice to

12  use the liquidation value?

13  A    That is just simply the application of business

14  valuation theory, and I could repeat that part about, if

15  you can't get a positive income approach, and it appears

16  economically that the assets should be liquidated, I

17  suppose -- we could have gone to a fire sale approach, but

18  that's not appropriate.  That's not a prudent way to

19  handle it.  An appraisal theory really directs you to some

20  notion of orderly liquidation.

21  Q    Are you aware that the land of Grove Farm was

22  recorded on the books at book value?

23  A    Yes.

24  Q    And market value was much, much higher than the book

25  value?

1    A    Yes.

2    Q    And you testified in your deposition that Grove Farm

3    was not insolvent in the sense that its assets continued

4    to exceed its liabilities at December 1, 2000?

5    A    Insolvency usually has two tests.  As we say in the

6    Midwest, some entities are dirt poor.  They work.  They

7    had declining cash, but they had a lot of -- they did have

8    assets.

9    Q    You said there were two tests:  One is assets

10   exceeding liabilities.  So for insolvency, Grove Farm was

11   not insolvent, in your opinion, based on that one test?

12   A    But the other test; namely, cash to cover your

13   current obligation, they were failing.

14   Q    Your opinion that we are all in agreement, they

15   weren't on the first test, the assets greater than

16   liabilities test and so on, correct?

17   A    I would agree.

18   Q    The other test is whether or not the company can meet

19   its current obligations, correct?

20   A    That's correct.

21   Q    And there would be no reason to liquidate if

22   Grove Farm were not insolvent by that test, correct?

23   A    Oh, that is not true.  Again, for the prior four

24   years to this particular sale, wealth was being depleted,

25   not increased.  That's why in a capitalist society we

M. O'Connor - Cross

1   function the way we do under the principles that we

2   function.

3           It makes -- it would have made more sense to,

4   given the negative cash flow situation of the company, to

5   do an orderly liquidation rather than just sit and

6   continue to bleed.

7   Q   Does an orderly liquidation necessitate discounts of

8   approximately 40 to 50 percent of the value of the asset

9   you are liquidating?

10  A   Again, it is not my opinion.  It is the real estate

11  appraisers who I have confidence in.

12  Q   I probably shouldn't write on the board again, but

13  the real estate appraisers, you are aware that -- I guess.

14  Turn to your schedule III, please.

15          The 73 million number that you have on your

16  schedule III is from Jan Medusky, correct?

17  A   Yes.

18  Q   You're aware that his opinion as to the aggregate

19  market value as to that portion of the land is

20  121,675,000, correct?

21  A   I don't remember the exact number, but that would be,

22  we call the retail value.

23  Q   Mr. Medusky referred to it specifically as the

24  aggregate market value?

25  A   Prior to a discount for liquidation.

1    Q    Prior to his bulk discount, I believe.  He used the

2    term "bulk."  You have used the term "liquidation."

3            We just heard Mr. Hastings testify to the two

4    previous values on here.

5            THE COURT:  That's what she said, and she relied

6    on those figures.

7            MR. MALLONEE:  But to put in perspective what

8    she is recommending should be done in a case where a

9    company may or may not be cash shy is liquidating its real

10   estate holdings, where it may or may not meet its current

11   obligations, and I believe Ms. O'Connor will testify --

12           THE COURT:  My question is:  You referred to the

13   two figures, which she adopted for her report.  If those

14   figures are erroneous, then her conclusions will be

15   erroneous obviously.  But what is your next question?

16   BY MR. MALLONEE:

17   Q    You wouldn't recommend liquidating a company which

18   had a value of $170 million for failure to meet a payment

19   or proposed -- or expected failure to meet a payment that

20   it could actually make, would you?

21           MR. KIM:  Objection.  She is not recommending

22   anything.  She was testifying about theory.

23           THE COURT:  She hasn't testified to anything

24   like that.

25   BY MR. MALLONEE:

M. O'Connor - Cross

1    Q    Okay.  We are close to the second theory of

2    insolvency.  The second theory of insolvency is that a

3    company could not meet its current obligations, and that's

4    when the liquidation method should be used, correct?

5    A    No.

6    Q    If a company could continue to meet its current

7    obligations, there would be no need to liquidate its

8    assets, correct?

9    A    No.

10   Q    So it is not your testimony that -- well, having seen

11   Grove Farm's financials, is it your testimony that

12   Grove Farm should have engaged in a liquidation of its

13   assets?

14   A    No.

15            MR. KIM:  Objection; relevance.

16            THE COURT:  She didn't make a statement -- she

17   does in her report, so I can understand what you are

18   concerned with.  But she didn't testify to this piecemeal

19   approach that was taken.  I have read her report.  And she

20   does; she gave you the full Monty.

21   BY MR. MALLONEE:

22   Q    In deposition, you testified that Grove Farm could

23   have kept on limping along.  Is that correct?

24   A    Yeah.  That doesn't mean that's the economic thing to

25   do, and that's what I model.

M. O'Connor - Cross

1    Q    Okay.  So your testimony is that Grove -- okay.  The

2    liquidation value here, you said that Grove Farm -- your

3    economic model is a liquidation model, but you have no

4    opinion whether Grove Farm should be liquidating

5    December 1, 2000, correct?

6    A    I think that's a fair characterization.

7    Q    Would it matter if the stockholders were irrationally

8    attached to it?

9    A    We assume in a capitalist economy that investors act

10   rationally.

11   Q    So your assumptions wouldn't work for a family that

12   wouldn't behave that way?

13   A    We are talking about a theoretical economic

14   situation.  If I cannot value a company by its cash flow,

15   I have to value it using some other model; in this

16   particular case, in order to do a liquidation model that

17   gets to what I believe is the market value of the shares.

18   Q    We already touched the real estate appraisers, so I

19   will go to the rest of your assumptions in the report.  If

20   the real estate appraisals are incorrect, those numbers on

21   your report are incorrect?

22   A    That would be true.

23   Q    Just several other assumptions in the report.  For

24   cost of sale, you determined that number based upon

25   numbers used in the sale, correct?

M. O'Connor – Cross

1   A    I based that on an estimate, which is usually

2   expressed, particularly for real estate, as a percentage

3   of proceeds what I believe it would cost to liquidate a

4   property of this magnitude.  It would be a very expensive

5   proposition.

6   Q    Then I want to jump to the top.  You have a figure of

7   775,000 for the estimated fair market value of the

8   machinery, equipment, autos, trucks and office furniture.

9   Is that correct?

10  A    Yes.

11  Q    You got that figure by multiplying the actual figure

12  on Grove Farm's books by 10 percent, correct?

13  A    Yes.

14  Q    And the reason that you chose 10 percent -- have you

15  used 40 percent for that category in "other work" of

16  theirs?

17  A    Well, you always pick a percentage based upon the

18  particular market for particular types of equipment.  In

19  my opinion, 10 percent is appropriate.

20  Q    Did you choose that 10 percent number because you

21  were told by management at Grove Farm that a large portion

22  of this category were cars and office furniture?

23  A    No.

24  Q    Did you testify to that in your deposition?

25  A    I'm not sure.  My understanding is that many of the

M. O'Connor - Cross

1    assets -- this is after the rock-crushing equipment had

2    been sold.  We had a lot of trucks and a lot of furniture.

3    Q    Above the highlighted portion, can you read.  I'll

4    read my question.  You read your answer.

5          I say, "Okay.  But I mean -- I am just trying to

6    find out where it came from, if it is from a book" --

7    maybe go to the one above that.

8          THE COURT:  We are really not getting very far

9    comparing percentages of stainless steel equipment that

10   might be substantial value versus Lord knows how much

11   sugar plantation residue is kicking around with no market

12   value, after you get all of our plantations going down.

13         MR. MALLONEE:  I thought we would go through it

14   quickly.

15         THE COURT:  You got another 45 minutes, if you

16   need it.  I don't want to you use it.

17         MR. MALLONEE:  I thought we would wrap that one

18   up quickly.

19   BY MR. MALLONEE:

20   Q    You used 10 percent and you have used 40 percent

21   before, correct?

22   A    I believe 10 percent is applicable to what I believe

23   is included in this lot of equipment.  We are also in a

24   remote location.

25         THE COURT:  I am glad your name isn't Sandra Day

M. O'Connor - Cross

1    O'Connor.  If you would put that back up, in fairness.

2    You went fairly fast for me.  I thought the 40 percent

3    assumption -- "Where I used 40 percent, it was a great

4    deal of equipment that was made of stainless steel and

5    those -- and the resale value there is -- is top dollar."

6    That's the point I was making.

7            MR. MALLONEE:  Right.  But she goes on to say in

8    her deposition that the management at Grove Farm told her

9    these were mostly cars, and the balance sheet shows they

10   are not.  I can let that point go.  You are right; it is

11   only $6 million.

12           MR. SIMMONS:  I care.  That's a lot of money.

13           MR. MALLONEE:  It is $6 million.

14           THE COURT:  Do you have another question for the

15   witness?

16   BY MR. MALLONEE:

17   Q    You used 10 percent for liquidation for equipment.

18   What would you use for a fire sale?

19   A    You would pay someone to take it away.

20           MR. MALLONEE:  For materiality for this witness,

21   we have no other questions, Your Honor.

22           THE COURT:  Thank you.

23           MR. KIM:  Your Honor, very brief redirect.

24

25

M. O'Connor – Cross

                    REDIRECT EXAMINATION

1   BY MR. KIM:

2   Q    Ms. O'Connor, by using the liquidation scenario for

3   your valuation of the company, are you making any sort of

4   judgment about what the company should or should not have

5   done?

6   A    No.

7   Q    And the reason you are using that scenario is because

8   you cannot use the income approach, correct?

9   A    That is correct.

10  Q    It is possible to use the liquidation scenario, even

11  if the company could survive for years and years, if there

12  is no positive cash flow generated?

13  A    Yes.

14          MR. KIM:  That's all the questions I had.  Thank

15  you.

16          THE COURT:  Thank you ma'am.

17          Anything further for the defense?

18          MR. NAKASHIMA:  We are still waiting for

19  plaintiffs to rest.

20          MR. SIMMONS:  It is not going to happen.  Those

21  words can't come out of my mouth.

22          MR. NAKASHIMA:  Rest on this phase?

23          MR. SIMMONS:  I'm definitely not going to do

24  that until I get some motions on my exhibits and some

M. O'Connor - ReDirect

1    things we have got to put in tomorrow.  I will make a

2    qualified rest tomorrow.  How is that?

3              THE COURT:  The issue, I can address sua sponte

4    any time, under Rule 52.  The bench trial has a special

5    segment.

6              MR. ALSTON:  I think 52(c), Your Honor.

7              THE COURT:  I thought we had an agreement that

8    we were going to close off the testimony and argue the

9    merits before we did anything further on motions.  Have

10   you closed off your evidence on merits?

11             MR. SIMMONS:  No, I have not.  I have closed

12   witnesses.  I need to move in some exhibits that they

13   wouldn't stipulate to.  To the extent there was an

14   agreement, I thought the agreement was I could basically

15   make a qualified rest; say, I am going to rest and argue

16   the merits based on the assumption that my experts are

17   credible and so forth on the damages side, and we have the

18   reports, and the Court can make a determination later.  I

19   am fine doing it that way, and I thought that's what

20   everybody wanted.  I wasn't trying to hold the merits

21   open, but I needed to deal with housekeeping stuff.

22             THE COURT:  What do you need to deal with on

23   reports?  What do you have in your hand?

24             MR. SIMMONS:  This is just exhibits.  I was

25   going to make a motion on some of the exhibits that they

weren't going to stipulate to.

THE COURT:  Okay.  Go ahead.

MR. SIMMONS:  Exhibit 1020 is a set of documents pertaining to -- well, it is her document.  It cites 60 pages.  It is the production and all her efforts and the correspondence pertaining to her efforts to buy her property at the Kukui Grove Commercial Village West area, and the Court heard today that Danton Wong's outfit had been told there were no offers to purchase any of the leased-fee interests.  That's a reference to what Ms. Daniel was trying to buy for almost ten years.

Guido Giacometti testified that he was ordered not to sell her that.  I would move on Exhibit 1020 and 1034, which is the letter returning Dixie Daniel's check and the $1.56 million contract as relevant, particularly as to the issue whether the company needed to be liquidated.  I refrained from calling her.  I was going to do an offer of proof, but I think the documents and Guido's testimony are sufficient.

THE COURT:  All right.

MR. SIMMONS:  They have "objection" written down.

MR. ALSTON:  Your Honor, this is a package of material that involves a woman who was trying to buy a particular parcel of property, but it has nothing to do

1   with insider trading.  The fact there was correspondence

2   in '98 and the fact that there may have been a check

3   returned in April of 1998 has nothing to do with insider

4   trading.  That's why we objected.

5          MR. SIMMONS:  They knew -- we went through the

6   notes.  They were being told what offers were out there

7   for other land, according to the notes we went through

8   from that time period.  First of all, it absolutely does

9   have to do with insider trading.  Second of all, it has to

10  do with whether or not the company had to be liquidated or

11  not.

12         THE COURT:  I will accept those as your offers

13  of proof.  I will take under advisement the admissibility.

14  But what I want, so we will all be understanding -- is

15  that all you got now?

16         MR. SIMMONS:  No.  They basically picked all the

17  things they don't like and said "objection."

18         THE COURT:  Well, that's fine.  Go ahead and

19  make your offers.

20         MR. SIMMONS:  I have made very few objections to

21  their evidence.

22         I have got 1037 and 1038, which are documents

23  pertaining to the various corporate entities involved,

24  their operating agreements and other documents, many of

25  which are signed by Stephen Case, showing the

1    interrelation between his companies.  That's 1037, 1038,

2    1084, 1093, 1235, 1236, 1376 and 1378.

3            That batch deals with the existence,

4    interrelationships and Steve Case's relationship to

5    various entities, including ALPS, that we talked about

6    during this case.  They are things like ratifications,

7    signed consents of a single member of an LLC, all the

8    organic documents that I intended to argue -- among other

9    things, alter-ego issues -- off of, if I need to.  If

10   nothing else, they show that the company existed; that

11   Steve Case ratified what happened, things like that.

12           THE COURT:  No one has contested that whatever

13   ALPS did was attributable to Stephen Case.  In fact, the

14   opposite has been asserted, that the ALPS signature was

15   sufficient, because it represented Stephen Case's assets.

16           MR. SIMMONS:  So if there is no dispute that

17   Stephen Case is chargeable with whatever ALPS did, then I

18   don't need those documents.

19           THE COURT:  Just a minute.  There is no dispute

20   on that, is there?

21           MR. ALSTON:  There is no dispute that ALPS was

22   acting for and on behalf of Stephen Case.

23           THE COURT:  So you just saved yourself a lot of

24   work.

25           MR. SIMMONS:  No problem.  I can get through

1    this a lot quicker with that.

2            THE COURT:  Then smile.  (Laughter)

3            MR. SIMMONS:  I have been having to fight for

4    that for three years.  Ten minutes from being done, they

5    decide to give in and throw in the towel.

6            THE COURT:  All right.

7            MR. SIMMONS:  I am not proud.  I will take it

8    any way I can get it.  That cuts out a lot of these,

9    Your Honor.

10           1495 -- I have a few more, Your Honor.

11           THE COURT:  Why don't you take a look at all

12   that and see what they object to.  And before we -- you

13   have got another half hour to talk.  Then I'll accept as

14   an offer of proof anything that you have got there that

15   they object to so it is on the record.  Then they will

16   have an objection on relevancy, saying these documents

17   don't have anything to do with insider trading, which is

18   their basic objections.

19           And then I want to hear your argument tomorrow

20   as to what you think is the insider trading evidence.  And

21   if you think you have got a hook with some of these

22   documents, you can say:  We made an offer of proof that

23   these are relevant to insider trading because of ta-da,

24   ta-da, ta-da.  You don't have to argue it twice.  You

25   argue it once.

1      MR. SIMMONS:  Fair enough.  Thank you.

2      THE COURT:  And they don't have to stand up and

3  object to each and every one of them.

4      MR. SIMMONS:  Which I think we tried to avoid

5  throughout.  With that suggestion, I think we can work out

6  what we need to work out.  If not, I'll make my offer of

7  proof.  The one issue we just got rid of was the most of

8  what I was worried about.

9      Is there any objection to the Miles and Wattson

10  documents?  I think we both had put in binders of

11  Tony Wattson documents.

12      MR. ALSTON:  We agreed to put in depositions.  I

13  assumed that carried with it exhibits.

14      MR. SIMMONS:  I did, too.  I just didn't want to

15  leave off without saying that.  So those are in evidence,

16  because we have been referring back and forth to them.

17      Other than that, I will wrap up the last couple

18  of things I have to do tomorrow in terms of exhibits and

19  make argument.

20      THE COURT:  Now, as far as the defense is

21  concerned --

22      MR. ALSTON:  Yes, Your Honor.

23      THE COURT:  You have the right under the Federal

24  Rules of Civil Procedure for bench trials to make a motion

25  for judgment as a matter of law at any juncture at the

1    completion of the issues.  I assume, since you have made

2    such a motion on statute of limitations, I assume that you

3    would make the same motion on merits?

4              MR. ALSTON:  We do, Your Honor.

5              THE COURT:  And on that, I will hold in abeyance

6    anything further to see whether there is anything further

7    to rule upon.  But I can't rule upon the motion.  I'll

8    assume, for the record, it has been made, but I want to

9    hear the arguments so I can make an intelligent decision.

10             MR. ALSTON:  That's what we assumed you would

11   do, Your Honor.  We wanted to make it for the record.  We

12   want to address, and we will do this tomorrow, the issue

13   of whether this is an omission case or a misrepresentation

14   case.  But, yes, thank you, Your Honor, for accepting that

15   oral motion.

16             THE COURT:  Okay.  That's fine.

17             For the arguments, tomorrow, are you going to

18   have additional PowerPoint-type materials for the Court?

19             MR. ALSTON:  Yes, Your Honor, I will.

20             THE COURT:  That's not your style.

21             MR. SIMMONS:  No.  I like slick timelines.  But

22   at the rate I'm going, it is going to be in Crayon.  I am

23   sort of half kidding.  I may have to end up doing them by

24   hand.

25             THE COURT:  I had many lawyers say, "Judge,

3439

1    can't I just use butcher paper?"  I don't care how you do

2    your argument.

3              MR. SIMMONS:  I don't expect doing a PowerPoint.

4              THE COURT:  I have seen multi-million dollar

5    cases argued with no visuals.  So it is all up to you as

6    advocates.

7              So we are clear, you have got an hour and a

8    half.  We have to start at 1:15.  But please be ready at

9    1:15.  Have all your stuff laid out so if you start to

10   meet with Leslie, she will be here before that.  She likes

11   to work through her lunch hour.  Seriously --

12             THE CLERK:  The courtroom will be open very

13   early.

14             THE COURT:  And then as far as your time is

15   concerned, you can split it any way you want and divide it

16   any way you want.  Same thing for rebuttal.  I usually

17   grant -- 1:15 -- and then we have an afternoon break and

18   then we go.  We will plan on -- usually the defense

19   argument is briefer than the plaintiffs.  But if it is --

20   whether it is or is not, I'll allot you 20 minutes for any

21   rebuttal.  You told me you wanted to make a fairly short

22   opening argument and more rebuttal.

23             MR. SIMMONS:  You are saying I get an hour and a

24   half and then 20 minutes on rebuttal?

25             THE COURT:  Yeah.

1          MR. SIMMONS:  That's sufficient.  I can do that.

2          THE COURT:  Or you can take 20 minutes for your

3    opening and use the rest for your rebuttal.  I don't care.

4    That's how much you got.

5          MR. ALSTON:  It is an hour and a half in the

6    aggregate, Your Honor?

7          THE COURT:  No.  Because he has got the burden

8    of proof, it is traditional to give additional time to the

9    plaintiff.

10         MR. ALSTON:  That's fine, Your Honor.

11         THE COURT:  Plus my experience is that the

12   defense is usually briefer than the party with the burden

13   of proof.

14         MR. ALSTON:  I will be.

15         THE COURT:  As far as the merits are concerned,

16   I think it is all plaintiffs' burden of proof, unlike the

17   statute of limitations.

18         Okay.  Do you have any further questions for me

19   from the plaintiff?

20         MR. SIMMONS:  No, Your Honor.

21         THE COURT:  From the defense?

22         MR. ALSTON:  No, Your Honor.  But I would like

23   to clarify one thing.  That is, I was earlier

24   acknowledging that Steve Case was at the top of a very

25   short chain of agents.  I was not saying that Mr. Case was

1    the alter-ego of anybody or anything.  I wouldn't want to

2    be quoted for that -- have my remarks quoted back in the

3    future for that purpose.

4              THE COURT:  We are only talking about ALPS and

5    this transaction.

6              MR. ALSTON:  I understand.  Thank you.

7              THE COURT:  That's all that is relevant here.

8              Okay.  Thank you.

9              Thank you for your cooperation throughout the

10   trial.  I am glad we got it done in a timely fashion.

11             (Recess.)

--oOo--


           I certify, by signing below, that the foregoing

is a correct transcript of the record of proceedings in


/s/ Dennis W. Apodaca                    November 24, 2008

Dennis W. Apodaca, RMR
Official Court Reporter
1000 SW Third Avenue, Room 301
Portland, Oregon  97204
(503) 326-8182